<u>FOR PUBLICATION</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KATHLEEN BOWERS,

            Plaintiff,

    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, et al.,

           Defendants.

HON. JEROME B. SIMANDLE

Civil Action
No. 97-2600 (JBS)

**<u>OPINION</u>**

APPEARANCES:

Jennifer R. Clarke, Esq.
Barbara E. Ransom, Esq.
PUBLIC INTEREST LAW CENTER OF PHILADELPHIA
125 South Ninth Street, Suite 700
Philadelphia, PA 19107
     <u>and</u>
Richard L. Bazelon, Esq.
A. Richard Feldman, Esq.
Noah H. Charlson, Esq.
BAZELON, LESS & FELDMAN, P.C.
1515 Market Street
Suite 700
Philadelphia, PA 19102-1907
    Attorneys for Plaintiff

J. Freedley Hunsicker, Jr., Esq.
Daniel H. Aiken, Esq.
Kathryn Elizabeth Bisordi, Esq.
DRINKER, BIDDLE & REATH, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
    Attorneys for Defendant National Collegiate Athletic
    Association

John B. Langel, Esq.
Shannon Farmer, Esq.
BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP

1735 Market Street
51st Floor
Philadelphia, PA 19103-7599
     Attorney for Defendant Temple University

Jack Jay Wind, Esq.
Robert E. Margulies, Esq.
MARGULIES, WIND, HERRINGTON & KNOPF
15 Exchange Place, Suite 510
Jersey City, NJ 07302-3912
     Attorneys for Defendant University of Iowa

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

     This case arises out of Plaintiff's allegations that during
the 1995-1996 academic year, Defendants subjected her son to
unlawful discrimination on account of his learning disability.
After its protracted history, this eleven-year old case is
finally set for trial.  Presently before the Court are a series
of in limine motions filed by Defendants: (1) Defendants' motion
to dismiss Plaintiff's case as a sanction for having failed,
until recently, to produce various expert-witness-related
documents that Plaintiff was required to disclose to Defendants
under the terms of a discovery Order that had been entered on
September 15, 2004 [Docket Item 450]; and (2) Defendants' motions
in limine under Rule 702, Fed. R. Evid., to exclude the testimony
of Plaintiff's four expert witnesses, Drs. Roberts, O'Brien,
Stodden, and Hishinuma [Docket Items 385, 386, 395, and 400].[1]

_____

     [1] The parties have filed a series of additional in limine
motions, which the Court will address in a separate, forthcoming
Opinion.

Mindful of the repeated admonition of the Court of Appeals that "[d]ismissal must be a sanction of last, not first, resort," Poulis v. State Farm Fire and Cas. Co., 747 F.2d 863, 869 (3d Cir. 1984), the Court will deny Defendants' motion for dismissal sanctions.  At the same time, as the Court explains below, it finds extremely troubling Plaintiff's multiple failures of disclosure, until the eve of trial and after oral arguments on the parties' expansive in limine motions, of numerous draft expert reports and correspondence that Plaintiff was required, under the terms of an unambiguous 2004 Discovery Order, to produce for Defendants more than three years ago.  With regard to Drs. O'Brien and Stodden, the Court finds that Plaintiff's belated disclosure has not only prejudiced Defendants, but has supplied additional reasons indicating that many of those experts' opinions are insufficiently reliable under Rule 702, Fed. R. Evid., to be admissible at trial.

As to Plaintiff's remaining experts, Drs. Roberts and Hishinuma, the Court finds that Defendants have not been prejudiced by Plaintiff's belated disclosure, and that no discovery sanction is called for.  The Court will grant in part and deny in part Defendants' motions to exclude those experts' testimony under Rule 702, as is explained in detail below.

## II.   BACKGROUND

### A.   Michael Bowers

The facts and procedural history of this case have been discussed in detail in numerous opinions issued by this Court and the Court of Appeals, and the following summary reviews only those facts that pertain to the instant motions.  At issue in this action are the policies of the NCAA pertaining to the initial eligibility of student athletes for participation in Division I intercollegiate athletics programs as they existed in 1995-1996, when Plaintiff's late son, Michael Bowers ("Bowers"),[2] submitted an application to the NCAA Initial-Eligibility Clearinghouse (the "Clearinghouse"), the organization responsible for assessing the eligibility of potential student athletes to participate in college sports.  The late Michael Bowers was an excellent high school football player at Palmyra High School who sought to play college football in a top-echelon intercollegiate football program.  Most of Michael Bowers' high school courses were in special education classes rather than college-preparatory courses, and Plaintiff alleges that Michael suffered from a disability.

At the time of the 1995-1996 school year, the Clearinghouse

---

[2]  Plaintiff Kathleen Bowers' son, Michael, was the initial plaintiff in this case.  Michael Bowers died as the result of a drug overdose in June 2002 and his mother has been substituted as Plaintiff.

reviewed students' applications and placed applicants into one of three categories: qualifier, partial qualifier, or nonqualifier. In brief, Plaintiff alleges that her son was designated as a nonqualifier largely on account of his high school special education curriculum, that such a designation discriminated against him on account of his learning disability, and that the designation negatively impacted his opportunity to receive an athletic scholarship.

In the fall of 1996, after the football scholarship and recruiting opportunities dried up, Bowers enrolled at Temple University as a commuter student, although he did not begin taking classes that semester because he was scheduled to have back surgery.  In the spring 1997 semester, Bowers earned a 3.63 GPA at Temple and made the Dean's List.  By November 1997, however, Bowers' life had taken a turn for the worse: he complained to his physician about being depressed about breaking up with his girlfriend and was prescribed antidepressant medication, and his grades began to drop and he failed to complete several courses and dropped out.

In addition, Bowers had started to abuse drugs.  Bowers was prescribed numerous painkillers between 1996 and 1997 in order to treat the pain he experienced as a result of a back injury, and ultimately, he became addicted to these medications and started obtaining them illegally.  In addition, by August 1998, Bowers

started using cocaine and heroin.  For nearly four years, Bowers received treatment for his substance abuse and mental health problems, and in June 2002, he died as a result of a drug overdose.  His undisclosed drug abuse and treatment occurred while substantial discovery was underway in this case, including his own depositions and several examinations by Plaintiff's proposed experts, as discussed below.

**B.   Procedural History**

Bowers filed the original Complaint in this case on May 23, 1997 [Docket Item 1], alleging that the NCAA and the Clearinghouse had violated Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132, 12182, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Plaintiff subsequently amended the Complaint to assert additional claims based on the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1, et seq., and to name Temple University, the University of Iowa, and the American International College as defendants.

Nearly seven years after this action was initiated – and after considerable discovery and motion practice and numerous decisions by the District Court and the Court of Appeals – and after Michael Bowers died, Plaintiff disclosed to Defendants for first time that Bowers had a substance abuse problem. Thereafter, Defendants moved for the imposition of sanctions in

the form of dismissal, arguing that they had been prejudiced as a result of Plaintiff's concealment of Bowers' substance abuse and drug treatment.  On March 21, 2005, the Court issued an Opinion and Order that imposed preclusion sanctions upon Plaintiff. Specifically, the Court found that because

> Defendants lack the practical ability to question Mr. Bowers about the full extent and duration of his drug abuse, and thus suffer irreparable prejudice, the records that have belatedly been supplied to Defendants in and after May 2004 must be deemed conclusive and unopposed by Plaintiff.  Plaintiff shall be precluded from disputing the facts shown by direct and circumstantial evidence in the records of Mr. Bowers's drug abuse and severe depression, and Plaintiff shall be precluded from arguing that gaps in these records give rise to some favorable inference in opposition to summary judgment.

Bowers v. National Collegiate Athletic Ass'n., No. 97-2600, 2005 WL 5155198, *12 (D.N.J. Mar. 21, 2005), overruled in part by 475 F.3d 524 (3d Cir. 2007).  The Court then addressed Defendants' motion for summary judgment in light of the discovery sanctions it had imposed and determined that the evidence warranted the entry of summary judgment in Defendants' favor.  Id. at *16.

Plaintiff appealed the March 21, 2005 Opinion and Order, and on February 1, 2007, the Court of Appeals issued its decision affirming in part and reversing in part this Court's Order.  With regard to the question of preclusion sanctions, the Court of Appeals found that

> [a]llowing any information regarding Bowers' substance abuse to be introduced posthumously by Bowers for her own advantage would thus be patently unfair to Defendants, who were clearly blind-sided by that evidence.  As a

7

result, we find the District Court did not abuse its discretion in issuing preclusion sanctions with respect to Bowers' drug use.

. . . .

[However, u]nlike Bowers' drug problems, which would have been readily revealed had he disclosed his treatment with Dr. Gooberman, Defendants were not blind-sided by evidence that Bowers had suffered from depression.

. . . .

While Bowers' depression certainly may have become aggravated by and intertwined with his drug abuse at some point, we believe the two can be disentangled for purposes of establishing damages in this case . . . Consequently, we conclude the District Court's blanket preclusion of evidence related to depression reflects a clearly erroneous assessment of the evidence in record and was thus an abuse of discretion. We will therefore affirm the sanctions order of the District Court only insofar as it precludes Bowers, in proving damages, from using evidence of his drug abuse and drug abuse-related depression.

Furthermore, we reverse the sanctions order insofar as it precludes Bowers from opposing Defendants' claim that Michael Bowers' drug abuse rendered him unqualified to participate in a program of intercollegiate athletics at all relevant times.

Bowers v. National Collegiate Athletic Ass'n, 475 F.3d 524, 541-

42 (3d Cir. 2007) (internal quotations and citations omitted).

The Court of Appeals also determined that a triable question of

fact existed as to whether Bowers was a qualified individual with

a disability at the time when Defendants allegedly discriminated

against him, and thus reversed the Court's entry of summary

judgment as to Plaintiff's ADA, Rehabilitation Act, and NJLAD

claims.[3]  Id. at 537.

After the matter was remanded, this Court denied Plaintiff's motion to compel the production of additional discovery, see Bowers v. National Collegiate Athletic Ass'n, No. 97-2600, 2008 WL 1757929 (D.N.J. Feb. 27, 2008), and scheduled a trial date of June 30, 2008.  The parties filed numerous in limine motions, including Defendants' motions to exclude the testimony of Plaintiff's four expert witnesses under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), on which the Court heard oral argument at hearings convened on April 25, 2008 and May 19, 2008 and reserved decision.

## C.  Recent Allegations of Attorney Misconduct

On the eve of trial, scheduled for June 30, 2008, and after oral arguments on the parties' in limine motions were heard on April 25, 2008 as well as at an all-day session on May 19, 2008, Plaintiff's attorneys informed the Court and Defendants that they had failed to disclose certain draft expert reports and correspondence that they had been obligated to produce under a Discovery Order issued by Magistrate Judge Rosen on September 15, 2004.  Defendants filed a new motion for sanctions in which they

---

[3]  The Court of Appeals also found that Plaintiff's attorneys did not have notice of the fact that sanctions were sought against them as well as against Plaintiff.  Bowers, 475 F.3d at 544-45.  Defendants have since filed a motion for sanctions against Plaintiff's counsel, and, with the consent of the parties, the Court has adjourned its consideration of this matter until after the completion of the trial on the merits.

argue that Plaintiff's case should be dismissed on account of
Plaintiff's counsel's failure to timely disclose these
materials.[4]  The Court then convened oral argument on this motion
for sanctions and supplemental argument upon the impacts of these
disclosures upon the Daubert in limine motions on June 18, 2008,
for several hours.  The relevant facts surrounding the newly
disclosed draft reports, and the allegations of misconduct
underlying Defendants' motion, are summarized below.

### 1.   Magistrate Judge Rosen's Discovery Order

On September 15, 2004, Magistrate Judge Rosen entered an
Order pertaining to the parties' discovery obligations.  This
Order, entered in the wake of the revelation that Plaintiff had
concealed evidence of Bowers' drug abuse, was broad in scope and
aimed at shedding light upon Bowers' previously undisclosed
substance abuse history.  The Order provided, inter alia, that

> each expert designated by a party in this case is
> required to produce notes and other written records (1)
> of communication with Michael Bowers and Kathleen Bowers
> or (2) that were created, considered, or reviewed in any
> manner in connection with the experts' engagement as an
> expert in the instant litigation including examination of
> Michael Bowers, evaluation of Michael Bowers, or
> preparation of any expert report.

(Defs.' Br. Ex. A at 2.)  The Order plainly required disclosure
of correspondence and emails between Plaintiff's counsel and the

---

[4]  Additionally, Defendants filed supplemental briefs in
support of three pending in limine motions, arguing that the
belatedly disclosed documents impact those motions, which the
Court has also considered, see Part III.B, below.

expert witnesses, as well as all drafts of reports created by the
experts or by counsel.  In the fall of 2004, following the entry
of Magistrate Judge Rosen's Order, counsel for Plaintiff reviewed
their hard copy files, (Bazelon Decl. ¶¶ 15-16), and produced for
Defendants the experts' reports, documents relied upon by the
experts, some correspondence between Plaintiff's counsel and the
experts, two drafts of the report prepared by Dr. Roberts, and
the experts' notes.  (Clarke Decl. ¶ 8; Ransom Decl.  ¶¶ 3-4.)
Importantly for present purposes, defense counsel prepared for
deposition and deposed Plaintiff's experts in December 2004 in
reliance upon the completeness of these expert witness materials.

2.   <u>Failure to Produce Expert Materials and<br>Circumstances of Eventual Disclosure</u>

It is now apparent that in the two months preceding the
entry of Magistrate Judge Rosen's Order, Plaintiff's counsel
received numerous drafts of the reports by Drs. O'Brien, Stodden,
and Hishinuma that were not timely produced to Defendants
following the entry of that Order.  With regard to Dr. O'Brien,
Plaintiff's counsel received a draft on July 29, 2004, provided
feedback to Dr. O'Brien on August 1, and received a copy of Dr.
O'Brien's final report on August 2. (Bazelon Decl. ¶¶ 3, 7-8.)
Mr. Bazelon "simply did not call to mind" Dr. O'Brien's July 29
draft when Magistrate Judge Rosen ordered that such materials be
produced on September 15, 2004.  (<u>Id.</u> at ¶ 16.)  As a result of
similar "inadverten[ce]," (Ransom Decl. ¶ 17), Plaintiff's

11

counsel likewise failed to produce numerous drafts they had received from Drs. Stodden and Hishinuma in August of 2004.

Plaintiff's counsel have represented that they first became aware of the possibility that they had failed to fully comply with the terms of Magistrate Judge Rosen's Discovery Order on Saturday, May 17, 2008, when Jennifer Clarke, Executive Director of the Public Interest Law Center of Philadelphia, was preparing for oral argument on the in limine motions, which was to take place on Monday, May 19, 2008.  (Clarke Decl. ¶ 2.)  According to Plaintiff's counsel, by the time of the May 19 hearing, the attorneys still had not been able to ascertain whether the documents had or had not been produced, and they chose to proceed with the May 19 arguments without informing the Court or Defendants of the possible non-production in order to determine whether, in fact, such a discovery violation had occurred. (Id. at ¶ 7.)  Between May 17 and May 22, Plaintiff's counsel assessed the scope of the discovery violation.  (Id.)

On May 22, 2008, after the Court had heard oral argument on the parties' pending in limine motions, including Defendants' Daubert motions aimed at excluding the testimony of Plaintiff's experts, counsel for Plaintiff, Richard Bazelon, Esq., sent via facsimile a letter to the Court and to defense counsel stating that

> [i]n connection with the oral arguments in the in limine
> motions this week, a review of the files of the Public

12

> Interest Law Center of Philadelphia and Bazelon Less &
> Feldman revealed a number of non-final expert reports
> which inadvertently were not previously produced to
> defendants.  In addition, several communications were
> identified which might come within the scope of Judge
> Rosen's Order dated September 15, 2004 . . .

(Def.'s Br. Ex. C.)  The letter further noted that the documents

would promptly be provided to Defendants, and that "Plaintiff's

counsel will offer to reimburse defense counsel for the time

spent at any supplemental depositions, and will also compensate

the experts for their time."[5]  (Id.)

In an affidavit submitted in opposition to Defendants'

motion – twenty days after the May 22, 2008 letter – one of

Plaintiff's attorneys indicated that Plaintiff's counsel had

likewise discovered additional documents relating to the expert

report of Dr. Hishinuma that Plaintiff had been required to

produce.  (Clarke Dec. ¶ 13.)  Upon defense counsel's request,

Plaintiff produced copies of email correspondence between Dr.

Hishinuma and Barbara Ransom, one of Plaintiff's attorneys,

(Defs.' Reply Br. Ex. V); this correspondence indicates that Dr.

Hishinuma exchanged drafts of his report with Plaintiff's

counsel, but the attorneys were, for a time, unable to locate the

drafts in their electronic files.  (Defs.' Reply Br. Exs. U and

---

[5] The parties' memoranda suggest that Defendants have
rejected Plaintiff's offer to re-depose any of the expert
witnesses, instead seeking total dismissal of Plaintiff's case or
alternatively, preclusion of each expert witness whose draft
report was not timely disclosed.

V.)  By June 18, 2008, the date when the Court convened a hearing to hear oral argument on Defendants' motion for sanctions, Plaintiff had produced additional documents,[6] previously undisclosed, relating to all four of her experts' reports, including four drafts of Dr. Hishinuma's report.  Almost all of the June 18th production of expert documents were created within several months before an after their disclosures were ordered in the September 15, 2004 Order.

## III. DISCUSSION

### A.   Motion for Sanctions

Defendants have moved the Court to dismiss Plaintiff's case as a sanction for what they argue was the attorneys' bad faith violation of Magistrate Judge Rosen's Discovery Order.  In the alternative, they argue, under Rule 37(c)(1), F. R. Civ. P., that the Court should exclude the testimony of the experts whose draft reports were not produced as a sanction for the discovery violation.  Defendants further argue that the Court should sanction Plaintiff's counsel for their failure to comply with the Discovery Order, although the parties have agreed to postpone argument on this issue until after the conclusion of the trial.

_____

[6]  Plaintiff's counsel produced four more groups of Bates stamped documents defense counsel and furnished them to the Court at the June 18th hearing, namely, documents that should have been produced to defense counsel under the September 15, 2004 Order with respect to Dr. O'Brien (BO 0001-0048), Dr. Stodden (BS 0001-0093), Dr. Hishinuma (BH 0001-0060), and Dr. Roberts (0001-0012).

Plaintiff admits that her attorneys' mistake violated the terms of the Discovery Order, but argues that the nondisclosure was inadvertent and insufficiently prejudicial to warrant the imposition of such drastic sanctions.  According to Plaintiff, alternative sanctions – including the re-deposition of Drs. O'Brien and Stodden at Plaintiff's attorneys' expense, and the imposition of sanctions on the attorneys themselves – are available in this case, making the dismissal sought by Defendants an unnecessarily heavy-handed remedy.

The Court addresses the appropriateness of dismissal and alternative sanctions after setting forth the standards governing the imposition of such sanctions as set forth by the Court of Appeals.  As the following discussion makes clear, there is substantial overlap between the standards governing the imposition of dismissal sanctions and the exclusion of witness testimony as a sanction for discovery violations.

    1.   <u>Standards for Sanctions Under *Poulis* and *Pennypack*</u>

It is well-settled that district courts are empowered to dismiss cases in which a party or its attorney has engaged in serious litigation misconduct.  <u>See</u> <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 46 (1991).  In a frequently quoted opinion, one district court in this Circuit noted that

> [t]he inherent power [to dismiss a case] arises from the very nature of the judicial institution, and is incidental and necessary to the fair and efficient operation of the courts.  Thus, the power of the courts

> to impose silence, decorum, and respect, and to require
> submission to rules of fair play is universally
> acknowledged to be vested in courts so as to achieve the
> orderly and expeditious disposition of cases.

Derzack v. County of Allegheny, 173 F.R.D. 400, 411 (W.D.Pa. 1996), aff'd without op., 118 F.3d 1575 (3d Cir. 1997) (citations and quotations omitted).

As the Court of Appeals has repeatedly emphasized, however, the entry of dismissal as a discovery sanction is a "drastic" approach, Poulis, 747 F.2d at 867, that is "disfavored absent the most egregious circumstances." United States v. $8,221,877.16 in U.S. Currency, 330 F.3d 141, 161 (3d Cir. 2003) (citation omitted). In Poulis, the Court of Appeals expressed its concern that the use of dismissal as a sanction could create an "atmosphere in which the meritorious claims or defenses of innocent parties are no longer the central issue," and indicated that "[d]ismissal must be a sanction of last, not first, resort." Poulis, 747 F.2d at 867, 869.

The Poulis court established a six-factor balancing test that courts in this Circuit must apply when addressing a motion for dismissal sanctions. The Court must consider:

> (1) the extent of the party's personal responsibility;
> (2) the prejudice to the adversary caused by the failure
> to meet scheduling orders and respond to discovery; (3)
> a history of dilatoriness; (4) whether the conduct of the
> party or the attorney was willful or in bad faith; (5)
> the effectiveness of sanctions other than dismissal,
> which entails an analysis of alternative sanctions; and
> (6) the meritoriousness of the claim or defense.

16

Id. at 868 (emphasis omitted).  While the appropriateness of dismissal is not contingent upon the satisfaction of all six factors in a given case, "the resolution of any doubts [must be] in favor of adjudication on the merits." $8,221,877.16 in U.S. Currency, 330 F.3d at 162 (citation omitted).

The Court of Appeals has instructed district courts to employ similar caution in contemplating the exclusion of a witness' testimony as a sanction for the violation of a discovery order.  "Rule 16(f)[, F. R. Civ. P.,] enables a judge to sanction a party in violation of a pre-trial or scheduling order.  Upon finding a violation, a judge may, for example, preclude expert witness testimony."  Exxon Corp. v. Halcon Shipping Co., Ltd., 156 F.R.D. 589, 591 (D.N.J. 1994).  In Meyers v. Pennypack Woods Home Ownership Ass'n, the Court of Appeals articulated four factors for courts to consider in assessing the appropriateness of such sanctions:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.

559 F.2d 894, 904-05 (3d Cir. 1977); see also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791-92 (3d Cir. 1994).[7]

---

[7]  The sanctions question in Pennypack arose in the context of a party's failure to timely identify a trial witness.  In this

2.   <u>Application to this Case</u>

a.   <u>Plaintiff's Personal Responsibility</u>

The first <u>Poulis</u> factor – Plaintiff's personal responsibility for the misconduct in question – weighs against dismissal.  There is no suggestion from any evidence before the Court that Kathleen Bowers was personally responsible for her attorneys' negligence, and Defendants do not argue that Plaintiff was personally culpable.  (Bazelon Decl. ¶ 42.)  In <u>Poulis</u>, the court made clear that a party's "lack of responsibility for [her] counsel's dilatory conduct is not dispositive, because a client cannot always avoid the consequences of the acts or omissions of its counsel." <u>Poulis</u>, 747 F.2d at 868 (citation omitted).  As Plaintiff notes, however, the Court of Appeals has "increasingly emphasized visiting sanctions directly on the delinquent lawyer, rather than on a client who is not actually at fault." <u>Adams v. Trustees of New Jersey Brewery Employees' Pension Trust Fund</u>, 29 F.3d 863, 873 (3d Cir. 1994) (quoting <u>Carter v. Albert Einstein Medical Ctr.</u>, 804 F.2d 805, 807 (3d Cir. 1986)).  Plaintiff's lack of personal responsibility for her attorneys' conduct thus

_____

case, Defendants knew the identities of Plaintiff's experts, but argue that Plaintiff's violation of Magistrate Judge Rosen's Discovery Order and extremely belated disclosure of expert materials prejudiced their capacity to test the reliability of the experts' methods and to prepare adequately for trial.  The Court finds that <u>Pennypack</u>'s considerations regarding the exclusion of belatedly disclosed expert testimony govern its evaluation of whether such sanctions are in order here.

weighs against the dismissal of her case.  Her attorneys were
delinquent, but Plaintiff herself was not.

        b.   <u>Prejudice to Defendants</u>

     Under <u>Poulis</u> and <u>Pennypack</u>, a critical consideration is
whether the discovery violation has resulted in prejudice to the
moving party.  As the Court of Appeals has noted, in the
discovery violation context, prejudice "does not mean
'irremediable harm,'" but, rather, "the burden imposed by
impeding a party's ability to prepare effectively a full and
complete trial strategy is sufficiently prejudicial." <u>Ware v.
Rodale Press, Inc.</u>, 322 F.3d 218, 222 (3d Cir. 2003); <u>see</u> <u>also</u>
<u>Curtis T. Bedwell and Sons, Inc. v. International Fidelity Ins.</u>,
843 F.2d 683, 693 (3d Cir. 1988).  However, in light of <u>Poulis</u>'
requirement that less onerous sanctions be imposed if such lesser
sanctions are capable of curing the moving party's prejudice,
<u>Poulis</u>, 747 F.2d at 868, the Court recognizes that the severity
of the prejudice caused by the violation should be proportional
to the sanction imposed in an effort to cure that prejudice.

     The Court must therefore examine whether, and to what
extent, Defendants have been prejudiced by Plaintiff's belated
disclosure of expert witness materials.  According to Defendants,
Plaintiff's failure to make timely disclosure of her experts'
reports deprived Defendants of the opportunity to "test the
substance" and "independence" of some of her experts' opinions,

<u>Trigon Ins. Co. v. United States</u>, 204 F.R.D. 277, 289-90 (E.D.
Va. 2001), which has impaired their capacity to effectively
litigate their <u>Daubert</u> motions.[8]  See <u>Reed v. Binder</u>, 165 F.R.D.
424, 430 (D.N.J. 1996) (noting that "[n]othing causes greater
prejudice than to have to guess how and why an adversarial expert
reached his or her conclusion").  The Court's evaluation of the
prejudice engendered by Plaintiff's discovery violation thus
requires an examination of the relationship between the
undisclosed expert materials and the Defendants' ability to have
addressed the admissibility of the experts' opinions under Rule
702, F. R. Evid., and <u>Daubert</u>.[9]

           i.   <u>Dr. O'Brien</u>

     Dr. O'Brien, a psychiatrist and professor of psychiatry who
also has a law degree, was retained by Plaintiff to assess
Bowers' psychiatric condition and whether Plaintiff suffered from
any psychiatric difficulties as a result of Defendants' alleged

---

     [8]  Defendants have not identified any prejudice that they
have experienced as a result of Plaintiff's failure to disclose
materials relating to the report of Dr. Roberts, and the Court
has discerned none.

     [9]  In addition to the arguments they raise regarding
Plaintiff's discovery violations, Defendants argue that the
experts' opinions are inadmissible irrespective of Plaintiff's
counsel's negligence.  Defendants' motions to exclude the
experts' testimony on Rule 702 grounds are addressed <u>infra</u>,
including various impediments to the reliability of expert
methodology and the application of that methodology to the facts
and circumstances of this case as revealed by some of these new
documents.

discrimination.  (Pl.'s Opp'n Br. Ex. 1-B.)  Dr. O'Brien
conducted a psychiatric examination upon Bowers over the course
of two days on December 22, 2001 and March 13, 2002, and based
his diagnosis upon his examination, as well as his review of
documentary evidence ranging from Bowers' medical records to his
educational records to the transcripts of the testimony of
various witnesses in this case.  (Id. at 1-12.)

Dr. O'Brien concluded that Bowers suffered from Major
Depressive Disorder beginning in November 1997 following the
court's denial of Bowers' motion for a preliminary injunction in
this case, and that his depression was caused by Defendants'
alleged discrimination.  (Id. at 13-14.)  In concluding that
Bowers was depressed in 1997 – four years before Dr. O'Brien
conducted his evaluation – Dr. O'Brien relied upon Bowers'
medical records, which indicated that Bowers exhibited depressive
symptoms during a visit to his physician, Dr. Switenko, in
November 1997.  (Id. at 3.)

Defendants argue, and the Court agrees, that the belated
disclosure of Dr. O'Brien's draft report prejudiced Defendants'
ability to test the reliability of Dr. O'Brien's methodology
under Daubert.  As is explained below, the very aspects of Dr.
O'Brien's report upon which Plaintiff relied in defending Dr.
O'Brien's diagnosis were not even included in the draft report,
appearing only after Dr. O'Brien consulted with Mr. Bazelon.

21

Defendants' inability to question Dr. O'Brien about the
independence and reliability of his opinions was prejudicial
within the meaning of <u>Poulis</u> and <u>Pennypack</u>.

In their motion challenging the admissibility of Dr.
O'Brien's diagnosis under Rule 702,[10] Defendants argued that
although Dr. O'Brien purported to apply the diagnostic criteria
set forth in the American Psychiatric Association's Diagnostic
and Statistical Manual IV ("DSM-IV") in rendering his diagnosis
of Bowers' depression, he failed to account for alternative
causes of Bowers' depression-related symptoms, which is required
under the DSM-IV in order to reliably diagnose Major Depressive
Disorder.[11]  Specifically, Defendants argued that under the DSM-

---

[10]  The Court explains, <u>infra</u>, the requirements for the
admission of expert testimony under <u>Daubert</u> and Rule 702.  In
brief, Rule 702 provides that:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably
> to the facts of the case.

F. R. Evid. 702.

[11]  The negation of alternative causes of an illness is also
required under the terms of Rule 702 itself.  <u>See</u> <u>Yarchak v. Trek
Bicycle Corp.</u>, 208 F. Supp. 2d 470, 497 (D.N.J. 2002) ("When
offered for the purpose of proving specific medical causation, a
meaningful or reliable differential diagnosis must specifically
negate other alternative possible causes.").

IV, such a diagnosis requires the examiner to find, <u>inter</u> <u>alia</u>, that the subject's "symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) . . ." (Defs.' Br. Ex. H at 327.)  Defendants argued that Dr. O'Brien failed to adequately account for evidence in Plaintiff's medical records suggesting that Bowers was addicted to prescription painkillers in November 1997 when he exhibited symptoms of depression.  (Def.'s Br. Ex. K.)  Under the terms of Dr. O'Brien's own methodology, Defendants argued, his diagnosis that Bowers suffered from Major Depressive Disorder in 1997 was not reliable due to his failure to account for such a potential alternative cause of Bowers' symptoms.

In her opposition to Defendant's motion to exclude Dr. O'Brien's testimony, Plaintiff argued that Dr. O'Brien had

> [good] grounds for concluding that the painkillers did not cause [Bowers'] depression: his good academic performance in Spring and Summer 1997, the Spring 1997 medical examination showing a lack of drug use or addiction and the November 1997 medical records which, while recording symptoms, did not record any clinical concerns about addiction.

(Pl.'s Opp'n Br. 31.)  As the belated disclosure of Dr. O'Brien's draft report reveals, however, the majority of the facts upon which Dr. O'Brien purportedly relied in concluding that Bowers' use of painkillers did not cause his depressive symptoms in 1997 were absent in his draft report, and appeared only after Dr.

23

O'Brien spoke with Mr. Bazelon in early August, 2004.[12]  (Bazelon
Decl. ¶¶ 3, 7-8.)  Specifically, Dr. O'Brien's draft report
contained no reference to Bowers' drug-free medical examination
in the spring of 1997.  (Pl.'s Opp'n Br. Ex. 1-C at 2.)
Likewise, only after Dr. O'Brien spoke with Mr. Bazelon did his
report make reference to the fact that Dr. Switenko's medical
records did "not document any clinical concern th[at] Mr. Bowers
had developed or was developing an addiction to opiate
medication."[13]  (Id. at 3.)

    The Court agrees with Defendants that Plaintiff's discovery
violations adversely affected their capacity to explore and
contest the reliability of Dr. O'Brien's diagnosis of depression.
The potential impact that Plaintiff's counsel may have had on
shoring up the grounds for Dr. O'Brien's diagnosis is a
quintessential deposition topic, and it likewise goes to the

---

    [12]  Indeed, Dr. O'Brien's second report is replete with
references to evidence documenting the chronology of Bowers' use
of painkillers which were not present in the draft report.
(Pl.'s Opp'n Br. Ex. 1-C at 2-3.)

    [13]  Additionally, as Defendants argue, in his draft report,
Dr. O'Brien did not opine that actions by Temple or Iowa were
causally linked to Bowers' depression, but in his final report,
after Mr. Bazelon asked him to opine on "whether the University
of Iowa and/or Temple University had also engaged in
discrimination against Plaintiff," (Bazelon Decl. ¶ 9), Dr.
O'Brien concluded, without additional analysis, that Iowa and
Temple had also caused Bowers' depression.  This addition, made
at the request of Plaintiff's attorney, would also presumably
have been the subject of deposition questioning and Daubert
arguments, had Plaintiff complied with the terms of the Discovery
Order.

heart of Defendants' Daubert motion.[14]  See, e.g., Reed, 165
F.R.D. at 430; cf. Viterbo v. Dow Chemical Co., 826 F.2d 420, 423
n.2 (5th Cir. 1987) (noting that "an expert who forms an opinion
before he begins his research is biased and lacking in
objectivity").  The inability of Defendants to question Dr.
O'Brien at his deposition about the draft report not only
prejudiced their ability to litigate their Daubert motion, but
also may have impacted their ability to cross-examine Dr. O'Brien
about the contrast between the two reports at trial.  See Occulto
v. Adamar of New Jersey, Inc., 125 F.R.D. 611, 615 (D.N.J. 1989)
(observing that "an expert who can be shown to have adopted the
attorney's opinion as his own stands less tall before the jury
than an expert who has engaged in painstaking inquiry and
analysis before arriving at an opinion").  The Court accordingly
finds that Plaintiff's failure to disclose Dr. O'Brien's draft
report resulted in prejudice to Defendants within the meaning of
Poulis and Pennypack.[15]

---

[14]  Plaintiff is correct that, as a general matter, it is
not improper for an attorney to inform an expert about the scope
of topic about which he has asked the expert to opine.  The point
here is not necessarily that Plaintiff's counsel influenced the
contents of Dr. O'Brien's report, but that Defendants were
deprived of the opportunity to assess whether or not such
influence occurred, and were thus ill-equipped to test the
independence of Dr. O'Brien's opinions.

[15]  As the Court explains, infra, this prejudice would not
appear to be easily cured by Plaintiff's proposal to have
Defendants re-depose Dr. O'Brien.  When Defendants initially
deposed Dr. O'Brien in 2004 - less than five months after he

ii.  <u>Dr. Stodden</u>

Defendants argue that they were also prejudiced by
Plaintiff's failure to disclose draft reports produced by another
of Plaintiff's expert witnesses, Dr. Stodden, as well as certain
correspondence between Dr. Stodden and Plaintiff's counsel.  Dr.
Stodden, a professor at the College of Education at the
University of Hawaii, was retained by Plaintiff to testify as to
the experience of disabled students in secondary and
postsecondary educational settings.  (Pl.'s Opp'n Br. 3-C at 1.)
Plaintiff belatedly disclosed to Defendants certain
correspondence between Dr. Stodden and Plaintiff's counsel prior
to the completion of Dr. Stodden's report, as well as a draft the
report itself.

In arguing that they were prejudiced by Plaintiff's failure
to disclose the Stodden expert materials, Defendants point to
several differences between the recently disclosed draft and the
final report.  First, Defendants note that in his final report,
but not the draft, Dr. Stodden included a discussion explaining

---

received substantive suggestions from Mr. Bazelon about the
contents of his report, (Bazelon Decl. ¶ 9) — Dr. O'Brien
testified that he did not recall Mr. Bazelon or Ms. Ransom
providing him with any comments on his report.  (O'Brien Dep.
156.)  His recollection can hardly be expected to have improved
over the course of the last four years.  Dr. O'Brien's disclaimer
of consultation with Mr. Bazelon was demonstrably incorrect and
implausible.  An experienced forensic psychiatrist with legal
training, Dr. O'Brien could not have forgotten about the
extensive consultation and revision process in which he engaged
in this case just a few months before his deposition.

the extent to which both Temple University and the University of
Iowa offer support services for students with disabilities.
(Pl.'s Opp'n Br. 3-C at 3-4.)  This addition appears to have been
made in response to an August 19, 2004 letter from Plaintiff's
counsel to Dr. Stodden requesting that Dr. Stodden discuss in his
report "what Temple and Iowa were doing for students with
disabilities," and providing "research materials" on the
universities' disability resources.  (Defs.' Br. Ex. J.)  Second,
while in his draft report, Dr. Stodden opined that the NCAA's
policies tended to "screen out or catch" disabled applicants,
(Pl.'s Opp'n Br. 3-A at 9), Dr. Stodden re-emphasized this point
in his final report by adding a phrase stating that the NCAA's
data "failed to provide any support to the need for the
[Clearinghouse] to screen out potential student athletes with
learning disabilities to improve retention and completion data."
(Pl.'s Opp'n Br. Ex. 3-C at ¶ 15.)  Third, Defendants note that
Dr. Stodden's final report, but not the draft, contains two
paragraphs summarizing his conclusions.  (Id. at 18.)

        Initially, the Court disagrees with Defendants that they
experienced any prejudice as a result of being unable to depose
Dr. Stodden about the second and third distinctions between the
draft and final reports referenced by Defendants and summarized
above.  Dr. Stodden's opinion that the NCAA's policies tended to
screen out disabled applicants and the contents of his summary of

27

conclusions, though perhaps phrased more emphatically in the
final report, were plainly evident in his initial drafts.  (Id.
at 14-18.)  Defendants thus were able to depose Dr. Stodden about
these matters with the materials available to them, and suffered
little to no discernable prejudice with regard to these issues.

However, for substantially reasons similar to those set
forth in its discussion of Dr. O'Brien, supra, the Court finds
that Defendants were prejudiced as a result of the belated
disclosure of Dr. Stodden's draft report, to the extent that they
were unable to question Dr. Stodden during his deposition about
the fact that Dr. Stodden's opinions about the resources
available at Temple and Iowa for learning disabled students was
absent in his earlier drafts.  See Reed, 165 F.R.D. at 430;
Occulto, 125 F.R.D. at 615.  His later inclusion of these
opinions appears to be based on nothing more than information
supplied by Plaintiff's counsel, which defense counsel were
unable to explore in the earlier deposition.

### iii. Dr. Hishinuma

Finally, Defendants argue that they were prejudiced as a
result of Plaintiff's belated disclosure of drafts and
correspondence relating to the production of Dr. Hishinuma's
expert report.  Defendants focus specifically on Plaintiff's
failure to disclose a draft of Dr. Hishinuma's report dated

28

August 22, 2004, (BH 0033),[16] and an email from Plaintiff's counsel to Dr. Hishinuma dated August 27, 2004, (BH 0011), in which counsel posed a series of questions to Dr. Hishinuma for him to answer and work into the report.  Defendants argue that Dr. Hishinuma's final report reflected his incorporation of this input from counsel, and that they were prejudiced as a result of their inability to depose Dr. Hishinuma about the origins and independence of his opinions.  Defendants devote particular attention to arguing that Dr. Hishinuma's discussion in his final report about beneficial impact that statistical research has on policy formation was absent in his draft report, and appeared only after Plaintiff's counsel instructed him to insert such a section in the report.  (BH 0012.)

If Dr. Hishinuma's opinion about the importance of such statistical research had not been apparent in his draft report, Defendants' arguments concerning the prejudice engendered by the nondisclosure of the Hishinuma materials would be forceful, as the Court's discussion of Drs. O'Brien and Stodden, supra, make clear.  However, upon carefully considering the differences

---

[16]  As the Court explained, supra, the extent of Plaintiff's discovery violation was not fully understood even as the parties commenced their motion practice, and as such, many of the draft expert reports and correspondence were not included as exhibits in any party's motion.  At the June 18, 2008 hearing, Defendants delivered to the Court additional documents that Plaintiff had produced earlier in the week.  In referring to these documents, the Court cites to the Bates stamp numbering contained on the documents themselves.

between Dr. Hishinuma's draft and final reports, the Court does
not find that Defendants were prejudiced by the belated
disclosure of the Hishinuma materials.  Dr. Hishinuma's opinions
concerning the importance of statistical research to policy
formation were not, as Defendants argue, added in the wake of Ms.
Ransom's August 27, 2004 email, but were instead readily apparent
in his August 22, 2004 draft report.  (BH 0043-0047.)  While Dr.
Hishinuma appears to have reorganized the contents of his reports
between the August 22, 2004 draft and the final report, the final
report does not appear to contain opinions that were not evident
in the draft reports.  Defendants were not deprived of the
opportunity to test the independence of Dr. Hishinuma's opinions,
because the opinions appeared consistently in the draft and final
reports.

As to the belated disclosure of the Hishinuma materials,
then, the Court finds that Defendants were not meaningfully
prejudiced by Plaintiff's discovery violation.

### c.   History of Dilatoriness

Poulis' third factor calls upon the Court to determine
whether the party that committed the discovery violation has "a
history of dilatoriness."  Poulis, 747 F.2d at 868.  Defendants
are correct that this factor weighs in favor of dismissal.
Plaintiff's effort to characterize the extremely aggravated
discovery misconduct Bowers perpetrated earlier in this case as a

30

"single prior instance . . . in a case that has been pending for eleven years," (Pl.'s Opp'n Br. 27), strains credibility, not only in light of the seriousness of the violation, but also in light of the fact that Bowers' misconduct plays no small part in the fact that this case has been pending for so long.  See Bowers, 475 F.3d at 540 ("The District Court was clearly correct in finding that the failure by Bowers to turn over information regarding his subsequent treatments with physicians for drug addiction from Fall 1998 until his death was willful and in bad faith.").  Because of Plaintiff's prior concealment of drug abuse, addiction and treatment, the parties, and ultimately the jury, are faced with the daunting and nearly metaphysical task of "disentangling" Mr. Bowers' drug dependence and drug-related depression from the depression Plaintiff now claims was substantially related to Defendants' alleged discriminatory conduct.

### d.   Willfulness or Bad Faith

The fourth factor under both Poulis and Pennypack addresses whether the party's failure to comply with discovery obligations was "willful or in bad faith."  Id.  The Third Circuit has made clear that in the context of discovery sanctions, willfulness and bad faith "involve[] intentional or self-serving behavior." Adams, 29 F.3d at 875.  By contrast, an attorney's "negligent behavior" or "failure to move with . . . dispatch" – even if

"inexcusable" – will not suffice to establish willfulness or bad faith.  Id. (citing Donnelly v. Johns-Manville Sales Corp., 677 F.2d 339, 342 (3d Cir. 1982).  "In the jurisprudence of dismissal, willfulness or bad faith is almost always required in order for dismissal to be within the proper scope of the court's discretion."  Estate of Spear v. C.I.R., 41 F.3d 103, 111 (3d Cir. 1994).

Whether the failure of counsel to disclose these draft expert reports was merely negligent or something more also requires examination of the context.  This non-disclosure violated Judge Rosen's Order of September 15, 2004, supra.  That Order was entered in the immediate wake of Plaintiff's startling disclosure of drug abuse that had started in the 1996-1997 period.  The breadth of Judge Rosen's Order was unusual, as it was clearly meant to ferret out all possible information that could shed light on Michael Bowers' concealed mental health and drug abuse history, as well as disability and depression.  This should have put Plaintiff's counsel on heightened alert to the significance of disclosing the documents at issue here, most of which were created within a few months before and after September 15, 2004, when this situation was so acute.

With these considerations in mind, the Court turns to the circumstances surrounding Plaintiff's discovery violation to determine whether they bear indicia of willfulness or bad faith.

32

First, the Court takes note of the unambiguous nature of the
Discovery Order at issue here.  Magistrate Judge Rosen directed

> each expert designated by a party in this case . . . to
> produce notes and other written records . . . that were
> created, considered, or reviewed in any manner in
> connection with the experts' engagement as an expert
> in the instant litigation including examination of Michael
> Bowers, evaluation of Michael Bowers, or preparation of
> any expert report.

(Defs.' Br. Ex. A at 2.)  There is no doubt that the experts'
draft reports fell within the scope of this Order, and, of
course, Plaintiff has not suggested otherwise.  Cf. ABB Air
Preheater, Inc. v. Regenerative Environmental Equipment Co.,
Inc., 167 F.R.D. 668, 672 (D.N.J. 1996) (indicating that where a
party's discovery obligation is ambiguous, sanctions are not
appropriate).  This Order was entered less than two months after
Plaintiff's counsel received at least nine draft reports from
three of Plaintiff's expert witnesses – one draft report from Dr.
O'Brien, four from Dr. Stodden, and four from Dr. Hishinuma.  The
proximity of Plaintiff's receipt of the drafts and the entry of
Judge Rosen's Order, as well as the sheer quantity of undisclosed
drafts, casts serious doubt upon Plaintiff's suggestion that the
nondisclosure was a mere oversight that happened to be repeated
several times over.

More important, in light of the Court of Appeals'
explanation that bad faith and willfulness "involve[] intentional
or self-serving behavior," Adams, 29 F.3d at 875, is the

33

misleading and inaccurate deposition testimony of Drs. O'Brien
and Stodden concerning the existence of draft reports and input
from Plaintiff's counsel, and the silence of Plaintiff's
attorneys following both witness' misleading testimony.  Just
four months after Dr. O'Brien produced a draft report to
Plaintiff's counsel and made substantive changes to the report
after speaking with Mr. Bazelon, (Bazelon Decl. ¶¶ 3, 9), Dr.
O'Brien gave the following deposition testimony:

> Q:   How many drafts of the report did you make before
>      you finalized the Exhibit 1?
>
> A:   Typically, a rough dictation is generated – a rough
>      report is dictated, typed up, transcribed from the
>      original dictation.  And then I review it, make
>      changes and try to identify the typographical
>      errors, although[] there are some still in the
>      actual final report.  And then it's returned to the
>      typist for correction.  So there's only one draft,
>      but it doesn't survive the corrections.  It's given
>      back to her and corrected and all I have is the
>      final.

(O'Brien Dep. 79.)  This testimony, given by a witness with
experience testifying as an expert (who is himself an attorney),
(id. at 127), plainly misrepresents the fact that Dr. O'Brien had
indeed produced a draft, which he had sent to Plaintiff's counsel
just months before he was deposed, and upon which he consulted
with counsel and produced substantial revisions.  The purpose of
Defendants' question – to assess "how and why an adversarial
expert reached his or her conclusion," Reed, 165 F.R.D. at 430 –
should have been clear to an experienced witness like Dr.

34

O'Brien, and would certainly have been apparent to Plaintiff's counsel.

Additionally, Dr. O'Brien testified at his deposition as to the feedback he had received from Plaintiff's counsel as follows:

Q.:  Did Mr. Bazelon or Barbara Ransom provide comments on your report?

A:  I don't recollect any, no.

(Id. at 156.)  It is now apparent, of course, that Dr. O'Brien did receive comments from Mr. Bazelon, (Bazelon Decl. ¶ 9), and that he made numerous substantive changes to his report after his conversation with Mr. Bazelon.  (Pl.'s Opp'n Br. Ex. 1-C.)

Similarly, Dr. Stodden, who likewise had exchanged drafts with Plaintiff's counsel and made substantive changes at the direction of Ms. Ransom in the months preceding his deposition testimony, (Defs.' Br. Ex. J), testified as to the input he had received in drafting his report:

Q:  Did you receive comments from either Mr. Bazelon or Ms. Ransom?

A:  Yes, I think I did.

Q:  And did you make changes in your working paper as a result of those discussions?

A:  Yes.  There were editorial changes that were made.

Q:  Would you show us on Exhibit Number 1, to the best of your recollection, where you made changes and what those changes were[?]

A:  To the best of my recollection, the changes were primarily edit changes, clarification of wording. That's probably the best I can do.

35

(Stodden Dep. 10.)  As the review of the changes Dr. Stodden made
between drafts makes clear, supra, Dr. Stodden made substantive
additions to his report at the request of Plaintiff's counsel;
these additions manifestly were not mere "editorial changes."
(Id.)  Such testimony was misleading because it concealed the
true nature of counsel's input and the witness's changes of
opinion to be offered in this case.

Taking account of the circumstances of the discovery
violations and the deposition testimony of Plaintiff's experts
O'Brien and Stodden, the Court is hard-pressed to conclude that
the collective silence of two attorneys and two experts as to the
input the experts received from the attorneys on their reports,
and the silence of the attorneys and Dr. O'Brien as to the
existence of his draft report, was simply the result of
negligence, or even "inexcusabl[y] negligent behavior."  Adams,
29 F.3d at 875.  It is not credible that Plaintiff's counsel did
not call to mind any of the drafts they received, any of the
conversations they had with their witnesses, or any of the
substantive feedback they had given over the contents of the
reports as they listened to their witnesses give misleading (or,
at absolute minimum, utterly inaccurate) testimony as to the
existence of draft reports and the changes the experts made in
response to attorney feedback.  The proximity of the receipt of
drafts to the entry of Judge Rosen's Order, the quantity of

drafts received, and the evident inaccuracy of Drs. O'Brien's and
Stodden's deposition testimony all undercut counsel's attribution
of their violation to mere inadvertence.  The Court is
constrained to find that the discovery violation at issue here
was the product of "intentional or self-serving behavior."  Id.

       e.   Availability of Alternative Sanctions

    The fifth Poulis factor requires the Court to assess the
availability of alternative sanctions short of dismissal, Poulis,
747 F.2d at 868, in recognition of the fact that "[d]ismissal
must be a sanction of last, not first, resort."  Id. at 869.
Similarly, Pennypack calls upon the Court to determine whether
the moving party has the ability to cure the prejudice that the
discovery violation has caused.  Pennypack, 559 F.2d at 904-05.

    The Court first notes that a sanction proportionate to the
prejudice caused by Plaintiff's violation is available in this
case, indicating that dismissal is not an appropriate sanction.
As the discussion of the prejudice caused by Plaintiff's
discovery violation indicates, supra, the prejudice caused by the
violation is limited to discrete subjects of proffered testimony.
Specifically, Plaintiff's belated disclosure of draft expert
reports deprived Defendants of the opportunity to test the
independence and reliability of Dr. O'Brien's opinion that Bowers
suffered from depression in November 1997 and Dr. Stodden's
opinion that Iowa and Temple made certain resources available to

learning disabled students.  The Court finds that a sanction targeting the specific proffered testimony, rather than dismissal of Plaintiff's claims, is appropriate under the circumstances of this case.

Plaintiff argues that the prejudice caused by her discovery violations could be cured by permitting Defendants to re-depose Drs. O'Brien and Stodden regarding the contents of their draft reports at Plaintiff's counsel's expense.  The Court does not find this to be an adequate solution.  First, Defendants already deposed Drs. O'Brien and Stodden about whether they created draft reports and whether they received substantive input from Plaintiff's attorneys.  Both experts gave what now appears to have been inaccurate and misleading testimony in response to these questions.  To give Plaintiff's witnesses a second crack at the same questions, with the expectation that this time the experts would give non-misleading answers, would hardly appear to be an appropriate means of redressing Plaintiff's counsel's discovery violations.  If these experts are to be given an opportunity to correct their deposition testimony, let it be before the jury who can assess the inconsistencies.

There are, as Defendants have argued, additional reasons to doubt the adequacy of re-deposing the witnesses as a cure to the prejudice caused by the discovery violation.  Whereas the initial depositions of Drs. O'Brien and Stodden took place in December

2004 – four months after they provided Plaintiff with draft
reports and received feedback – it is now four years since such
exchanges took place.  If Drs. O'Brien and Stodden had no
recollection of receiving substantive input from Plaintiff's
counsel in 2004, and making substantial changes to their own
opinions, their memories can hardly be expected to have improved
over the ensuing four years.  Indeed, as became clear at the June
18, 2008 hearing, even Mr. Bazelon has no independent
recollection of his August 1, 2004 conversation with Dr. O'Brien,
but has instead attempted to piece together the input he provided
"based on [his] comparison of the first paragraph of the July 29
draft report to the first paragraph of the final report."[17]
(Bazelon Decl. ¶ 9.)

    The Court finds that a sanction short of dismissal is
available to cure the prejudice caused by Plaintiff's discovery
violation in this case, but that Plaintiff's proposed sanction of
having Defendants re-depose Plaintiff's witnesses is not an
adequate alternative.  Instead, the Court finds that an
appropriate sanction capable of curing the prejudice Plaintiff's
violation has caused would be to exclude Dr. O'Brien's testimony

---

    [17]   Moreover, as Defendants have argued, at least one of
these two witnesses – Dr. O'Brien – has seen Defendants' Daubert
brief, and could thus anticipate the questions that Defendants
would be expected to ask at a second deposition.  Defendants
would accordingly be at a considerable disadvantage at a second
deposition, further suggesting the inadequacy of such a sanction
as a cure for the prejudice they have experienced.

that Bowers was depressed in November 1997 and Dr. Stodden's
testimony that Iowa and Temple provided services and resources to
learning disabled students.  It is upon the matter of the
reliability of these specific opinions, under Daubert and Rule
702, that Defendants were denied the opportunity to effectively
explore as a result of Plaintiff's discovery violation.  Apart
from Plaintiff's proposal that Defendants re-depose the
witnesses, the inadequacy of which the Court explained above, no
viable lesser sanction has been suggested.

>        f.   Meritoriousness of Plaintiff's Claims

The Court must finally consider the meritoriousness of
Plaintiff's claims.  Poulis, 747 F.2d at 868.  "A claim, or
defense, will be deemed meritorious when the allegations of the
pleadings, if established at trial, would support recovery by
plaintiff or would constitute a complete defense."  Id. at 869-70
(also noting that this is a lower standard than that used at
summary judgment).  Defendants do not seriously contest the
meritoriousness of Plaintiff's claims, and in light of the fact
that those of Plaintiff's claims that remain in the case have
survived summary judgment motions in the past, the claims may be
considered sufficiently arguable under Poulis for present
purposes.

>        g.   Analysis

As the preceding discussion indicates, the balance of the

<u>Poulis</u> factors reveals that dismissal is not an appropriate sanction to address Plaintiff's discovery misconduct.  Against the prejudice caused by the violation, the history of discovery violations in this case, and the willfulness of the violations presently under consideration weigh Plaintiff Kathleen Bowers' lack of personal responsibility for the violation, the availability of less onerous sanctions to cure Defendants' prejudice, and the arguable meritoriousness of Plaintiff's claims.  On balance, while Plaintiff's attorneys' failure to comply with the terms of Judge Rosen's Order has caused substantial inconvenience to Defendants and to the Court, the availability of alternative sanctions and the Court of Appeals' mandate that "[d]ismissal must be a sanction of last, not first, resort," <u>Poulis</u>, 747 F.2d at 869, require that Defendants' motion for dismissal sanctions be denied.

However, in light of the prejudice caused by the discovery violation, the history of prior discovery abuse by Plaintiff, the inability of Defendants' to cure that prejudice, and the strong indicia that the failure to disclose the expert materials was not the result of a mere oversight by counsel, the Court finds that a sanction targeting the prejudice the discovery violation has caused is necessary.  See <u>Pennypack</u>, 559 F.2d at 904-05; <u>see also</u>

Exxon Corp., 156 F.R.D. at 591.[18]  Plaintiff's failure to produce
the draft reports in accordance with Judge Rosen's Order, and the
less-than-forthcoming testimony of Drs. O'Brien and Stodden
concerning the existence of those drafts and the substantive
input of counsel on their reports, unfairly hindered Defendants'
ability to explore the reliability of Dr. O'Brien's opinion that
Bowers suffered from depression in November 1997 and Dr.

---

[18]  Pennypack, which arose in the context of a party's
failure to timely identify a trial witness until trial, addressed
"the extent to which waiver of the rule against calling unlisted
witnesses would disrupt the orderly and efficient trial of the
case or of other cases in the court," in addition to
considerations of prejudice, willfulness, and alternative cures
to prejudice.  Pennypack, 559 F.2d at 904-05.  This formulation
is not strictly relevant to the issues raised by Plaintiff's
discovery violation.

However, the Court notes, to the extent that Pennypack
invites considerations of the administration of justice, that the
extremely belated disclosure of expert materials in this case –
the full scope of which was not understood by the parties or the
Court even as motion practice on Defendants' sanctions motion was
well underway – has strained the Court's capacity to bring this
dispute to trial in an orderly fashion.  Plaintiff's deficient
compliance with discovery obligations has caused prejudice to the
administration of justice itself, making it extremely difficult
to adjudicate upon the shifting sands as previously undisclosed
material documents are revealed by Plaintiff's counsel.  The
impact, for example, upon the Court's ability to finalize its
opinions upon the Daubert motions pertaining to these same
witnesses, wherein these non-disclosures came to light after oral
arguments were heard in an all-day session, cannot be ignored.
Further consideration required redrafting of these Daubert-
related opinions herein, especially in part III.B, infra,
necessitating even more effort and some delay.  The discovery
sanction set forth above represents the Court's best effort to
mitigate the prejudice created by Plaintiff's discovery violation
and eve-of-trial revelations, while preserving Mrs. Bowers'
ability to bring this extensively litigated dispute to its long
overdue conclusion.

Stodden's opinions concerning the availability of resources for learning disabled students at Iowa and Temple.  The newly disclosed draft reports at minimum are strongly suggestive that both experts shored up their opinions after consulting with Plaintiff's counsel, a fact that Defendants would unquestionably have taken up in their depositions and Daubert motions had Plaintiff complied with her discovery obligations.  See Occulto, 125 F.R.D. at 615; Reed, 165 F.R.D. at 430; Viterbo, 826 F.2d at 423 n.2.

The prospect of reconvening the depositions of O'Brien and Stodden upon these new facets is untenable on the eve of trial of this eleven-year-old case, even at Plaintiff's expense; reconvening expert depositions where so much water is already under the bridge is not a suitable remedy of the pattern of non-disclosure of important discovery.  Nor should the Court be forced by Plaintiff's last-minute disclosures to reopen discovery and eventually reargument upon the Daubert in limine motions, lest this case, in its pretrial preparation, be literally without end.

Pursuant to Rule 16(f), F. R. Civ. P., the Court will accordingly exclude Dr. O'Brien's testimony regarding whether Bowers suffered from depression in November 1997 and Dr. Stodden's opinions concerning the availability of resources for learning disabled students at Iowa and Temple as a sanction for

Plaintiff's violation of Judge Rosen's Discovery Order.

**B.   Motions to Exclude Expert Testimony**

Aside from the sanctions motion discussed above, Defendants have moved to exclude the testimony of Drs. Roberts, Stodden, and Hishinuma on a variety of grounds.  The Court addresses Defendants' motions in turn after reviewing the standards governing the admission of expert witness testimony under the Federal Rules of Evidence.

1.   <u>Admissibility of Expert Testimony Under Rule 702</u>

The admissibility of expert witness testimony is governed by Rule 702, F. R. Evid., and the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F. R. Evid. 702.  As the Supreme Court explained in <u>Daubert</u>, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and methodologically reliable in order to determine whether it is admissible under Rule 702.  <u>Id.</u> at 590-91; <u>see also</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 146-47 (1999) (holding

44

that Daubert extends to testimony about "technical or other
specialized knowledge") (internal quotations and citations
omitted).

Under the law of this Circuit, Daubert and Rule 702 call
upon the Court to examine the admissibility of expert testimony
in light of three factors: the qualifications of the expert, the
reliability of his or her methodology and the application of that
methodology, and whether the testimony fits the matters at issue
in the case.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717,
741-43 (3d Cir. 1994).  With regard to the qualifications prong,
the Court of Appeals has explained that an expert's
qualifications should be assessed "liberally," recognizing that
"a broad range of knowledge, skills, and training qualify an
expert as such." Id. at 741 (also noting that "[w]e have
eschewed imposing overly rigorous requirements of expertise and
have been satisfied with more generalized qualifications").

In addition to being qualified to testify in an expert
capacity, an expert witness whose testimony is offered by a party
must base her opinions on reliable methodology.  The Court of
Appeals explained in Paoli that

> Daubert explains that the language of Rule 702 requiring
> the expert to testify to scientific knowledge means that
> the expert's opinion must be based on the methods and
> procedures of science rather than on subjective belief or
> unsupported speculation; the expert must have good
> grounds for his or her belief.  In sum, Daubert holds
> that an inquiry into the reliability of scientific
> evidence under Rule 702 requires a determination as to

its scientific validity.

Id. at 742 (internal quotations and citations omitted).
Recognizing that the "inquiry as to whether a particular
scientific technique or method is reliable is a flexible one,"
the Court of Appeals has identified a nonexhaustive list of eight
factors that courts may address in determining whether an
expert's methodology is reliable.[19]  Id.; see also Heller v. Shaw
Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999) (noting that
the factors identified in Paoli serve as "useful guideposts, not
dispositive hurdles that a party must overcome in order to
have expert testimony admitted"); Kannankeril v. Terminix
Intern., Inc., 128 F.3d 802, 806-07 (3d Cir. 1997) (noting that
the Paoli factors are "neither exhaustive nor applicable in every
case").

Finally, to be admissible under Rule 702, expert testimony
must "fit," or be relevant to, the facts at issue in the case.

---

[19]  The factors identified by the Court of Appeals for
assessing the reliability of an expert's methodology are:

(1) whether a method consists of a testable hypothesis;
(2) whether the method has been subject to peer review;
(3) the known or potential rate of error; (4) the
existence and maintenance of standards controlling the
technique's operation; (5) whether the method is
generally accepted; (6) the relationship of the technique
to methods which have been established to be reliable;
(7) the qualifications of the expert witness testifying
based on the methodology; and (8) the non-judicial uses
to which the method has been put.

Paoli, 35 F.3d at 742, n.8.

_Paoli_, 35 F.3d at 743.  "Because Rule 702 demands that the expert testimony assist the trier of fact, such testimony will be admissible only if the research is sufficiently connected to the facts and issues presented in a given case."  _Suter v. General Acc. Ins. Co. of America_, 424 F. Supp. 2d 781, 787 (D.N.J. 2006) (citing _Paoli_, 35 F.3d at 743).  In other words, Rule 702's relevance standard requires that there be "a valid scientific connection" between the expert's testimony and the facts and issues in the case in order for the expert's testimony to be admissible.  _Paoli_, 35 F.3d at 743.

As the Court of Appeals has made clear, the standard for admissibility under Rule 702 is "not that high."  _Id._ at 745.  Parties are not required to "prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are _correct_, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."  _Id._ at 743.

>           2.   Motion to Exclude Testimony of Dr. Roberts
>
>                a.   Dr. Roberts' Report

In connection with this litigation, Plaintiff retained Dr. Carol Roberts[20] to evaluate Bowers' cognitive and learning

---

[20]  Dr. Roberts is a senior staff psychologist at the Child Study Institute ("CSI") at Bryn Mawr College, and is the director of the CSI's Special Education Consultation Services program. (Pl.'s Opp'n Br. Ex. A at 2-3.)  She received her Ph.D. in education and child development in 1981 and has worked in the

difficulties.  Dr. Roberts conducted a psychological evaluation of Bowers between February 25, 1999 and September 19, 2000 in order to assess Bowers' "cognitive capabilities, learning strengths and weaknesses, and emotional state at this time" and to "form an opinion regarding the type of educational setting in which he will be most likely to experience success."  (Def. Br. Ex. A at 1.)

In preparing the evaluation, Dr. Roberts reviewed various documents, including Bowers' school records (including Individualized Education Plans, or "IEPs"); psychological reports and evaluations of Michael Bowers conducted on October 16, 1984, February 4, 1992, and February 21, 1995; and the transcripts of deposition testimony from numerous parties who have been deposed in this matter.  (Id.)  Over the course of three days, Dr. Roberts and her associates evaluated Bowers through a series of assessment tests and tools.[21]  (Id. at 5.)  Dr. Roberts concluded that Bowers suffered from serious cognitive and emotional

_____

field of child psychology ever since.  (Id. at 2.)

[21]  Dr. Roberts employed the following assessment tools: Wechsler Adult Intelligence Scale, Third Edition (WAIS-III); Wechsler Memory Scale, Third Edition (WMS-III); Rey Complex Figure Test (RCFT); Nelson-Denny Reading Test; Woodcock-Johnson Psychoeducational Battery, Revisited (WJR).  (Def. Br. Ex. A at 5.)  In addition, she employed the following tests: Wisconsin Card-Sorting Test; California Verbal Learning Test (CVLT); Minnesota Multiphasic Personality Inventory, Second Edition (MMPI); Rorschach Technique; and a clinical interview.  (Id.)  Dr. Roberts' report describes each of these tools and tests, and sets out Bowers' scores on each.  (Id. at 15-19.)

impairments, and indicated that Bowers' long-standing academic limitations had been exacerbated by the more recent onset of substance abuse and emotional problems.

b.   <u>Admissibility of Dr. Roberts' Opinions</u>

Defendants' motion to exclude the testimony of Dr. Roberts raises three issues.  First, they argue that Dr. Roberts' opinion as to whether Bowers had a learning disability is irrelevant to this case, since Dr. Roberts evaluated Bowers in 1999-2000 and cannot reliably testify as to whether Bowers had such a disability during the time period at issue in this case, namely 1995-1996.  Next, they argue that Dr. Roberts' opinions are unreliable, because Bowers was apparently using drugs at the time she conducted her evaluation of him.  Finally, Defendants argue that Dr. Roberts' opinions on causation and damages – to the extent that she offers any – are unreliable, and should likewise be excluded.

For the following reasons, the Court finds that Dr. Roberts' testimony on the subject of whether Bowers was disabled in 1995 and 1996 is admissible under Rule 702.  However, Dr. Roberts will not be permitted to testify as to causation or to Bowers' heightened level of impairment in 1999 and 2000 for the purpose of proving damages.

Dr. Roberts' opinion that Bowers had a learning disability in 1995 and 1996 is both relevant to the issues in this case and

49

derived from a reliable methodology.  First, the Court concludes that Dr. Roberts did offer an opinion that Bowers had a learning disability in 1995 and 1996, and that this opinion satisfies Rule 702's requirement that expert testimony fit the matters at issue in this case.  Had Dr. Roberts solely offered an opinion as to Bowers' disability in 1999 and 2000 without regard to whether the disability preexisted her evaluation, then Defendants would be correct in arguing that such an opinion would not meet Rule 702's fitness requirement.  See Suter, 424 F. Supp. 2d at 787 (under Paoli, expert testimony "will be admissible only if the research is sufficiently connected to the facts and issues presented in a given case").  Because, as Defendants correctly note, "the determination of whether a person was a 'qualified individual with a disability' . . . [is made] from the point at which the alleged discriminatory decision was made," Bowers, 475 F.3d at 535-36, the jury in this case, in determining Defendants' liability, will be called upon to decide whether Bowers had a learning disability in 1995 and 1996, not 1999 or 2000.  If Dr. Roberts' opinions as to Bowers' disability were temporally limited to the post-1999 period, then Defendants would be correct in arguing that such opinions fail to satisfy Rule 702's relevance requirement.

Contrary to Defendants' arguments, however, Dr. Roberts did not diagnose Bowers' learning disability in a vacuum.  Instead,

50

Dr. Roberts situated her diagnosis in the context of impairments that Bowers had exhibited since first grade, and over the course of this contextual analysis, she offered a relevant opinion that Bowers had a learning disability during the pertinent 1995-1996 period.  For example, when she was questioned during her deposition about the 1995 psychological evaluation of Bowers, Dr. Roberts emphasized the evaluation's notation that Bowers had been classified as learning disabled since first grade, stating that such a classification accurately described his condition in 1995:

> Q.  Based on his 1995 evaluation, what was Michael's disability?
>
> A.  . . . [I]n the beginning, [the evaluation] says he had been classified as learning disabled as a first grader.  There is the statement about what he is.

(Roberts Dep. 175-76.)

Dr. Roberts' opinion as to whether Bowers was disabled in 1995-1996 is likewise evident in her discussion of the continuity of at least some of Bowers' impairments from the time of his primary school evaluations through her evaluations in 1999 and 2000.  For example, in noting that her evaluation revealed "the same pattern of abilities identified in 1st grade," Dr. Roberts explained in her report that Bowers' score on the Rey Complex Figure Test – which tests a subject's visual/spatial analysis and synthesis – was well below average.  (Def. Br. Ex. A at 8.)  Dr. Roberts concludes from the results of this test that "the original identification of Michael as a Perceptually Impaired

51

student appears to have been quite appropriate." (Id.)
Additionally, as Plaintiff argues, in her deposition, Dr. Roberts
drew parallels between her 1999 and 2000 findings and the
impairments Bowers exhibited from elementary school through high
school. (Roberts Dep. 42, 48-49.) In short, in her evaluation,
Dr. Roberts linked at least some of the impairments she observed
in 1999 and 2000 to the perceptual limitations that Bowers
demonstrated from first grade through high school, making her
opinions about Bowers' disabilities relevant to the question of
whether Bowers was a qualified individual with a disability in
1995 and 1996.

In attempting to limit the scope of Dr. Roberts' opinions to
the 1999-2000 period, Defendants take portions of her deposition
testimony out of context and overstate the significance of other
deposition statements.[22] Defendants rely, for example, on Dr.
Roberts' concession that, hypothetically, a child who was
inappropriately diagnosed as learning disabled at an early age

_____

[22] It is worth noting that Plaintiff also mischaracterizes
Dr. Roberts' testimony. In arguing that Dr. Roberts testified
that an individual "never lose[s]" a learning disability,
(Roberts Dep. 187), Plaintiff takes a fragment of Dr. Roberts'
testimony entirely out of context and obscures its significance.
(Pl.'s Opp'n Br. 12.) Dr. Roberts did not testify that a
learning disability does not go away. In the testimony
referenced by Plaintiff, Dr. Roberts only opines that a person
does not "lose" a learning disability when it is compounded by
emotional difficulties. (Roberts Dep. 186-87.) Her deposition
testimony appears to be silent on the subject of whether it is
possible, as a general matter, for a learning disability to
disappear over time.

might later be found to be not disabled at a later age, (Defs.'
Reply Br. 6), to support their over-broad conclusion that Dr.
Roberts did not offer any opinion as to whether Bowers was
disabled during the relevant 1995-1996 time frame.  Defendants'
argument is belied by the fact, explained in detail above, that
Dr. Roberts expressly tied her 2000 diagnosis to impairments
Bowers exhibited throughout his childhood in both her report and
her deposition.[23]

Likewise, Defendants overstate the significance of Dr.
Roberts' admission that she could not pinpoint the exact date of
onset of Bowers' disability.  (Id. at 7.)  Contrary to
Defendants' reasoning, the mere fact that Dr. Roberts was unable
to identify the specific date when Bowers became disabled does
not mean that she declined to offer an opinion as to whether
Bowers was disabled prior to her evaluation.  Again, Defendants'
arguments are undermined by the basic fact that Dr. Roberts
expressly and repeatedly situated her 2000 diagnosis in the

_____

[23]   To the extent that Defendants argue that Dr. Roberts
cannot offer an opinion as to whether Bowers was disabled in
1995-1996 because she merely consulted his school and medical
records for that time period, rather than personally evaluating
him at that time, they are incorrect as a matter of law.  See
Paoli, 35 F.3d at 762 (noting that "evaluation of the patient's
medical records is a reliable method of concluding that a patient
is ill even in the absence of a physical examination"); see
also Kannankeril, 128 F.3d at 807 (stating that "a doctor needs
only one reliable source of information showing that a plaintiff
is ill; either a physical test or medical records will suffice
for this").

context of Bowers' history of perceptual impairments, and opined that Bowers was indeed learning disabled in 1995-1996.

Defendants' argument that Bowers' drug use rendered Dr. Roberts' opinions so unreliable as to the 1995-96 period as to be inadmissible is also without merit.[24]   It is true, of course, that where "the data underlying [an] expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." Montgomery County v. Microvote Corp., 320 F.3d 440, 448 (3d Cir. 2003) (internal quotations and citation omitted).   In this case, however, it is quite apparent that Dr. Roberts did not overlook the impact of Bowers' drug use on her evaluation.   To the contrary, Dr. Roberts specifically disregarded data that she thought might have been affected by Bowers' drug use, (Def. Br. Ex. A at 6), provided an explanation for her opinion that certain tests were impacted by Bowers' drug use while others were not, (id. at 11), and accounted for the potential impact of his substance abuse on the different components of her evaluation.

_____

[24]   Defendants do not appear to contest the reliability of the tests that Dr. Roberts employed to diagnose learning disabilities in general.   The fact that many of the same tests were employed by psychologists evaluating Bowers' impairments in first, eighth, and eleventh grades, in a non-litigation context, is indicative of the reliability of such methods.   See Paoli, 35 F.3d at 742, n.8 (including among the factors for assessing a methodology's reliability "whether the method is generally accepted[,] . . . [and] the non-judicial uses to which the method has been put").

(Roberts Dep. 56-57); see Yarchak, 208 F. Supp. 2d at 498 ("Where a physician has ruled out the most obvious alternative causes and offered a reasonable explanation for dismissing or discounting alternative possible causes identified by the defendant, the testimony should be admitted and questions regarding the credibility, accuracy, and weight of the testimony should be reserved for determination by the trier of fact") (citing Heller, 167 F.3d at 157).  In short, then, the Court finds that Dr. Roberts offered a reliable and relevant opinion as to whether Bowers had a learning disability in 1995-1996, and will permit her to testify as to this opinion at trial.

However, for the following reasons, Defendants' motion to exclude Dr. Roberts' testimony on the issues of causation and damages will be granted.  See Heller, 167 F.3d at 159 n.8 (recognizing that reliable portion of expert's testimony may be admissible while unreliable portion must be excluded).  With regard to causation, Plaintiff places great emphasis on a single sentence in Dr. Roberts' report stating that "it is likely" that the pressure of attending "a large metropolitan university[,] without the support of teammates and coaches[,] . . . contributed to Michael's depression."  (Def. Br. Ex. A at 4.)  Unlike her opinions as to whether Bowers' had a learning disability – for which Dr. Roberts explained her methodology and how she arrived at the conclusions she drew – Dr. Roberts' throwaway observation

that attending Temple without the supportive structure that
Bowers' football team provided contributed to his depression
appears to be based on little more than "subjective belief or
unsupported speculation." Paoli, 35
F.3d at 742.

There is no apparent connection between Dr. Roberts'
offhanded reference to causation of depression and the data and
methodologies she employed in assessing Bowers' learning
disability.  That is, while her methodologies may have been a
reliable means for diagnosing learning disabilities, nothing
suggests that they were also reliable for diagnosing the causes
of depression.  See Yarchak, 208 F. Supp. 2d at 495.  Most
critically, Dr. Roberts herself does not appear to have
considered her opinion regarding the causes of Bowers' depression
to have been anything more than speculation.  Dr. Roberts'
deposition testimony indicates unmistakably that she was
"offering no opinion on causation."  (Roberts Dep. 117-18.)
Based on the absence of evidence indicating that Dr. Roberts'
speculation into the cause of Bowers' depression is "based on the
methods and procedures of science," Paoli, 35 F.3d at 742, Dr.
Roberts' testimony on that issue will be excluded.

The Court will likewise exclude Dr. Roberts' testimony on
the subject of damages allegedly caused by Defendants' conduct.
As the Court discussed in detail, supra, in the wake of Bowers'

serious misconduct during discovery, this Court issued an order which, as was upheld by the Court of Appeals, "precludes Bowers, in proving damages, from using evidence of his drug abuse and drug abuse-related depression." <u>Bowers</u>, 475 F.3d at 541.  Dr. Roberts makes no apparent effort to disentangle the effects of Bowers' "drug abuse and drug abuse-related depression," <u>id.</u>, from the conglomeration of impairments that she documented in her 2000 report.  Her report, even read liberally, suggests no methodology for doing so.  Given that Dr. Roberts does not purport to identify which of Bowers' impairments were caused by his drug abuse and drug abuse-related depression, Plaintiff cannot offer her testimony on the issue of damages without running afoul of the sanctions order as it was upheld by the Court of Appeals. Moreover, the methodological framework that might make such an attempt reliable is not present.  Dr. Roberts' testimony on the issue of damages will therefore be excluded.

       3.   <u>Motion to Exclude Testimony of Dr. O'Brien</u>

As the Court explained in Section III.A, <u>supra</u>, it has determined that in order to address the prejudice caused by Plaintiff's counsel's failure to provide Defendants with the draft of Dr. O'Brien's expert report, in accordance with the September 15, 2004 Discovery Order, Dr. O'Brien will not be permitted to testify as to his opinion that Bowers was suffering from Major Depressive Disorder in November of 1997.  Prior to

learning of Plaintiff's counsel's discovery violations,

Defendants moved to exclude Dr. O'Brien's testimony regarding his

diagnosis of depression cause by their alleged misconduct on

account of Dr. O'Brien's failure to reliably apply a

scientifically sound methodology in rendering his diagnosis.  As

the following discussion makes clear, the Court agrees with

Defendants that Dr. O'Brien's diagnosis of Bowers' depression is

unreliable – and that this unreliability is especially evident in

light of the recently disclosed draft report – making his

testimony inadmissible under Rule 702, Fed. R. Evid., even if it

had not been excluded as a sanction for Plaintiff's discovery

misconduct.

     As the Court noted, <u>supra</u>, Dr. O'Brien is a psychiatrist who

was retained by Plaintiff to assess

> the presence or absence of any psychiatric, substance
> abuse, or cognitive disorder diagnosis in [Bowers]; the
> relationship, if any, between the onset or aggravation of
> such a diagnosis[] and the alleged discrimination
> [against] Mr. Bowers as a learning disabled student by
> the NCAA, University of Iowa, and Temple University
> beginning in September 1995.

(Pl.'s Opp'n Br. Ex. 1-B at 1.)  Dr. O'Brien conducted a

psychiatric examination upon Bowers over the course of two days

on December 22, 2001 and March 13, 2002, and based his diagnosis

upon his examination, as well as his review of various

documentary evidence, including Bowers' medical and educational

records.  (<u>Id.</u> at 1-12.)  Relying upon the diagnostic criteria

set forth in the DSM-IV, (O'Brien Dep. 129, 185-86), Dr. O'Brien opined that as of November 1997 – when Bowers first began to exhibit symptoms of depression – Bowers was suffering from Major Depressive Disorder, and determined that Bowers' "psychiatric condition and his substance abuse were a direct result of the discrimination against him as a learning disabled student by the NCAA during his senior year at Palmyra High School . . ."  (Pl.'s Opp'n Br. Ex. 1-B at 14.)

Defendants argue that Dr. O'Brien's opinion that Bowers was suffering from Major Depressive Disorder in November 1997 is not reliable, because it fails to adequately account for potential alternative causes of the psychiatric symptoms he experienced.[25] Specifically, Defendants argue that under the terms of Dr. O'Brien's own methodology – the requirements set forth in the DSM-IV – a reliable diagnosis of Major Depressive Disorder requires that the examiner find, among other things, that the patient's "symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication)." (Defs.' Br. Ex. H at 327.)  According to Defendants, the data upon which Dr. O'Brien relied in diagnosing Bowers' depression –

---

[25]  The notes of Dr. Switenko, Bowers' physician – whom Bowers visited in November 1997 and upon whose records Dr. O'Brien relied in reaching his diagnosis – indicate that in November 1997, Bowers experienced depression, anxiety, insomnia, loss of appetite, and anhedonia (meaning an inability to experience pleasure).  (Pl.'s Opp'n Br. Ex. H.)

his medical records – reveal that Bowers had already been abusing prescription painkillers in November 1997 when he first exhibited depressive symptoms; because Dr. O'Brien failed to adequately account for Bowers' prescription drug abuse during this period, Defendants argue, his diagnosis is unreliable under its own terms, (id.), and under Rule 702.  See Yarchak, 208 F. Supp. 2d at 497 ("When offered for the purpose of proving specific medical causation, a meaningful or reliable differential diagnosis must specifically negate other alternative possible causes.").

Plaintiff disputes Defendants' argument that Dr. O'Brien did not adequately account for Bowers' use of prescription painkillers in opining that Bowers was depressed in November 1997.  Specifically, Plaintiff argues that Dr. O'Brien had strong grounds for concluding that the painkillers did not cause

> grounds for concluding that the painkillers did not cause [Bowers'] depression: his good academic performance in Spring and Summer 1997, the Spring 1997 medical examination showing a lack of drug use or addiction and the November 1997 medical records which, while recording symptoms, did not record any clinical concerns about addiction.

(Pl.'s Opp'n Br. 31.)  In its discussion of Defendants' sanctions motion, supra, the Court explained that in his draft report, in which he reached the same conclusion about Bowers' depression as in his final report, Dr. O'Brien did not mention either Bowers' 1997 medical examination or the fact that his November 1997 medical records revealed no concerns about addiction.  (Pl.'s Opp'n Br. Ex. 1-C at 2-3.)  The implication from the fact that

60

Dr. O'Brien reached the same opinion regarding Bowers' depression without even mentioning most of the "grounds" now cited by Plaintiff renders completely implausible Plaintiff's suggestion that Dr. O'Brien relied upon those grounds in ruling out the likelihood that Bowers' use of painkillers caused his depression.

In addition to the fact that Dr. O'Brien made no initial mention of the considerations upon which he purportedly relied in ruling out the possibility that Bowers' prescription drug use caused his depression, the data upon which Dr. O'Brien relied does not support the conclusions he drew regarding Bowers' use of prescription medications.  See Yarchak, 208 F. Supp. 2d at 495 ("a court must engage in limited review of an expert's conclusions 'in order to determine whether they could reliably flow from the facts known to the expert and the methodology used'") (quoting Heller, 167 F.3d at 153).  More specifically, the data available to Dr. O'Brien simply does not support the chronology he constructs of Bowers' use and abuse of prescription medications to rule out the possibility that the abuse of such substances caused the symptoms Bowers exhibited in November 1997.[26]

---

[26]  Plaintiff argues that Dr. O'Brien's failure to reliably account for Bowers' use of painkillers and other medication "overlooks the distinction that both Dr. O'Brien and the Court of Appeals drew between the use of painkillers, which preceded the recorded signs of his clinical depression and the serious drug abuse, which followed."  (Pl.'s Opp'n Br. 31) (citing Bowers, 475 F.3d at 541) (noting that Bowers' "depression has been a

First, Dr. O'Brien's repeated statement that Bowers "was not prescribed opiate analgesic medications after November 1996," (Def.'s Br. Ex. F at 4), is belied by the records of Dr. Smolenski, which indicate that Bowers received such a prescription as late as March 6, 1997.  (Def.'s Br. Ex. C.)

More importantly, Bowers' medical records from the Seabrook House, a drug rehabilitation center, indicate that Bowers used Percocet "when not in pain" for one year beginning in January 1997, and that Bowers "felt addicted" to the drug.  (Def.'s Br. Ex. K.)  Dr. O'Brien does not offer any "reasonable explanation," Paoli, 35 F.3d at 760, for discounting the evidence of Bowers' ongoing use of opiate analgesic medications despite his purported

---

centerpiece of his claims for damages from the inception of this case, long before the clear onset of any substance abuse problems").  Plaintiff's argument misconstrues the Court of Appeals' holding and otherwise misses the point.  The Court of Appeals' language quoted by Plaintiff appeared in the context of its ruling on the scope of the sanctions that would be imposed upon Plaintiff for willfully concealing evidence of Bowers' drug use.  In reviewing the sanctions order, the Court of Appeals did not render a binding decision on the history of Bowers' use of painkillers.

Moreover, whether or not Dr. O'Brien "drew [a distinction] between the use of painkillers . . . and the serious drug abuse," (Pl.'s Opp'n Br. 31), Dr. O'Brien was required by the terms of his own methodology to account not only for serious drug abuse, but also the use of painkillers, in diagnosing Bowers' depression.  (Defs.' Br. Ex. H at 327) (under the DSM-IV, examiner must find that "the symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication)") (emphasis added).  The recognized methodology required Dr. O'Brien, in applying the recognized diagnostic criteria of DSM-IV for Major Depressive Disorder, to rule out medication as a cause of Michael Bowers' depressive symptoms, but he did not do so.

reliance on Bowers' medical records to construct the chronology of Bowers' drug use.  Dr. O'Brien did not, for example, identify any evidence that contradicts or casts doubt upon the Seabrook House's records; to the contrary, those records are largely consistent with Bowers' own statement to Dr. O'Brien that he took Percocet "daily for a period of a year both before and after [his back] surgery."[27]  (O'Brien Dep. 29.)

Finally, with regard to Plaintiff's argument that Dr. O'Brien "relied upon Temple's complete medical examinations in March 1997 that showed no evidence of substance abuse or dependence," (Pl.'s Opp'n Br. 9) – quite apart from the fact that Dr. O'Brien made no mention of this examination in his draft report, in which he rendered the same diagnosis of depression – the Court agrees with Defendants that the examination offers no support for Dr. O'Brien's opinion.  The March 1997 evaluation did not provide for a drug test, making it unsurprising that the exam "showed no evidence of substance abuse."  (Id.; Defs.' Reply Br. Ex. Q.)  Moreover, although Bowers received prescriptions for painkillers from Dr. Smolenski from January through March 1997, (Def.'s Br. Ex. C), he did not list any such medications on the form where it directs students to "List ALL Current Medications." (Defs.' Reply Br. Ex. Q at 6.)  Dr. O'Brien's purported reliance

---

[27]  Bowers had surgery on his back in November 2006. (Def.'s Br. Ex. F at 3.)

upon this examination – despite Dr. O'Brien's failure to mention it in his draft report – as evidence that Bowers had ceased taking painkillers thus casts even further doubt upon the reliability of his opinion.

As the preceding discussion indicates, the data upon which Dr. O'Brien supposedly relied in ruling out the role of Bowers' use and abuse of prescription painkillers on the symptoms Bowers exhibited in November 1997 does not support the opinion Dr. O'Brien drew from the data.  See Heller, 167 F.3d at 153.  Under Dr. O'Brien's own methodology – that is, the diagnostic criteria set forth in the DSM-IV – the "physiological effects of a substance (e.g., a drug of abuse, a medication)" must be discounted as a potential source of the subject's symptoms to support a reliable diagnosis of depression.  (Defs.' Br. Ex. H at 327.)  The timeline cited by Dr. O'Brien in ruling out the possibility that Bowers' abuse of painkillers caused his symptoms is not supported by the facts upon which he purported to rely.  Equally importantly, the recent disclosure of Dr. O'Brien's draft report undermines Plaintiff suggestion that he relied on such facts in rendering his opinion in the first place.  As the Court explained, supra, Plaintiff's statement of the grounds upon which Dr. O'Brien relied in ruling out Bowers' use of painkillers is further belied by the fact that the majority of those grounds were not referenced in Dr. O'Brien's newly disclosed draft

64

report, and did not appear until after Dr. O'Brien sent the draft
to Plaintiff's counsel and consulted with counsel about its
contents.  (Bazelon Decl. ¶¶ 3, 7-8.)

In summary, as a result of Dr. O'Brien's failure to reliably
rule out the possibility that Bowers' prolonged use and abuse of
painkillers caused the psychiatric symptoms that were documented
in November 1997, and the indication from the newly disclosed
draft report that Dr. O'Brien initially rendered his diagnosis
without addressing Bowers' use of painkillers whatsoever, the
Court agrees with Defendants that Dr. O'Brien's testimony is
inadmissible under Rule 702.

> 4.   Motion to Exclude Testimony of Dr. Stodden

Plaintiff seeks to introduce the testimony of Dr. Robert
Stodden, a professor at the College of Education at the
University of Hawaii with "more than thirty years of training and
experience focused on the preparation for and support of persons
with disabilities in secondary education and postsecondary
education settings."  (Defs.' Br. Ex. A at 1.)  Plaintiff intends
to offer Dr. Stodden's testimony on several topics which she
claims are relevant to matters at issue in this case.  Defendants
argue that Dr. Stodden lacks a reliable basis from which to opine
about several subjects of his proposed testimony, that many of
topics about which Plaintiff seeks to have Dr. Stodden testify
are not relevant to the issues in this case, and that Dr. Stodden

is not qualified to render a diagnosis as to Bowers' alleged
learning disability.  The proposed subjects of Dr. Stodden's
testimony, and Defendants' objections thereto, are addressed in
turn below.

a.   Criticism of NCAA Policies Pertaining to
Applicants' Special Education Coursework

The primary subject of Dr. Stodden's proffered testimony
appears to be his opinion that learning disabled students who
take special education courses in high school have the potential
to succeed in college, and that the NCAA's treatment of special
education curricula – as reflected in its initial eligibility
bylaws – was unnecessarily restrictive.  Dr. Stodden proposes to
testify about the preparation of students with disabilities in
secondary school settings under the Individuals with Disabilities
Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., and,
specifically, how that Act "ensured that students with Learning
Disabilities would attend high school with the provision of
appropriate services, supports, and accommodations to receive a
high school diploma."  (Defs.' Br. Ex. A at 2.)  Dr. Stodden also
proposes to testify about the resources that are available to
learning disabled students at institutions of higher education.[28]
In further support of his opinion about the potential of learning

---

[28]  As the Court explained, supra, Dr. Stodden's proposed
testimony as to the specific resources offered at the University
of Iowa and Temple University will be excluded as a result of
Plaintiff's violation of Judge Rosen's 2004 Discovery Order.

disabled students to succeed in college, Dr. Stodden criticizes the NCAA's claim that being an intercollegiate student-athlete imposes unique demands on students, arguing that "extracurricular activities and especially athletics are often the primary motivators for students to succeed academically." (<u>Id.</u> at 14.)

In their motion to exclude Dr. Stodden's testimony, Defendants attack the relevance and reliability of these opinions. First, with regard to Dr. Stodden's proposed testimony on the impact of the IDEA on the education of the disabled, Defendants argue that Dr. Stodden's report fails to "suggest that the IDEA or any developments under the IDEA are geared toward ensuring that prospective student-athletes can handle the combined rigors of intercollegiate athletics and academics during their freshman year of college." (Defs.' Br. 8.) As to Dr. Stodden's opinion about the availability of support and accommodations for the learning disabled in college, Defendants argue that the existence of accommodations aimed at assisting disabled college students "has nothing to do with the legitimacy of the NCAA's initial eligibility criteria for student-athletes." (<u>Id.</u> at 10.) Finally, Defendants argue that Dr. Stodden lacks a reliable basis to support his opinion that participation in athletics helps learning disabled students succeed academically, making his opinion speculative and inadmissible under <u>Daubert</u>.

For the following reasons, the Court will grant Defendants'

motion to exclude Dr. Stodden's testimony on the history and
impact of the IDEA, but permit Dr. Stodden to testify about the
support that is available to learning disabled college students
and the ability of such students to succeed in college.
Additionally, the Court will grant Defendants' motion to exclude
Dr. Stodden's opinion that participation in athletics motivates
learning disabled students to succeed academically.

First, with regard to Dr. Stodden's proffered testimony
about the IDEA's impact on the capacity of learning disabled high
school students to earn high school diplomas, his opinions on
this issue are too peripheral to the matters at issue in this
case be of assistance to the jury.  See Yarchak, 208 F. Supp. 2d
at 496 ("'Fit' requires that the proffered testimony must in fact
assist the jury, by providing it with relevant information,
necessary to a reasoned decision of the case") (citation
omitted).  As Defendants correctly note, there is no IDEA claim
in this case, and Plaintiff simply has not explained how Dr.
Stodden's testimony that the IDEA "initiated the process for
ensuring that children with disabilities would receive a Free and
Appropriate Public Education . . . within a Least Restrictive
Environment . . . for learning," (Defs.' Br. Ex. A at 2), will
assist the jury in determining whether Defendants discriminated
against Bowers.

Plaintiff's arguments would appear to suggest that Dr.

68

Stodden's testimony about the IDEA is relevant to whether Bowers
was an "otherwise qualified" individual under § 504 of the
Rehabilitation Act and related antidiscrimination statutes.  See,
e.g., Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d
113, 123 (3d Cir. 1998) (to establish a violation under the
Rehabilitation Act, a plaintiff must prove, inter alia, "that he
is 'otherwise qualified' for the position sought").  But neither
Dr. Stodden's opinions about the history and impact of the IDEA,
nor his vague speculation that the NCAA "did not understand" the
general nature of special education curricula under the IDEA,[29]
will help the jury to assess whether or how Bowers was qualified
to be a student-athlete in college.  (Defs.' Br. Ex. A at 16.)
This is because the characteristics of educational programming
under the IDEA that Dr. Stodden discusses – that such programming
is "individualized," that it occurs in the "least restrictive
environment," that it is not "quantifiabl[y] comparab[le]" to
other educational programming – simply do not bear on whether
Bowers was actually qualified to meet the academic expectations
of the intercollegiate athletics program.  (Id.)  That is, the
jury in this case will not be required to determine whether

_____

[29]  Dr. Stodden's report states, for example, that "it is
apparent that NCAA-IEC officials did not understand the
principles of 'least restrictive environment' and
'individualized' instruction as applied in secondary education
settings with students with disabilities (under the Individuals
with Disabilities Education Act)."  (Defs.' Br. Ex. A at 16.)

Bowers' secondary education was distinctive or customized, but whether it rendered him qualified for the intercollegiate athletics program.  Dr. Stodden's proffered testimony on school curricula under the IDEA does not address any issue that the jury in this case will be called upon to decide.

In short, Dr. Stodden's proffered testimony about the characteristics of educational programming under the IDEA is not "sufficiently connected to the facts and issues presented in [this] case" to be of assistance to the jury.  Suter v. General Acc. Ins. Co. of America, 424 F. Supp. 2d 781, 787 (D.N.J. 2006) (citing Paoli, 35 F.3d at 743).  His testimony on this matter will accordingly be excluded under Rule 702.

However, Defendants' motion to exclude Dr. Stodden's testimony about the accommodations and support that are available to learning disabled college students, and the success of such students in college, will be denied.  Unlike his discussion of the IDEA, which is not pertinent to the issues raised in this lawsuit, Dr. Stodden's testimony about the resources that colleges and universities employ to enable learning disabled students to succeed academically is relevant to the question of whether the NCAA's initial eligibility bylaws were "necessary for the provision of the . . . program . . . being offered."  28

C.F.R. § 35.130(b)(8).[30]  Defendants have defended the legitimacy of the NCAA's eligibility bylaws on the grounds that they help "ensur[e] that prospective student-athletes can handle the combined rigors of intercollegiate athletics and academics during their freshman year of college." (Defs.' Br. 8.)  Dr. Stodden's testimony regarding the accommodations that colleges make available to learning disabled students to help them to succeed academically will assist the jury in evaluating the extent to which the NCAA's eligibility criteria were necessary for the achievement of its stated objective.  Defendants' motion to exclude Dr. Stodden's testimony on this issue will thus be denied.

Finally, the Court will grant Defendants' motion to exclude Dr. Stodden's testimony that participation in college athletics helps learning disabled students succeed academically, as he

---

[30]  The quoted regulation – 28 C.F.R. § 35.130(b)(8) – explains the prohibitions against discrimination under Title II of the ADA, and is almost identical to the definition of discrimination contained in Title III of the ADA.  See 42 U.S.C. § 12182(b)(2)(A)(i).  While Plaintiff's claim against the NCAA is brought under section 504 of the Rehabilitation Act, "Congress has directed that Title II of the ADA be interpreted in a manner consistent with Section 504 . . . and all the leading cases take up the statutes together." Yeskey v. Com. of Pa. Dept. of Corrections, 118 F.3d 168, 170 (3d Cir. 1997).  See also Bowers v. National Collegiate Athletic Ass'n, 118 F. Supp. 2d 494, 533 n.34 (D.N.J. 2000) ("Bowers III") ("All parties agree that the 'otherwise qualified' and 'solely by reason of' analysis under the Rehabilitation Act is substantially similar to the 'qualified', 'by reason of' and 'discriminated against on the basis of disability' analysis under the ADA.")

lacks a reliable basis from which to advance this opinion.  When
questioned by the Court at oral argument regarding Dr. Stodden's
basis for this opinion, Plaintiff argued that Dr. Stodden's
experience regarding the provision of education to learning
disabled students afforded a reliable basis for Dr. Stodden to
offer this opinion.

The Court is not persuaded that Dr. Stodden's general
experience in the field provides a sufficiently reliable basis
for him to testify to something so specific as his opinion that
"extracurricular activities and especially athletics are often
the primary motivators for students to succeed academically."
(Defs.' Br. Ex. A at 14.)  Nothing in the record suggests that
Dr. Stodden has any experience working with disabled student-
athletes, and Dr. Stodden has not pointed to statistics or other
data to support his opinion. See Fed. R. Evid. 702 advisory
committee's note ("If the witness is relying solely or primarily
on experience, then the witness must explain how that experience
leads to the conclusion reached, why that experience is a
sufficient basis for the opinion, and how that experience is
reliably applied to the facts.").

Indeed, as Defendants argue, the recently disclosed
correspondence relating to Dr. Stodden's draft report indicates
that neither Plaintiff's counsel nor Dr. Stodden believed that
Dr. Stodden had a basis from which to reliably opine about the

impact of athletics on the academic success of learning disabled students.  In an email to Dr. Stodden, Plaintiff's counsel stated that she needed "an expert to round out your testimony – one who has expert[ise] or has done research on student athletes and/or student experts with disabilities."  (Defs.' Supp. Reply Br. Ex. F.)  Rather than suggesting that he had sufficient expertise to reliably opine on such a matter, Dr. Stodden stated only that he would "ask around on the student athletes with disabilities." (Id.)  The Court is not persuaded that Dr. Stodden has a reliable basis from which to offer an opinion on the correlation between participation in athletics and academic success among learning disabled college athletes, and will grant Defendants' motion to exclude his testimony on that subject.

> b.   Opinion that Michael Bowers had a Learning Disability

Plaintiff seeks to introduce Dr. Stodden's testimony that Bowers was learning disabled, which Dr. Stodden apparently formed by reviewing Bowers' school records and Individualized Education Plans ("IEPs").  (Defs.' Br. Ex. A at 15.)  Defendants argue that Dr. Stodden is not qualified to offer his opinion that Bowers had such a disability.  According to Defendants, Dr. Stodden, as an academician without a medical or clinical background, is not qualified to diagnose Plaintiff with a learning disability; Defendants cite numerous authorities so holding.  See, e.g., Gonzalez v. Nat'l Bd. Of Med. Examiners, 225 F.3d 620, 628 n.15

(6th Cir. 2000); <u>Bartlett v. New York State Bd. of Law Examiners</u>, No. 93-4986, 2001 WL 930792, at *37 n.48 (S.D.N.Y. Aug. 15, 2001).

Although an expert's qualifications should be assessed "liberally," <u>Paoli</u>, 35 F.3d at 741, Dr. Stodden is not qualified to testify as an expert on whether Bowers had a learning disability.  Courts evaluating whether an expert is qualified to diagnose a party with a learning disability consistently look to the psychological credentials of the expert.  <u>See</u>, <u>e.g.</u>, <u>Lanni v. New Jersey</u>, 177 F.R.D. 295, 302-03 (D.N.J. 1998); <u>Mancuso v. Consolidated Edison Co. of New York, Inc.</u>, 967 F. Supp. 1437, 1454-55 (S.D.N.Y. 1997).  This is because "in the final analysis, clinical and psychoeducational considerations must come together in a diagnosis of learning disability."  <u>Mancuso</u>, 967 F. Supp. at 1455 (quoting one of the "definitive text[s]" on diagnosing learning disabilities, Jerome M. Sattler, <u>Assessment of Children's Intelligence and Special Abilities</u> 400 (2d ed. 1988)).

Plaintiff's own description of Dr. Stodden's qualifications – that he is a "national leader in the conduct of training, technical assistance, and research on secondary education, transition, and postsecondary educational supports for persons with disabilities" who serves as the "principal investigator for programs that impact persons with developmental disabilities" for the United States Department of Education, (Pl.'s Opp'n Br. 2-3)

– indicates that Dr. Stodden's expertise is in the fields of pedagogy and educational programming, not in the clinical or medical fields.  He thus lacks the expertise to render a diagnosis of whether Bowers had a learning disability, and his opinion testimony on this issue will be excluded.[31]

### c.  Speculation into Motives and Bias of the NCAA and its Employees

Finally, Defendants correctly note that throughout his report, Dr. Stodden makes a series of speculative and conclusory statements regarding the "assumption[s]," (Defs.' Br. Ex. A at 14), "bias[es]," (id. at 15), "attitudes," (id. at 17), and motives of the NCAA and its employees.  It is abundantly apparent that Dr. Stodden does not have a reliable basis from which to speculate as to the subjective considerations that informed the NCAA's decision-making.  At the heart of Rule 702's reliability criterion is the requirement that "the expert's opinion must be grounded in scientific procedures and methods, as opposed to

---

[31]  Plaintiff argues that Dr. Stodden's opinion about Bowers' learning disability should be admissible because he testified consistently with this opinion at his deposition, and his opinion would thus come as "no surprise" to Defendants.  This argument misses the point entirely.  Dr. Stodden's opinion that Bowers had a learning disability is inadmissible because Dr. Stodden lacks the "knowledge, skill, experience, training, or education" to render such an opinion, regardless of whether or not his opinion would come as a surprise to the defendants.  F. R. Evid. 702.  Dr. Stodden's remaining testimony may assume that Michael Bowers had a learning disability if other competent evidence contains that diagnosis, but he may not himself become the witness who offers an opinion to establish that diagnosis.

'subjective belief or unsupported speculation.'" <u>Suter</u>, 424 F. Supp. 2d at 787 (quoting <u>Paoli</u>, 35 F.3d at 742) (in turn quoting <u>Daubert</u>, 509 U.S. at 590). Dr. Stodden does not have a reliable basis from which to testify about the assumptions and attitudes that motivated the NCAA's decisions in implementing and enforcing the initial eligibility bylaws.[32]

The reasoning of the Court of Appeals for the Seventh Circuit in <u>DePaepe v. General Motors Corp.</u>, 141 F.3d 715 (7th Cir. 1998), is directly on point. In that case, the plaintiff's expert, an engineer, testified that General Motors ("GM") had made the decision to reduce the amount of padding in its vehicles' sun visors because it wanted to save money. The court held that under <u>Daubert</u>, the engineer could not offer a reliable opinion as to the subjective considerations that motivated GM's decisions because

> the whole point of <u>Daubert</u> is that experts can't "speculate." They need analytically sound bases for their opinions. District courts must be careful to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than

---

[32] Dr. Stodden likewise lacks a reliable basis for his testimony regarding the reasons underlying the NCAA's denial of Bowers' eligibility waiver request. In his report, Dr. Stodden surmises that the NCAA based its decision to deny Bowers' waiver request on the inadequately informed opinion of its consultant, Professor Steven Colson, that Bowers was not learning disabled. (Defs.' Br. Ex. A at 15.) As Defendants note, however, Dr. Stodden did not review the NCAA's documentation of its waiver review, (Stodden Dep. at 38), and he thus lacks the basis from which to opine as to what considerations motivated the NCAA's waiver review decision.

it deserves.  [The expert] lacked any scientific basis
for an opinion about the motives of [GM's] designers.  He
could give an opinion as an engineer that reducing the
padding saved a particular amount of money; he might
testify as an engineer that [GM's] explanation for the
decision was not sound (from which the jury might infer
that money was the real reason); but he could not testify
as an expert that [GM] had a particular motive.  Because
[the expert] did not participate in the deliberations
leading to the design of the sun visor, he could not
testify as a fact witness on the subject, either.

DePaepe, 141 F.3d at 720.[33]  Dr. Stodden has no "analytically

sound bas[i]s" from which to testify about the NCAA's attitudes,

biases, motives, or assumptions, and his testimony on these

matters will be excluded.  Id.

     5.  Motion to Exclude Testimony of Dr. Hishinuma

     Finally, Defendants have moved to exclude the testimony of

Dr. Earl Hishinuma.  Dr. Hishinuma is a Professor and Associate

Chair of Research in the Department of Psychiatry at the

University of Hawaii's John A. Burns School of Medicine.[34]

------------------------------------

[33]  As one court recently observed:

An expert's first and most important duty is to testify
truthfully and accurately to the best of his ability and
leave the advocacy to the lawyers.  But because some
experts are misled by their attorneys, or even just
mistaken, about their role in litigation, courts must
continue to act as a gatekeeper in determining whether to
admit the testimony.

In re Methyl Tertiary Butyl Ether Products Liability, No.
1:00-1898, 2008 WL 1971547, *11 (S.D.N.Y. May 07, 2008).

[34]  Dr. Hishinuma's graduate work was in the fields of
experimental psychology, special education, and psycho-
educational assessment.  (Id.)  As is evident from his curriculum
vitae, Dr. Hishinuma has extensive experience in the areas of

(Pl.'s Opp'n Br. Ex. A.)  As with Dr. Stodden, Defendants have moved to exclude Dr. Hishinuma's testimony under Rule 702, F. R. Evid., arguing that his opinions are neither reliable nor relevant.  The reliability and relevance of Dr. Hishinuma's testimony are addressed in turn below.

            a.   Reliability of Dr. Hishinuma's Opinions

     In his lengthy report, Dr. Hishinuma sets forth a series of observations and conclusions about the NCAA's initial eligibility criteria and their impact on learning disabled applicants.  Dr. Hishinuma explains the beneficial impact that "large-scale, longitudinal research" can have on the formulation of "policies relating to the decision to restrict admission to an identifiable class of individuals."  (Defs.' Br. Ex. A at 2.)  Dr. Hishinuma opines that the absence of such research can result in the implementation of arbitrary and ineffective admissions criteria, which, he argues, is precisely what happened when the NCAA implemented the eligibility bylaws at issue in this case.  (Id. at 3-5.)  Based on testimony and other communications from NCAA officials, Dr. Hishinuma observes that the NCAA did not have adequate information about learning disabilities or special education courses before it implemented these bylaws, and that this information deficit led to the formulation of a flawed

_____

"Methodology, Statistics, & Assessment" and "Learning, Experimental, Developmental, Education, & Special Education." (Id.)

policy.  (Id. at 4-5.)

Among the shortcomings in the bylaws that Dr. Hishinuma identifies are: (1) the use of the SAT and ACT tests as predictors of college preparedness, when such use was not consistent with the purposes of those tests; (2) the failure to consider applicants' non-cognitive characteristics on a case-by-case basis; (3) the consideration of applicants' GPAs in core, but not non-core, courses; (4) the arbitrary selection of thirteen core courses; (5) the imposition of unnecessary hurdles for high schools seeking approval designations for special education courses; and (6) the employment of unqualified personnel to make assessments regarding the sufficiency of learning disabled applicants' high school curricula.  (Id. at 8-19.)

Dr. Hishinuma also opines that if the NCAA had employed more flexible, individualized standards that, inter alia, gave greater weight to Bowers' non-core courses, permitted Bowers' high school principal to designate special education courses as "core," and accounted for non-cognitive factors, Bowers could have met the NCAA's academic criteria.  (Id. at 19-22.)  In addition, Dr. Hishinuma opines that the NCAA's bylaws discriminated against students with learning disabilities, and discusses at significant length the "life span" of the Consent Decree between the NCAA and the Department of Justice between 1998 and 2003 (the "1998

79

Consent Decree"). (<u>Id.</u> at 22-26.)

According to Defendants, Dr. Hishinuma's report should be excluded in its entirety because it fails to set forth the methodology he employed in reaching his conclusions and thereby inhibits the Court's capacity to perform the gatekeeping role that <u>Daubert</u> calls for. Defendants argue that Dr. Hishinuma's report amounts to little more than a statement of "his own misgivings about the NCAA's rules," noting that Dr. Hishinuma did not conduct or rely upon an empirical study of how the NCAA's bylaws impact learning disabled students. (Defs.' Br. 7.)

Plaintiff argues that Dr. Hishinuma employed a reliable methodology and that his testimony is admissible under Rule 702. According to Plaintiff, Dr. Hishinuma's opinions stem from his review of the documents and data related to the NCAA's formulation and implementation of the bylaws at issue in this case, including the deposition testimony of NCAA officials, as well as the relevant literature pertaining to the academic success of learning disabled students in college, and his knowledge and experience in the field of disability education. Plaintiff argues that courts have admitted the testimony of social scientists employing analogous methodologies in the context of so-called "social framework analysis," citing <u>Dukes v. Wal-Mart, Inc.</u>, 222 F.R.D. 189 (N.D. Cal. 2004), in which the court explained:

> Dr. Bielby conducted a "social framework analysis" by combining an extensive review of documents and deposition testimony regarding Wal-Mart's culture and practices with his knowledge of the professional research and literature in the field.  This is an acceptable social science methodology.  Price Waterhouse v. Hopkins, 490 U.S. 228, 235-36 (1989) (considering similar evidence by an expert social psychologist); Fed. R. Evid. 702 (referring to "scientific, technical, or other specialized knowledge").

Dukes, 222 F.R.D. at 191-92; see also Pineda v. Ford Motor Co.,
520 F.3d 237, 248 (3d Cir. 2008) (recognizing that Daubert's list
of factors relating to the reliability of an expert's methodology
are "non-exhaustive" and that among the "factors for trial courts
to consider in evaluating [the] reliability [of testimony on
'technical' or 'other specialized' subjects are] relevant
literature [and] evidence of industry practice").

The Court will grant in part and deny in part Defendants'
motion to exclude Dr. Hishinuma's proffered testimony on account
of its alleged unreliability as follows.  As Daubert recognizes,
and Kumho and Pineda emphasize, the Court's analysis under Rule
702 is "a flexible one."  Daubert, 509 U.S. at 594.  Such
flexibility is necessary in the case of expert testimony based on
"'soft' social sciences":

> Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case".  Kumho Tire Co., 526 U.S. at 153.

United States v. Simmons, 470 F.3d 1115, 1123 (5th Cir. 2006)

(some internal quotations and citations omitted).  Standing
alone, the fact that a social scientist's approach might have
"inherent methodological limitations," id., and does not produce
"a testable hypothesis" or a "known or potential rate of error,"
Paoli, 35 F.3d at 742, n.8, does not necessarily render the
resulting testimony unreliable under Rule 702.  Instead, the
Court must perform its gatekeeping assessment on measures of
reliability that are appropriate to the particular testimony in
question.  See, e.g., Milanowicz v. The Raymond Corp., 148 F.
Supp. 2d 525, 536 (D.N.J. 2001) (noting that "courts should
determine whether an expert has supported his conclusions through
discussion of the relevant literature") (cited approvingly in
Pineda, 520 F.3d at  248 ); Paoli, 35 F.3d at 742, n.8 ("the
qualifications of the expert witness testifying based on the
methodology" bear on the reliability analysis).[35]

As Plaintiff notes, Dr. Hishinuma's opinions are largely
based on his review of data, documents, and testimony relating to
the NCAA's policies, literature in the field of disability
education, and his own knowledge and experience in the areas of
special education and quantitative methodology.  This is not

_____

[35] This discussion does not, of course, suggest that a non-
scientific expert's testimony is subjected to less rigorous
standards of reliability.  See, e.g., Watkins v. Telsmith, Inc.,
121 F.3d 984, 991 (5th Cir. 1997).  It merely emphasizes that the
reliability analysis under Rule 702 must be sufficiently flexible
to account for different types of expertise.

cutting-edge science, but is instead a conventional social science approach that courts have routinely admitted as methodologically reliable.  See, e.g., Arnold v. Cargill, Inc., No. 01-2086, 2006 WL 1716221, *6-*7 (D. Minn. June 20, 2006); E.E.O.C. v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 461-62 (S.D.N.Y. 2004); Dukes, 222 F.R.D. at 191-92.  While Dr. Hishinuma's review of the "relevant literature," Milanowicz, 148 F. Supp. 2d at 536, on eligibility criteria that suit the needs of the learning disabled does not purport to have exhausted every article written on the subject, Defendants have not, for example, pointed to literature contradicting Dr. Hishinuma's opinions that Dr. Hishinuma fails to account for.  See Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 808 (3d Cir. 1997).

Nor is there an "analytical gap between the data and the opinion proffered," General Electric Co. v. Joiner, 522 U.S. 136, 145-146 (1997), in the case of Dr. Hishinuma's proffered testimony regarding the implementation of the NCAA's eligibility criteria.  Dr. Hishinuma's opinion – essentially, that there exist eligibility criteria suitable to the needs of the learning disabled that the NCAA could have employed, but did not – "could reliably flow from the facts known to the expert and the methodology used." Yarchak, 208 F. Supp. 2d at 495 (quoting

Heller, 167 F.3d at 153).[36]

However, although Dr. Hishinuma will be permitted to testify to his opinions regarding the flaws in the NCAA's eligibility criteria and the potential to have adopted criteria more suitable to the needs of learning disabled applicants, his opinion that the NCAA's policies discriminated against students with learning disabilities will be excluded.  In support of his conclusion that NCAA Bylaw 14.3 discriminated against students with learning disabilities and that the NCAA exhibited a "callous disregard for the adverse impact that these policies had on students with learning disabilities," (Defs.' Br. Ex. A at 23), Dr. Hishinuma simply quotes at length from the 1998 Consent Decree between the NCAA and the Department of Justice.  It is not apparent how Dr. Hishinuma's parroting of the language in the Consent Decree will contribute to the jury's understanding of whether the bylaws discriminated against Bowers.  "Even though experts are entitled to give their opinion on an ultimate issue in the case, see Rule 704(a), this does not mean that the opinion may be given divorced from the scientific, medical, or other expert basis that qualified the witness in the first place."[37]  United States v.

---

[36]  Defendants' reliance on Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584 (D.N.J. 2002), where the expert failed to account for his exclusion of unfriendly data, is thus misplaced.

[37]  Plaintiff argues that Dr. Hishinuma's testimony about the Consent Decree should be admitted because in Pineda, the

<u>Hall</u>, 93 F.3d 1337, 1344 (7th Cir. 1996); <u>see also</u> <u>Tabatchnick v.</u>
<u>G. D. Searle & Co.</u>, 67 F.R.D. 49, 55 (D.N.J. 1975).

In summary, Dr. Hishinuma has a reliable basis from which to testify regarding the majority of opinions offered in his report. However, with respect to his conclusory statements that the NCAA discriminated against learning disabled students, in support of which Dr. Hishinuma merely quotes from the 1998 Consent Decree, Defendants' motion to exclude his opinion that the NCAA's policies discriminated against students with learning disabilities will be granted.

    b.    <u>Relevance of Dr. Hishinuma's Opinions</u>

Defendants also challenge the relevance of nearly all of Dr. Hishinuma's opinions to the issues raised in this case.  Contrary to the arguments raised in Defendants' motion, it appears that Dr. Hishinuma's remaining opinions are relevant to issues that the jury in this case will be called upon to decide.

For instance, Dr. Hishinuma's proffered testimony regarding the significance of "large-scale, longitudinal research" to the

---

Court of Appeals held that "despite Rule 407's general exclusion of subsequent remedial measure evidence, . . . Rule 703 permits [an expert] to base his opinion on a consideration of [a subsequent remedial measure]."  <u>Pineda</u>, 520 F.3d at 247. <u>Pineda</u>'s holding that an expert may base his opinion on evidence of a subsequent remedial measure ("SRM") that itself would be inadmissible under Rule 407 does not <u>require</u> that an expert's opinion on an SRM be admitted where the expert's testimony would not be helpful to the jury.

formation of policies such as the NCAA's,[38] the absence of research supporting the NCAA's eligibility bylaws as they pertained to learning disabled applicants, the alleged failings in the NCAA's policies, and his proposals for more accommodating criteria for evaluating learning disabled applicants, are all relevant to whether the NCAA's "eligibility criteria" were "necessary for the provision of the . . . program . . . being offered."  28 C.F.R. § 35.130(b)(8).  As the discussion of the relevance of Dr. Stodden's testimony on institutional accommodations for learning disabled students, supra, explains, the NCAA has consistently maintained that its eligibility bylaws were aimed at ensuring that its student-athletes could meet the twin challenges of succeeding athletically and academically during their freshman year of college.  Dr. Hishinuma's testimony is relevant to the jury's determination of whether the bylaws, as they pertained to learning disabled students, were necessary to the achievement of this goal.[39]  As Plaintiff notes, his

---

[38]  As Plaintiff argues, Defendants' claim that Dr. Hishinuma "must offer a specific study that should have been conducted" in order to render his opinion reliable, (Defs.' Br. 13), is undermined by the decision of the Court of Appeals in Pineda v. Ford Motor Co., 520 F.3d 237, 248 (3d Cir. 2008) (holding that engineering expert's opinion on the inadequacy of the defendant's warnings was not rendered unreliable by his failure to articulate a specific, superior warning).

[39]  Defendants are correct, of course, in noting that the Rehabilitation Act does not require the NCAA to support its decisions with the research that Dr. Hishinuma discusses.  Cf. Menkowitz, 154 F.3d at 123 ("the Rehabilitation Act does not

proffered testimony on eligibility criteria more suitable to learning disabled applicants is likewise relevant to whether the NCAA could have accommodated learning disabled applicants without experiencing an "undue burden," a relevant consideration for Plaintiff's claims under the New Jersey Law Against Discrimination.  See Ellison v. Creative Learning Center, 893 A.2d 12, 19 (App. Div. 2006).

Defendants also argue that Dr. Hishinuma's opinion that Bowers' high school curriculum adequately prepared him for post-secondary education, and that the NCAA should have accommodated Bowers by crediting his special education courses toward its thirteen core course requirement, is not relevant to the issues in this case.  Defendants argue that "Plaintiff's requested accommodation is his arbitrary 75% rule [that learning disabled students who satisfy 75% of the core course criteria should be

---

impose an affirmative action obligation on recipients of federal assistance").  A policy that does not exclude otherwise qualified individuals solely on account of their disabilities does not violate the Rehabilitation Act, irrespective of whether the policymaker researched the policy's impact on disabled individuals.  However, the NCAA has defended – and, presumably, will continue to defend – the policy in question on the grounds that it ensures that student-athletes "can handle the combined rigors of intercollegiate athletics and academics during their freshman year of college," (Defs.' Br. 8), and, as is explained, supra, whether the policy is necessary to the achievement of this goal is implicated by Plaintiff's claims as a matter of law.  See Bowers III, 118 F. Supp. 2d at 517-19.  Dr. Hishinuma's testimony is relevant to the jury's assessment of this issue: if credited by the jury, it could suggest that the NCAA's criteria were arbitrary, not necessary.

qualified], not that he should have received credit for Pre-Algebra." (Def.'s Br. 18.) Defendants' argument regarding the relevance of Dr. Hishinuma's testimony on this matter is belied by the parties' Joint Pretrial Order, in which Plaintiff asserts numerous proposed accommodations, including "accepting as 'core courses' each of the academic courses that Michael Bowers[] took pursuant to his Individualized Education Plan." (Joint Pretrial Order at 100.) Of course, Defendants will be free to cross-examine Dr. Hishinuma regarding his opinion that Bowers' Pre-Algebra coursework prepared him sufficiently for the rigors of collegiate academics, but their argument that his testimony on this matter is not relevant must be rejected.[40]

## IV. CONCLUSION

For the reasons explained above, the Court will deny Defendants' motion for dismissal sanctions. As a sanction for Plaintiff's violation of her discovery obligations, pursuant to Rule 16(f), F. R. Civ. P., the Court will exclude Dr. O'Brien's opinion that Bowers was depressed as a result of Defendants' conduct in November 1997, as well as Dr. Stodden's testimony about the resources available to learning disabled students at

---

[40] Defendants also challenge the relevance of Dr. Hishinuma's testimony about the accommodations offered to learning disabled students at postsecondary educational institutions. This argument mirrors Defendants' challenge to Dr. Stodden's proffered testimony on the same subject, discussed supra, and will be rejected for the same reasons.

Iowa and Temple.

The Court will also grant Defendants' motion to exclude Dr. O'Brien's testimony, and will grant in part and deny in part Defendants' motions to exclude the testimony of Drs. Roberts, Stodden, and Hishinuma consistent with the discussion set forth above.  The accompanying Order will be entered.


__**June 27th, 2008**__                     __**s/ Jerome B. Simandle**__
Date                                        JEROME B. SIMANDLE
                                            United States District Judge

89