IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KATHLEEN BOWERS,

           Plaintiff,

    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

           Defendant.

HON. JEROME B. SIMANDLE

Civil Action
No. 97-2600 (JBS)

**OPINION**

APPEARANCES:

Jennifer R. Clarke, Esq.
Barbara E. Ransom, Esq.
PUBLIC INTEREST LAW CENTER OF PHILADELPHIA
125 South Ninth Street, Suite 700
Philadelphia, PA 19107
    and
Richard L. Bazelon, Esq.
A. Richard Feldman, Esq.
Noah H. Charlson, Esq.
BAZELON, LESS & FELDMAN, P.C.
1515 Market Street
Suite 700
Philadelphia, PA 19102-1907
    Attorneys for Plaintiff

J. Freedley Hunsicker, Jr., Esq.
Daniel H. Aiken, Esq.
Kathryn Elizabeth Bisordi, Esq.
DRINKER, BIDDLE & REATH, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
    Attorneys for Defendant National Collegiate Athletic
    Association

**TABLE OF CONTENTS**

I.    **INTRODUCTION**............................................2
II.   **BACKGROUND**...............................................4
     A.   Michael Bowers......................................4
     B.   Procedural History..................................6
III. **DISCUSSION**...............................................10
     A.   Threshold Considerations of the Law of the Case.....10
          1.   The NCAA Bylaws and Judge Orlofsky's Ruling....11
          2.   Analysis.......................................13
     B.   Plaintiff's Motion to Preclude "Reasonable
         Modification" and "Waiver Proceeding" Defenses......22
          1.   Reasonable Modification Defense.................24
          2.   NCAA's Eligibility Waiver......................28
              a.   Eligibility Waiver as a Reasonable
                  Accommodation.............................30
              b.   The 1997 Waiver Review of Bowers'
                  Credentials..............................32
     C.   Plaintiff's Motion to Exclude After-Acquired
         Evidence............................................38
          1.   The After-Acquired Evidence Doctrine...........39
          2.   The Parties' Arguments.........................41
          3.   Analysis.......................................45
     D.   Plaintiff's Motion to Preclude the NCAA from
         Contesting that Bowers was Disabled.................47
     E.   NCAA's Motion to Exclude Evidence of the 1998
         Consent Decree and Other Subsequent Bylaw Changes...55
          1.   The Bylaws and the 1998 Consent Decree.........55
          2.   Admissibility of the Consent Decree............58
          3.   Admissibility of Pre-Decree Bylaw Changes......61
IV.  **CONCLUSION**..............................................64

**SIMANDLE**, District Judge:

**I.    INTRODUCTION**

      This case arises out of Plaintiff's allegations that during the 1995-1996 academic year, Defendants subjected her son, Michael Bowers ("Bowers"), to unlawful discrimination on account of his learning disability.  Presently before the Court are a series of <u>in limine</u> motions: (1) the NCAA's motion to exclude evidence of the 1998 Consent Decree between the NCAA and the

Department of Justice [Docket Item 398]; (2) Plaintiff's motion
to preclude Defendants' "reasonable modification" and "waiver
proceeding" defenses [Docket Item 405]; (3) Plaintiff's motion to
preclude after-acquired evidence on the issue of liability
[Docket Item 406]; and (4) Plaintiff's motion to preclude
Defendants from contesting that Bowers was disabled [Docket Item
407].  Trial in this case is scheduled to commence on July 7,
2008.

　　For the reasons set forth below, the Court will grant the
NCAA's motion to exclude evidence of the 1998 Consent Decree
without prejudice to Plaintiff's renewal of its request to
introduce evidence of pre-Decree bylaw changes if the NCAA
controverts the feasibility of alternative policies in its
defense.  The Court will grant in part and deny in part
Plaintiff's motion to preclude Defendants' "reasonable
modification" and "waiver proceeding" defenses.  Additionally,
the Court will grant Plaintiff's motion to preclude the admission
of after-acquired evidence on the issue of liability in its
entirety, and will deny Plaintiff's motion to preclude Defendants
from contesting that Bowers had a learning disability.[1]

---

　　[1] Defendants have also filed an in limine motion to
preclude Plaintiff from introducing evidence of Bowers'
depression following the inception of his drug use [Docket Item
397].  This motion is based on the sanctions Order entered by
this Court and upheld by the Court of Appeals, which "precludes
Bowers, in proving damages, from using evidence of his drug abuse
and drug abuse-related depression."  Bowers v. National

3

## II.   BACKGROUND

### A.   Michael Bowers

The facts and procedural history of this case have been discussed in detail in numerous opinions issued by this Court and the Court of Appeals, and the following summary reviews only those facts that pertain to the instant motions.  At issue in this action are the policies of the NCAA pertaining to the initial eligibility of student athletes for participation in Division I intercollegiate athletics programs as they existed in 1995-1996, when Plaintiff's late son, Michael Bowers ("Bowers"),[2] submitted an application to the NCAA Initial-Eligibility Clearinghouse (the "Clearinghouse"), the organization responsible for assessing the eligibility of potential student athletes to participate in college sports.  The late Michael Bowers was an excellent high school football player at Palmyra High School who sought to play college football in a top-echelon intercollegiate football program.  Most of Michael Bowers' high school courses were in special education classes rather than college-preparatory courses, and Plaintiff alleges that Michael suffered from a

_____

Collegiate Athletic Ass'n, 475 F.3d 524, 541-42 (3d Cir. 2007).
The Court has reserved decision on this motion, which is relevant
only to the damages phase of this trifurcated trial.

[2]  Plaintiff Kathleen Bowers' son, Michael, was the initial
plaintiff in this case.  Michael Bowers died as the result of a
drug overdose in June 2002 and his mother has been substituted as
Plaintiff on behalf of his estate.

disability.

At the time of the 1995-1996 school year, the Clearinghouse reviewed students' applications and placed applicants into one of three categories: qualifier, partial qualifier, or nonqualifier. In brief, Plaintiff alleges that her son was designated as a nonqualifier largely on account of his high school special education curriculum, that such a designation discriminated against him on account of his learning disability, and that the designation negatively impacted his opportunity to receive an athletic scholarship.

In the fall of 1996, after the football scholarship and recruiting opportunities dried up, Bowers enrolled at Temple University as a commuter student, although he did not begin taking classes that semester because he was scheduled to have back surgery.  In the spring 1997 semester, Bowers earned a 3.63 GPA at Temple and made the Dean's List.  By November 1997, however, Bowers' life had taken a turn for the worse: he complained to his physician about being depressed about breaking up with his girlfriend and was prescribed antidepressant medication, and his grades began to drop and he failed to complete several courses and dropped out.

In addition, Bowers had started to abuse drugs.  Bowers was prescribed numerous painkillers between 1996 and 1997 in order to treat the pain he experienced as a result of a back injury, and

ultimately, he became addicted to these medications and started obtaining them illegally.  In addition, by August 1998, Bowers started using cocaine and heroin.  For nearly four years, Bowers received treatment for his substance abuse and mental health problems, and in June 2002, he died as a result of a drug overdose.  His undisclosed drug abuse and treatment occurred while substantial discovery was underway in this case, including his own depositions and several tests and interviews by Plaintiff's own proposed experts.

### B. Procedural History

Bowers filed the original Complaint in this case on May 23, 1997 [Docket Item 1], alleging that the NCAA and the Clearinghouse had violated Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132, 12182, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Plaintiff subsequently amended the Complaint to assert additional claims based on the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1, et seq., and to name Temple University, the University of Iowa, and the American International College as defendants.

Nearly seven years after this action was initiated – and after considerable discovery and motion practice and numerous decisions by the District Court and the Court of Appeals – and after Michael Bowers died, Plaintiff disclosed to Defendants for

first time that Bowers had a substance abuse problem.
Thereafter, Defendants moved for the imposition of sanctions in
the form of dismissal, arguing that they had been prejudiced as a
result of Plaintiff's concealment of Bowers' substance abuse and
drug treatment.  On March 21, 2005, the Court issued an Opinion
and Order that imposed preclusion sanctions upon Plaintiff.
Specifically, the Court found that because

> Defendants lack the practical ability to question Mr.
> Bowers about the full extent and duration of his drug
> abuse, and thus suffer irreparable prejudice, the records
> that have belatedly been supplied to Defendants in and
> after May 2004 must be deemed conclusive and unopposed by
> Plaintiff.  Plaintiff shall be precluded from disputing
> the facts shown by direct and circumstantial evidence in
> the records of Mr. Bowers's drug abuse and severe
> depression, and Plaintiff shall be precluded from arguing
> that gaps in these records give rise to some favorable
> inference in opposition to summary judgment.

Bowers v. National Collegiate Athletic Ass'n., No. 97-2600, 2005
WL 5155198, *12 (D.N.J. Mar. 21, 2005), overruled in part by 475
F.3d 524 (3d Cir. 2007).  The Court then addressed Defendants'
motion for summary judgment in light of the discovery sanctions
it had imposed and determined that the evidence warranted the
entry of summary judgment in Defendants' favor.  Id. at *16.

Plaintiff appealed the March 21, 2005 Opinion and Order, and
on February 1, 2007, the Court of Appeals issued its decision
affirming in part and reversing in part this Court's Order.  With
regard to the question of preclusion sanctions, the Court of
Appeals found that

7

[a]llowing any information regarding Bowers' substance abuse to be introduced posthumously by Bowers for her own advantage would thus be patently unfair to Defendants, who were clearly blind-sided by that evidence.  As a result, we find the District Court did not abuse its discretion in issuing preclusion sanctions with respect to Bowers' drug use.

. . . .

[However, u]nlike Bowers' drug problems, which would have been readily revealed had he disclosed his treatment with Dr. Gooberman, Defendants were not blind-sided by evidence that Bowers had suffered from depression.

. . . .

While Bowers' depression certainly may have become aggravated by and intertwined with his drug abuse at some point, we believe the two can be disentangled for purposes of establishing damages in this case . . . . Consequently, we conclude the District Court's blanket preclusion of evidence related to depression reflects a clearly erroneous assessment of the evidence in record and was thus an abuse of discretion.  We will therefore affirm the sanctions order of the District Court only insofar as it precludes Bowers, in proving damages, from using evidence of his drug abuse and drug abuse-related depression.

Furthermore, we reverse the sanctions order insofar as it precludes Bowers from opposing Defendants' claim that Michael Bowers' drug abuse rendered him unqualified to participate in a program of intercollegiate athletics at all relevant times.

Bowers v. National Collegiate Athletic Ass'n, 475 F.3d 524, 541-

42 (3d Cir. 2007) (internal quotations and citations omitted).

The Court of Appeals also determined that a triable question of

fact existed as to whether Bowers was a qualified individual with

a disability at the time when Defendants allegedly discriminated

against him, and thus reversed the Court's entry of summary

judgment as to Plaintiff's ADA, Rehabilitation Act, and NJLAD claims.[3]  Id. at 537.

After the matter was remanded, this Court denied Plaintiff's motion to compel the production of additional discovery, see Bowers v. National Collegiate Athletic Ass'n, No. 97-2600, 2008 WL 1757929 (D.N.J. Feb. 27, 2008), and scheduled a trial date of June 30, 2008.  The parties filed numerous in limine motions, including Defendants' motions to exclude the testimony of Plaintiff's four expert witnesses under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), on which the Court heard oral argument at hearings convened on April 25, 2008 and May 19, 2008 and reserved decision.

After the Court heard oral argument on the parties' in limine motions, it was revealed that Plaintiff had failed to comply in full with the terms of a Discovery Order entered on September 15, 2004, to the extent that numerous drafts of expert reports and related materials had not been provided to Defendants.  Defendants moved to dismiss Plaintiff's claims as a sanction for Plaintiff's discovery violations.  The Court addressed this motion, as well as Defendants' Daubert motions, in

---

[3]  The Court of Appeals also found that Plaintiff's attorneys did not have notice of the fact that sanctions were sought against them as well as against Plaintiff. Bowers, 475 F.3d at 544-45.  Defendants have since filed a motion for sanctions against Plaintiff's counsel, and, with the consent of the parties, the Court has adjourned its consideration of this matter until after the completion of the trial on the merits.

a recent Opinion and Order entered upon the docket on June 30, 2008.  In that Opinion and Order, the Court did not dismiss Plaintiff's claims, but ordered that Plaintiff be precluded from introducing certain testimony relating to the belatedly disclosed expert materials and, in some instances, shortcomings under Rule 702, Fed. R. Evid.  Further, the Plaintiff and Defendants University of Iowa and Temple University reached settlements of Plaintiff's claims within the past week, and the NCAA is the sole remaining defendant as the case goes to trial on July 7, 2008.

**III. DISCUSSION**

 **A.  Threshold Considerations of the Law of the Case**

  Initially, the Court addresses a threshold issue that the parties raise in their submissions pertaining to several motions: whether former Judge Orlofsky's determination in <u>Bowers v. National Collegiate Athletic Ass'n</u>, 118 F. Supp. 2d 494 (D.N.J. 2000) ("<u>Bowers III</u>"), that the provisions in the NCAA's initial eligibility bylaws pertaining to learning disabled applicants were not facially neutral, is the law of this case, and whether that determination was clearly erroneous.  In its motion to exclude evidence of the 1998 Consent Decree, addressed in detail <u>infra</u>, the NCAA argues that Judge Orlofsky's determination was an "ill-considered dictum" that is not the law of the case and which, in any case, was clearly erroneous.  (NCAA's Reply Br. 2.) As the Court explains below, it finds that the ruling in question

10

is the law of this case, and that that ruling – that NCAA Bylaw 14.3.1.3 is not facially neutral – should not be disturbed.  The Court reviews the relevant bylaws and Judge Orlofsky's determination in turn below.

        1.   <u>The NCAA Bylaws and Judge Orlofsky's Ruling</u>

In 1995-1996, when Bowers submitted his application to the Clearinghouse for its initial eligibility review, the NCAA had two relevant bylaws pertaining to the eligibility of applicants with learning disabilities and/or special education coursework. NCAA Bylaw 14.3.1.3 established the "core-curriculum requirements" for applicants, and provided that "[c]ourses that are taught at a level below the high school's regular academic instructional level (e.g., remedial, special education or compensatory) shall not be considered core courses regardless of course content."  (NCAA Bylaw 14.3.1.3.)  A related provision, Bylaw 14.3.1.5, provided that

> The NCAA Academic Requirements Committee may approve the use of high-school courses for the learning disabled and handicapped to fulfill the core-curriculum requirements if the high-school principal submits a written statement to the NCAA indicating that students in such classes are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in other core courses.  The learning-disabled or handicapped student still must complete the required core courses and achieve the minimum required grade-point average in this core curriculum.

(NCAA Bylaw 14.3.1.5.)

In <u>Bowers III</u>, the court addressed the NCAA's motion for

11

summary judgment in which the NCAA argued, <u>inter alia</u>, that it was entitled to summary judgment as to his claim for compensatory damages under the Rehabilitation Act because compensatory damages could not be awarded for that claim.  The court denied the NCAA's motion as to this issue, finding that compensatory damages could be awarded under the Act for claims of intentional discrimination.  118 F. Supp. 2d at 507.  In holding that Bowers had alleged such a claim, the court determined that Bowers' claim for intentional discrimination "is evidenced by the type of policy that he has attacked" – that is, a policy that was not facially neutral.  <u>Id.</u> at 507-08.  The court reasoned as follows:

> In this case, the challenged policy states that "[c]ourses that are taught at a level below the high school's regular instructional level (e.g., remedial, special education or compensatory) shall not be considered core courses regardless of course content." (NCAA Bylaw 14.3.1.3).  This provision is not facially neutral precisely because it is premised on a "trait that the handicapped as a class are less capable of meeting or less likely of having," i.e., a specified level of academic achievement.  NCAA Bylaw 14.3.1.3.5, which enables students with learning disabilities to obtain core course credit for special education classes, does not render the NCAA's policy neutral.  The learning disabled still bear the burden of proving that their special education courses are "good enough" to satisfy the core course requirement.  After all, "[t]he learning-disabled or handicapped student must still complete the required core courses and achieve the minimum required grade-point average in this core curriculum."

<u>Id.</u> at 508 (some internal citations omitted).  Finding that Bowers had attacked a policy that was not facially neutral, the court denied the NCAA's motion for summary judgment on the issue

12

of compensatory damages.  Id.

     2.  Analysis

_____The Court is not persuaded by the NCAA's argument that Judge
Orlofsky's determination in Bowers III that the NCAA bylaws were
not facially neutral was mere dicta.  A discussion in an opinion
"is dicta [if] it is not necessary to that opinion's holding."
Ponnapula v. Ashcroft, 373 F.3d 480, 488 (3d Cir. 2004).  Judge
Orlofsky's ruling on whether the bylaw was facially
discriminatory was issued in response to the NCAA's motion for
summary judgment, in which the NCAA argued, inter alia, that
Bowers could not recover compensatory damages under the
Rehabilitation Act because he had not alleged that the NCAA
intentionally discriminated against him.  As is summarized above,
the court rejected the NCAA's argument and denied its motion for
summary judgment as to this issue.  See Bowers III, 118 F. Supp.
2d at 507-08; see also id. at 538-39 ("Defendants' challenges to
standing and the recoverability of damages are DENIED IN PART AND
GRANTED IN PART, GRANTED with respect to the argument that
damages for loss of a future athletic career are too speculative
but DENIED in all other respects").  The court's determination
that the policy was not facially neutral was necessary to its
holding that Plaintiff could recover compensatory damages under
the Rehabilitation Act, and thus was not, as the NCAA has argued,
mere dicta.  See Ponnapula, 373 F.3d at 488.

Judge Orlofsky's ruling that "Bowers has not attacked a facially neutral policy," Bowers III, 118 F. Supp. 2d at 507, is thus the law of this case, and may be revisited only under certain limited circumstances.  "The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it."  Fagan v. City of Vineland, 22 F.3d 1283, 1290 (3d Cir. 1994); see also Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 116 (3d Cir. 1997).  As the Supreme Court has explained:

> A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.

Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817 (1988) (internal quotations and citations omitted); see also Fagan, 22 F.3d 1290 (noting that "a successor judge should not lightly overturn decisions of his predecessors in a given case").

The Court of Appeals has provided guidance as to what constitutes "extraordinary circumstances" as that term was used in Christianson.  Those circumstances include "situations in which: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice."  Magnesium Elektron, Inc., 123 F.3d at 117; In re City of Philadelphia Litigation, 158 F.3d 711, 718 (3d Cir. 1998).  The NCAA's

14

argument appears to focus exclusively on the third possibility, namely, that Judge Orlofsky's decision was clearly erroneous and would work a manifest injustice.

The Court disagrees.  As the following discussion makes clear, while Judge Orlofsky did not articulate precisely the correct legal standard in ruling that the NCAA's policies were not facially neutral, he reached the correct result.  There was, accordingly, no "manifest injustice" rendered by his decision to justify this Court's revisitation of his decision.  Magnesium Elektron, Inc., 123 F.3d at 117.

In an opinion subsequent to Judge Orlofsky's Bowers III decision, the Court of Appeals explained the considerations underlying facially discriminatory classification claims in Community Services, Inc. v. Wind Gap Mun. Authority, 421 F.3d 170 (3d Cir. 2005):

> Generally, to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a "motivating factor" behind the challenged action . . . .
>
> Where a regulation or policy facially discriminates on the basis of the protected trait, in certain circumstances it may constitute per se or explicit discrimination because the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classifies people on that basis. Hence, where a plaintiff demonstrates that the challenged action involves disparate treatment through explicit facial discrimination, or a facially discriminatory classification, a plaintiff need not prove the malice or discriminatory animus of a defendant.  Rather, the focus is on the explicit terms of the discrimination.

421 F.3d at 177 (internal quotations and citations omitted).

Contrary to the NCAA's suggestion that a policy is facially neutral if the precise name of the protected class does not appear in the text of the policy, courts have also recognized that a policy that classifies on the basis of a neutral classification that is a proxy for a protected category may also, under certain circumstances, be facially discriminatory.  See, e.g., McWright v. Alexander, 982 F.2d 222, 228 (7th Cir. 1992). As the Court of Appeals has explained,

> courts have developed a "proxy" theory for [evaluating facially discriminatory classification] claims, recognizing that a regulation or policy cannot use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination, such as classifications based on gray hair (as a proxy for age) or service dogs or wheelchairs (as proxies for handicapped status).

Id. (citing McWright, 982 F.2d at 228).

Significantly, under such a proxy theory, a policy will not be found to be facially discriminatory if the neutral classification merely "correlate[s]" with the protected category. Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993).  The Supreme Court's decision in Hazen Paper helps illustrate the proxy-correlation distinction.  In that case, the Court addressed whether "an employer . . . could fire an employee in order to prevent his pension benefits from vesting" without running afoul of the Age Discrimination in Employment Act.  Id. at 613.  The Court explained that the vesting of an employee's pension plan

16

may correlate with age, but that the two categories were not
coextensive – while older employees might on average have
completed more years of service than younger employees, the two
categories are analytically distinct.  Id. ("Because age and
years of service are analytically distinct, an employer can take
account of one while ignoring the other, and thus it is incorrect
to say that a decision based on years of service is necessarily
"age based.").

The Court of Appeals employed similar reasoning in Community
Services when it determined that the statutory use of the term
"personal care home" was analytically distinct from, and was thus
not a proxy for, disability or handicap.  The court explained
that "'personal care home' could fairly be used to describe any
number of facilities providing services to residents who may not
necessarily have, have had, or be regarded as having a physical
or mental impairment that substantially limits a major life
activity," including facilities providing care for the elderly,
juveniles, or ex-criminal offenders.  Community Services, 421
F.3d at 179.  While there was a correlation between personal care
homes and the disabled, the two were analytically distinct.[4]  Id.

---

[4]  As these cases make clear, the standard for evaluating
claims that a neutral classification is a "proxy" for a facially
discriminatory classification is rigorous, and even a strong
correlation between the two categories will not alone suffice to
show that the classification is facially discriminatory.  Compare
Erie County Retirees Ass'n v. County of Erie, 220 F.3d 193, 211
(3d Cir. 2000) ("Medicare status is a direct proxy for age,"

When viewed in light of this standard, Judge Orlofsky's determination that the NCAA's policies, as they pertained to learning disabled applicants, were not facially neutral because they singled out a "trait that the handicapped as a class are less capable of meeting or less likely of having," Bowers III, 118 F. Supp. 2d at 508, was not a correct statement of the law. The result he reached was correct, however, which means that it worked no "manifest injustice" to warrant disturbing his decision.  Magnesium Elektron, Inc., 123 F.3d at 117.

The NCAA policies at issue here classified applicants based on whether they took special education courses in high school, providing that "special education [courses] . . . shall not be considered core courses regardless of course content."  (NCAA Bylaw 14.3.1.3) (emphasis added).  The Court agrees with Plaintiff that "students enrolled in special education courses" is a proxy for "students with disabilities," and that, accordingly, the NCAA bylaws were not facially neutral.  See Community Services, 421 F.3d at 177.  The most convincing indicator of why the population of students taking special education courses does not merely correlate with the disabled student population, but is "necessarily" tied to that population,

_____

since eligibility "follows ineluctably upon attaining age 65") (emphasis added), with Hazen Paper, 507 U.S. at 613 (correlation exists between age and vesting of pension plans, but one is not necessarily tied to the other).

18

_Hazen Paper_, 507 U.S. at 613, can be found in the language of the statute that provides federal funding for special education programs, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1400, _et seq._  That statute makes clear that special education is inextricably linked to disability status, expressly defining the term "special education" to mean "specially designed instruction, at no cost to parents, to meet the unique needs of a child _with a disability_."  § 1401(29) (emphasis added).  As it is defined by the federal law that funds the provision of educational services to disabled children, then, special education is necessarily tied to disability status; it is impossible take account of the former while ignoring the latter.[5]  See _Hazen Paper_, 507 U.S. at 613.

The link between special education and disability status is much more direct than in proxy cases where the classification in question was found merely to correlate with the protected category.  While the potential proxies in _Community Services_ and _Hazen Paper_ encompassed categories of persons beyond the handicapped and the elderly, respectively, the proxy category here – the special education population – is no more broad than

---

[5]  That the population of students with disabilities might be larger than the special education population – in other words, that not every disabled child is necessarily enrolled in special education – is, of course, irrelevant.  The question is whether the special education population is a proxy for the disabled student population, not the reverse.

19

the suspect classification in question.  Thus, whereas in
Community Services the term "'personal care home' could fairly be
used to describe any number of facilities providing services to
residents who may not necessarily" be disabled, 421 F.3d at 179,
special education, by definition under federal law, is directed
"to meet the unique needs of a child with a disability."  §
1401(29).

    The NCAA's arguments to the contrary are not convincing.
First, the NCAA notes that in his deposition, Bowers was asked
whether non-special-education students would be permitted to take
special education courses, and testified as follows: "If – I
believe if that's, like, his weak area, then he has to go slower
than a student would.  They don't have to be classified special
education."  (Bowers Dep. 35.)

    This testimony does not undermine the Court's conclusion.
First, nothing in the record suggests that Bowers had the
personal knowledge to provide competent testimony as to the
educational policies of his school concerning the admission of
non-special-education students into special education courses;
his incompetent speculation as to whether all students in such
classes are "classified special education," (id.), is plainly
insufficient to overcome the fact the special education, by law,
is defined as education directed "to meet the unique needs of a
child with a disability."  § 1401(29).  More importantly, Bowers'

20

testimony does not suggest that non-disabled students took
special education courses – it only addresses whether students
not "classified special education" could take such courses.
(Bowers Dep. 35.)  Bowers' testimony thus provides no support for
the NCAA's position that "special education" is not a proxy for
"disabled students."

At the May 19, 2008 hearing, the NCAA argued that
Plaintiff's claim that its bylaws contained facial
classifications was foreclosed by the Court of Appeals' most
recent decision in this case.  Specifically, the NCAA noted that
in discussing whether the University of Iowa was entitled to
immunity under the Eleventh Amendment, the Court of Appeals
determined that "[t]he NCAA rule (and the universities' adoption
and application of the NCAA rule) easily passes muster under
rational basis review as the rule is designed to ensure that
incoming student athletes can handle the rigors of college
academia while engaging in intercollegiate athletics." Bowers,
475 F.3d at 554.  Because the bylaws would be lawful under
rational basis review, the NCAA appears to argue, its policies
must be facially neutral.

While not without superficial appeal, this argument must
likewise be rejected.  Whether a policy is or is not facially
neutral, and whether it passes muster under rational basis
review, are two separate issues.  The former is directed at

resolving the question of whether "a protected characteristic
played a role in the defendant's decision to treat [the
plaintiff] differently," Community Services, 421 F.3d at 177
(citation omitted), whereas the latter addresses whether that
differential treatment, once proven, is lawful.  The NCAA's
effort to mix apples (whether its bylaws were facially neutral)
with oranges (whether the bylaws would survive rational basis
review under an Equal Protection challenge) is unavailing, and
does not support its argument that the bylaws were facially
neutral.

    The Court accordingly finds that Judge Orlofsky's ruling
that the NCAA bylaws were not facially neutral should not be
disturbed.  The impact of this determination on the parties' in
limine motions will become clear over the course of the following
discussion.

   **B.   Plaintiff's Motion to Preclude "Reasonable
        Modification" and "Waiver Proceeding" Defenses**

    The Court first addresses Plaintiff's motion to preclude the
Defendants' "reasonable modification" and "waiver proceeding"
defenses.  Plaintiff's motion raises two issues.  First,
Plaintiff argues that because the eligibility bylaws at issue in
this case were facially discriminatory, Defendants should be
precluded from defending the bylaws on the grounds that
Plaintiff's proposed modifications would have been unreasonable;
Plaintiff relies primarily on the recent holding of the Court of

Appeals in New Directions Treatment Services v. City of Reading, 490 F.3d 293, 305 (3d Cir. 2007), that "it is inappropriate to apply the 'reasonable modification' test to facially discriminatory laws."

Second, Plaintiff makes a series of arguments regarding the relevance to this case of an accommodation that the NCAA made available to learning disabled applicants during the 1995-1996 application period.  The accommodation in question was a waiver procedure under which a disabled applicant who did not meet the initial eligibility criteria could achieve "qualifier" status if an NCAA member institution requested a waiver on the applicant's behalf.  (Karpinski Dep. 89; NCAA's Opp'n Br. Ex. B.)  As the parties recognize, Bowers himself did not complete his applications to any NCAA member institutions during the 1995-1996 school year, and accordingly, no waiver was requested on his behalf during that period.  However, in 1997, after Bowers filed this lawsuit, Judge Orlofsky entered an Order in connection with the parties' preliminary injunction motion practice, under which the NCAA's eligibility Waiver Committee was to review Bowers' application to determine if a waiver of the NCAA's eligibility requirements was appropriate.  See Bowers v. NCAA, 974 F. Supp. 459, 463 (D.N.J. 1997).  The Committee determined that a waiver was not appropriate.

With regard to the relevance of the eligibility waiver

23

process, Plaintiff makes a series of arguments: (1) that it is the law of the case that the NCAA's waiver proceedings did not constitute a reasonable accommodation for Bowers as a matter of law; (2) that the Court should itself rule that such proceedings do not amount to a reasonable accommodation, even if it is not the law of the case; and (3) that evidence relating to Bowers' own waiver proceeding, undertaken in 1997 after this litigation had commenced, should be excluded on various grounds, including that it is irrelevant and unfairly prejudicial.  These arguments are reviewed below.

     1.   <u>Reasonable Modification Defense</u>

Plaintiff argues that because her Rehabilitation Act claims against the NCAA are premised upon the NCAA's liability for a facially discriminatory policy, the NCAA should be precluded from arguing in defense that Plaintiff's proposed modifications of the policy would have been unreasonable.  Plaintiff relies upon the finding by Judge Orlofsky in <u>Bowers III</u> that NCAA Bylaw 14.3.1.3 was not facially neutral, discussed <u>supra</u>, and the Court of Appeals' recent determination that "it is inappropriate to apply the 'reasonable modification' test to facially discriminatory laws," <u>New Directions</u>, 490 F.3d at 305, in arguing that a reasonable modification defense is unavailable to the NCAA in this action.  While the NCAA should not be permitted to defend a facially discriminatory policy on the grounds that no reasonable

24

modification was available, Plaintiff argues, the NCAA may argue
in defense that its "eligibility criteria that screen out or tend
to screen out an individual with a disability . . . [were]
necessary for the provision of the . . . accommodations being
offered."[6]  42 U.S.C. § 12182(b)(2)(A)(i).

In addition to its argument, rejected _supra_, that its bylaws
were facially neutral, the NCAA argues in opposition that
Plaintiff's Rehabilitation Act claims against it are not limited
to her claim that the bylaws were facially discriminatory -- to
the contrary, Plaintiff continues to pursue as a separate claim,
asserted in her Second Amended Complaint, that the NCAA
discriminated against Bowers by "fail[ing] to make reasonable
modifications in policies, practices, or procedures, when such
modifications are necessary to afford such . . . accommodations
to individuals with disabilities . . ."[7]  42 U.S.C. §

---

[6]  The quoted language is contained not in the
Rehabilitation Act, but in Title III of the ADA.  All parties
agree that the "relevant portions of each statute regarding the
otherwise qualified and reasonable modification inquiries are
largely the same."  (NCAA's Opp'n Br. 4 n.2); _see also_ _Yeskey v._
_Com. of Pa. Dept. of Corrections_, 118 F.3d 168, 170 (3d Cir.
1997); _McDonald v. Com. of Pa., Dept. of Public Welfare_, 62 F.3d
92, 94 (3d Cir. 1995); _Bowers III_, 118 F. Supp. 2d at 533 n.34
("All parties agree that the 'otherwise qualified' and 'solely by
reason of' analysis under the Rehabilitation Act is substantially
similar to the 'qualified', 'by reason of' and 'discriminated
against on the basis of disability' analysis under the ADA.")

[7]  Indeed, in the brief in support of her motion, Plaintiff
argues that she "still may argue, as an alternative to liability
under the 'screen out' analysis, that defendant failed to offer .
. . Bowers a reasonable modification to its initial eligibility

12182(b)(2)(A)(ii).  According to the NCAA, Plaintiff cannot have it both ways.  In light of the failure to accommodate claim that Plaintiff herself asserts, the NCAA argues that evidence pertaining to its reasonable accommodations is "directly responsive to Plaintiff's pleaded claims and allegations."  (NCAA's Opp'n Br. 4.)

For the following reasons, the Court will permit the NCAA to assert and offer evidence in support of its reasonable modification defense, but holds that such a defense is only applicable to Plaintiff's failure to accommodate claim.  Ordinarily, when a claim is brought pursuant to the Rehabilitation Act, "[t]he inquiry into whether an applicant is otherwise qualified necessarily involves a determination of whether the applicant could have gained access to the program if the recipient of [federal] funds had made reasonable accommodations."  Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1014 (3d Cir. 1995) (citing Alexander v. Choate, 469 U.S. 287, 301 (1985)).

The Court of Appeals recently held, however, that an inquiry into whether a proposed accommodation (or modification) is reasonable is not applicable in the context of policies that are not facially neutral:

---

bylaws, by for example, refusing to allow substitution of core courses . . ."  (Pl.'s Br. 12 n.6.)

> where the "statute discriminates against qualified
> individuals on its face rather than in its application,"
> the applicable regulation interpreting Title II, which
> only requires "reasonable" accommodation, makes little
> sense.
>
> . . . .
>
> We agree with the Sixth and Ninth Circuits . . . that it
> is inappropriate to apply the "reasonable modification"
> test to facially discriminatory laws.  The only way to
> modify a facially discriminatory statute is to remove the
> discriminatory language.

New Directions, 490 F.3d at 302, 305 (quoting Bay Area Addiction

Research and Treatment, Inc. v. City of Antioch, 179 F.3d 725,

734 (9th Cir. 1999)).

Based on the Court's decision not to disturb Judge

Orlofsky's prior ruling that the NCAA's initial eligibility

bylaws were not facially neutral, supra, New Directions makes

clear that the NCAA may not defend against Plaintiff's claim that

the policies were facially discriminatory under a "reasonable

modification" theory.  490 F.3d at 305.  However, the NCAA is

correct that Plaintiff cannot parlay the unavailability of such a

defense with respect to a facially discriminatory policy claim

into a sweeping preclusion that prevents the NCAA from defending

against her separate failure to accommodate claim.  In the

context of a failure to accommodate claim,

> [t]he burden is on the recipient of federal funds to show
> that the required modification entails a substantial
> alteration in order to avoid a violation of the
> [Rehabilitation] Act.  If there is no factual basis in
> the record demonstrating that accommodating the
> individual would require a fundamental modification or an

27

undue burden, then the handicapped person is otherwise qualified and refusal to waive the requirement is discriminatory.

Juvelis v. Snider, 68 F.3d 648, 653 (3d Cir. 1995) (internal quotations and citations omitted). To the extent that Plaintiff intends to pursue her claim that the NCAA failed to make reasonable accommodations in its policies to meet the needs of learning disabled applicants, the above-quoted language in Juvelis makes clear that the reasonableness of the NCAA's accommodations lies at the heart of Plaintiff's claim and the NCAA's defense.

In short, the NCAA cannot assert a reasonable modification defense to Plaintiff's claim that the bylaws facially discriminated against Bowers on account of his learning disability, but such a defense is available with respect to Plaintiff's failure to accommodate claim.

        2.   NCAA's Eligibility Waiver

Plaintiff's arguments with respect to the NCAA's eligibility waiver procedure are essentially twofold. First, Plaintiff advances a series of arguments relating to the NCAA's waiver procedures in general, all of which ask the Court to find that as a matter of law, the waiver review process that the NCAA made available to applicants in 1995-1996, and which Bowers did not

invoke at that time,[8] did not constitute a reasonable accommodation.  Second, Plaintiff makes a series of arguments directed toward excluding evidence from the NCAA Waiver Committee's specific review of Bowers' credentials, which was performed pursuant to a court order in 1997 after Plaintiff commenced this lawsuit.

Although both parties discuss the NCAA's general waiver review process as it existed in 1995-1996 and the court-ordered 1997 review of Bowers by the Waiver Committee in conjunction, the Court will address these issues separately.  As the following discussion makes clear, the Court will deny Plaintiff's motion for a ruling that the waiver process as it existed in 1995-1996 was not a reasonable accommodation as a matter of law.  However,

---

[8]  As the Court explained, <u>supra</u>, during the time period relevant to Plaintiff's claims, "all requests for . . . [an initial-eligibility] waiver must [have been] initiated through an NCAA school that officially has accepted [the student] for enrollment as a regular student."  (NCAA's Opp'n Br. Ex. E at 5.) Bowers did not complete his applications for any NCAA schools during his senior year of high school, and did not request that any school initiate such a waiver process on his behalf.

The Waiver Committee's review of Bowers' credentials thus did not occur, as the NCAA's policies at that time provided, as a result of an NCAA school's request for such a review.  Instead,

> [a]fter Bowers filed his complaint and motion for preliminary injunctive relief, this Court instructed the NCAA to determine, on an expedited basis, whether Bowers was entitled to a waiver of the initial eligibility requirements pursuant to NCAA bylaw 14.3.1.7 before it would rule on Bowers's motion for a preliminary injunction.

<u>Bowers</u>, 974 F. Supp. at 463.

29

the Court agrees with Plaintiff that evidence of the 1997 review
of Bowers' credentials is not relevant to the issue of whether
the NCAA made a reasonable accommodation available to Bowers.
The evidence is relevant to the matter of Bowers' qualifications,
and will be admissible for that limited purpose.

a.   <u>Eligibility Waiver as a Reasonable
Accommodation</u>

Plaintiff's threshold argument concerning the NCAA's
eligibility waiver procedures asserts that this Court has already
found, as a matter of law, that such a waiver review did not
constitute a reasonable accommodation for Bowers because it
occurred too late in the application cycle to be of any use.
Plaintiff reasons that in November 2000, Judge Orlofsky issued an
opinion denying the NCAA's motion for summary judgment, in which
the Court held, <u>inter</u> <u>alia</u>, that the NCAA had failed to prove
that the waiver proceedings constituted a reasonable
accommodation as a matter of law.  Plaintiff takes the Court's
denial of the NCAA's motion for summary judgment and runs with
it, arguing that it is now the law of this case that the waiver
review process was not a reasonable accommodation as a matter of
law.  Alternatively, Plaintiff argues that even if it is not the
law of the case that the waiver proceedings were not a reasonable
accommodation, "this Court should nevertheless find, as a matter
of law, that the waiver proceeding . . . was not reasonable."
(Pl.'s Br. 17.)

The Court is not persuaded by either of these arguments.
Judge Orlofsky's November 2000 opinion makes clear the limited
procedural context of that decision -- a ruling on the NCAA's
motion for summary judgment.  The court observed that on summary
judgment, its task was to "determine whether the evidence shows
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Bowers III, 118 F. Supp. 2d at 510 (internal quotations and
citation omitted).  It further noted that "the judge's function
is not himself to weigh the evidence and determine the truth of
the matter but to determine whether there is a genuine issue for
trial."  Id. (quotations and citation omitted).  Plaintiff's
argument appears to suggest that the court set forth these legal
standards and then proceeded to ignore them, "weigh[ing] the
evidence" and drawing its own conclusions from that evidence to
adjudicate the material fact of whether the eligibility waiver
was a reasonable accommodation.  Id.  Obviously, the court did no
such thing.  In denying the NCAA's motion for summary judgment,
the court did not hold that the waiver review was unreasonable as
a matter of law; it merely held that the issue presented a jury
question.

Because the determination of whether an accommodation is
reasonable is a question of fact to be decided by a jury, the
Court will also deny Plaintiff's motion to hold that the

eligibility waiver process, as it existed in 1995-1996, was not a reasonable accommodation as a matter of law. See, e.g., Buskirk v. Apollo Metals, 307 F.3d 160, 170 (3d Cir. 2002) ("Generally, the question of whether a proposed accommodation is reasonable is a question of fact."); see also Equal Employment Opportunity Commission v. Convergys Customer Management Group, Inc., 491 F.3d 790, 796 (8th Cir. 2007) (same). The parties' arguments as to whether the eligibility waiver process came too late in the application cycle to be reasonable are questions of fact for the jury to decide. Buskirk, 307 F.3d at 170.

      b.  The 1997 Waiver Review of Bowers' Credentials

Plaintiff has also moved to exclude evidence of the Waiver Committee's 1997 review of Bowers' credentials, which occurred pursuant to a court order in connection with Bowers' motion for a preliminary injunction. Plaintiff argues that the waiver proceeding, conducted after the alleged discrimination at issue in this case had taken place, is not relevant to the question of whether the NCAA made a reasonable accommodation available to Bowers in 1995-1996, nor whether Bowers was otherwise qualified to be a Division I student-athlete during the 1995-1996 application cycle. As the Court explains below, it agrees with Plaintiff that the 1997 Waiver Committee proceeding is not relevant to the reasonable accommodation inquiry, but it finds that evidence relating to those proceedings is relevant to

32

whether Bowers was otherwise qualified.  It will accordingly permit the NCAA to introduce evidence from those proceedings, but will instruct the jury as to the limited purpose for which the evidence may be considered.

First, the Court agrees with Plaintiff that evidence relating to the 1997 waiver proceeding is not relevant to the question of whether the NCAA made a reasonable accommodation available to Bowers in 1995-1996, the time that the alleged discrimination at issue in this case occurred.  The Court is guided by the Court of Appeals' most recent consideration of this case:

> We have clearly stated that the determination of whether a person was a "qualified individual with a disability" for the purposes of an ADA claim is <u>not made from the time the lawsuit was filed or any other later time period, but from the point at which the alleged discriminatory decision was made</u>.  In this case, the allegedly discriminatory conduct occurred over the course of the Fall 1995-96 school year, during which time Bowers was deemed to be a nonqualifier and the defendant universities in this case allegedly stopped recruiting him for that reason.

<u>Bowers</u>, 475 F.3d at 535-36 (citations omitted) (emphasis added).

The NCAA has not presented a convincing reason to treat the relevant time period for the reasonable accommodation analysis separately from the time period applicable to the otherwise-qualified inquiry.  To the contrary, the two considerations are closely intertwined, as stated by the Third Circuit:

> "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his

33

handicap." <u>Southeastern Community College v. Davis</u>, 442
U.S. 397, 406 (1979).

But "an individual may be otherwise qualified in some
instances even though he cannot meet all of a program's
requirements." <u>Wagner v. Fair Acres Geriatric Center</u>, 49
F.3d 1002, 1009 (3d Cir. 1995). "The benefit . . .
cannot be defined in a way that effectively denies
otherwise qualified handicapped individuals the
meaningful access to which they are entitled; to assure
meaningful access, reasonable accommodations in the
grantee's program or benefit may have to be made."
<u>Alexander v. Choate</u>, 469 U.S. 287, 300 (1985).

<u>Juvelis</u>, 68 F.3d at 653. Since "the determination of whether a
person was a 'qualified individual with a disability,'" and, by
extension, whether an accommodation was reasonable, "is not made
from the time the lawsuit was filed or any other later time
period, but from the point at which the alleged discriminatory
decision was made," <u>Bowers</u>, 475 F.3d at 535-36, the Waiver
Committee's court-ordered assessment of Bowers' qualifications in
1997, well after the allegedly discriminatory decision in this
case was made, is not relevant to whether a reasonable
accommodation was available to Bowers during the time period
relevant to this case. The Court thus agrees with Plaintiff that
the 1997 waiver proceeding did not constitute a reasonable
accommodation as a matter of law, and will preclude the NCAA from
arguing to the contrary.

However, the Court agrees with the NCAA that evidence from
the 1997 waiver proceeding is relevant to the question of whether
Bowers was academically qualified during the 1995-1996 period.

34

In order to make out a prima facie case under the Rehabilitation Act, Plaintiff must demonstrate that Bowers was able to satisfy the NCAA's academic criteria, or could have done so with a reasonable accommodation.  See Juvelis, 68 F.3d at 653.  As the NCAA has argued, the waiver review "is directly relevant to that inquiry because it was an analysis of Bowers' academic record used to determine whether there was any evidence that Bowers was academically prepared to handle the combined demands of college academics and Division I athletics."  (Defs.' Opp'n Br. at 21.) The Court agrees with the NCAA that the Waiver Committee's review of Bowers' credentials – which focused on his academic records during the 1995-1996 period – is relevant to Plaintiff's claim that Bowers was "qualified . . . to meet . . . [the] program's requirements."  Southeastern Community College, 442 U.S. at 406; see also Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

Plaintiff's arguments to the contrary are not convincing. First, Plaintiff argues that the Committee's assessment of Bowers' academic qualifications is irrelevant because the Committee's evaluation of Bowers' credentials was based on imperfect information and/or influenced by bias.  In support of this argument, Plaintiff draws the Court's attention to certain

irregularities in the Committee's evaluation of Bowers'
application, including the fact that the review was performed by
"the NCAA's own committee" in the midst of a lawsuit, which
allegedly prejudiced its determinations, (Pl.'s Br. at 27), and
the fact that Bowers did not have the opportunity to submit
letters from his teachers to the Committee, which the Committee
typically afforded "quite a bit" of weight.  (Raske Dep. 99.)
The Court does not agree with Plaintiff that these irregularities
render irrelevant the Committee's assessment of Bowers' academic
qualifications.  Plaintiff is, of course, free to cross-examine
the NCAA's witnesses as to the existence and impact of these
irregularities and alleged biases on their assessment of Bowers'
credentials, but these irregularities do not render the evidence
<u>irrelevant</u> as to the issue of Bowers' academic qualifications.

Additionally, Plaintiff argues that evidence of the
Committee's review of Bowers' credentials should be excluded
under Rule 403, Fed. R. Evid., because the limited probative
value of the evidence is outweighed by the risk of unfair
prejudice it carries.  According to Plaintiff, because the 1997
proceedings were conducted pursuant to a court order, the results
reached by the Committee inherently carry the "imprimatur" of the
Court's authority.  Plaintiff reasons that "[t]his would unfairly
leave the jury with the impression that the Committee's
conclusion that Michael Bowers should not be granted initial

36

eligibility (albeit nearly two years after he first applied) was 'correct' because this Court in some way had 'sanctioned' this proceeding."  (Pl.'s Br. at 29.)

The Court disagrees, and finds Plaintiff's concerns over the imprimatur of Court approval to be misplaced.  First, the Court could instruct the jury that simply because the proceeding took place pursuant to a court order does not mean that the Court sanctioned the result of the Committee's review.  See United States v. Daraio, 445 F.3d 253, 260 (3d Cir. 2006) (recognizing that "it is a basic tenet of our jurisprudence that a jury is presumed to have followed the instructions the court gave it") (citation omitted).  Moreover, the Court does not agree with Plaintiff that the fact that the waiver proceeding occurred as the result of a court order carries a substantial risk of prejudice.  If anything, the fact that it took a court order for the Committee to review Bowers' application would appear to illustrate the difficulties that the NCAA's policies posed for learning disabled applicants, a suggestion that certainly is not unfavorable to Plaintiff.  In any case, because the Court finds that whatever minimal prejudice created by the fact that 1997 Waiver Committee proceeding took place pursuant to a court order could be cured by an instruction to the jury, the Court finds that exclusion of evidence stemming from that proceeding under

Rule 403 is not called for.[9]

In summary, the Court agrees with Plaintiff that the 1997 waiver proceeding is not relevant to the issue of whether the NCAA made a reasonable accommodation available to Plaintiff, since that proceeding occurred well "after the alleged discriminatory decision was made."  Bowers, 475 F.3d at 535-36. The Court will accordingly grant Plaintiff's motion to the extent that it seeks to preclude the NCAA from arguing that the 1997 proceeding was a reasonable accommodation for Bowers.  However, evidence stemming from the Waiver Committee's review of Bowers' academic record in 1995-1996 is relevant to Bowers' academic qualifications at the time he submitted his application to the Clearinghouse, and is admissible for the purpose of addressing whether or not Bowers was otherwise qualified at the time the allegedly discriminatory conduct took place.

**C.   Plaintiff's Motion to Exclude After-Acquired Evidence**

Plaintiff has moved to preclude the NCAA from introducing as evidence that Bowers was not an "otherwise qualified individual"

_____

[9]  The Court also disagrees with Plaintiff's argument that permitting the Committee members to testify about their review of Bowers' credentials is a back-door means of introducing expert testimony in violation of Rule 702, Fed. R. Evid.  These witnesses' testimony would be "rationally based on the[ir] perception" based on their first-hand knowledge of the Committee's review of Bowers' application.  Fed. R. Evid. 701(a). The witnesses' descriptions of the circumstances surrounding their review of Bowers' qualifications, and the decisions they reached, is not expert testimony.

evidence that she argues is barred under the after-acquired evidence doctrine.  Specifically, Plaintiff seeks to preclude the NCAA, in proving that Bowers was not qualified under its initial eligibility rules, from introducing evidence of the fact that Bowers took his Algebra and Geometry courses on an expedited basis, a fact that the NCAA did not learn until after the NCAA denied Bowers initial eligibility on July 30, 1996.[10]  For the reasons set forth below, the Court will grant Plaintiff's motion.[11]

### 1.   The After-Acquired Evidence Doctrine

Put simply, the after-acquired evidence rule proscribes a defendant alleged to have unlawfully discriminated against a plaintiff from introducing evidence which the defendant did not know about at the time it took the adverse action in order to escape liability.  McKennon v. Nashville Banner Pub. Co., 513

_____

[10]  In particular, the NCAA seeks to argue that at the time Bowers was deemed to be a nonqualifier, his transcripts indicated that he had completed a full year of Geometry and a full year of Algebra.  As the NCAA later learned, Bowers took both courses on an expedited basis.  The NCAA seeks to argue that the circumstances under which Bowers completed these courses were "highly irregular" and "suspicious," and that such circumstances bear on whether Bowers was otherwise qualified to be a Division I student-athlete.  (NCAA's Opp'n Br. 2-3.)

[11]  In her motion, Plaintiff also sought to preclude Temple, in proving that Bowers was not qualified to play football after he enrolled at Temple in 1997, from introducing evidence of Bowers' drug use, which Temple did not learn about until 2004.  Because Temple is no longer a party to this lawsuit, Plaintiff's motion as to this point is moot and will be dismissed.

U.S. 352, 359-60 (1995); Mardell v. Harleysville Life Ins. Co.,

31 F.3d 1221, 1228 (3d Cir. 1994), abrogated by McKennon, 513

U.S. 352.  As the Supreme Court explained in McKennon,

> Congress designed the remedial measures in these statutes
> to serve as a spur or catalyst to cause employers to
> self-examine and to self-evaluate their employment
> practices and to endeavor to eliminate, so far as
> possible, the last vestiges of discrimination.
> Deterrence is one object of these statutes.  Compensation
> for injuries caused by the prohibited discrimination is
> another.
>
> . . . .
>
> It would not accord with this scheme if after-acquired
> evidence of wrongdoing that would have resulted in
> termination operates, in every instance, to bar all
> relief for an earlier violation of the Act.
>
> . . . .
>
> [P]roving that the same decision would have been
> justified is not the same as proving that the same
> decision would have been made.

513 U.S. at 358, 360 (internal quotations and citations omitted).

The Court of Appeals put the matter more bluntly in Mardell

when it stated:

> After-acquired evidence, simply put, is not relevant in
> establishing liability under Title VII or ADEA because
> the sole question to be answered at that stage is whether
> the employer discriminated against the employee on the
> basis of an impermissible factor at the instant of the
> adverse employment action.

Mardell, 31 F.3d at 1228.[12]  Although McKennon and Mardell took

---

[12]   While after-acquired evidence is not relevant to the
issue of liability, such evidence is relevant to the remedies
that are available to a plaintiff in a discrimination suit.  In
the employment context, the Supreme Court held that while

up the after-acquired evidence doctrine in the context of Age
Discrimination in Employment Act and Title VII claims, the rule
applies with equal force to the statutes under which Plaintiff's
suit is brought.  See Bowers, 475 F.3d at 537.

> 2.  The Parties' Arguments

According to Plaintiff, the NCAA did not know about Bowers'
expedited mathematics coursework at the time it allegedly
discriminated against Bowers, and, accordingly, this information
could not have motivated the allegedly discriminatory conduct
underlying Plaintiff's claims.  Because the NCAA did not know
about the information in question at the time of the allegedly
discriminatory conduct, Plaintiff argues, it cannot rely on
after-acquired evidence suggesting that Bowers was not otherwise
qualified, because "[a]fter-acquired evidence, simply put, is not
relevant in establishing liability."  Mardell, 31 F.3d at 1228.

Plaintiff relies heavily on the brief treatment of the
after-acquired evidence rule by the Court of Appeals in this
case.  In addressing whether Defendants could use evidence of
Bowers' drug use to prove that he was not "otherwise qualified"
to participate in intercollegiate athletics, the court held that
after-acquired evidence that Bowers was not qualified could not

---

"neither reinstatement nor front pay is an appropriate remedy,"
back pay may be awarded to cover the period between the
defendant's adverse action until the date that the defendant
discovered the evidence in question.  McKennon, 513 U.S. at 362.

be used to defend Defendants' allegedly discriminatory conduct:

> Defendants' argument that Bowers was unqualified at the relevant time frame as a result of his drug abuse rests on the erroneous assumption that Defendants could have used evidence of Bowers' drug abuse as an after-the-fact justification for their allegedly discriminatory conduct. It is clear that the Defendants were completely unaware of Bowers' drug abuse at the time the allegedly unlawful discrimination took place in 1995-96 as well as during the time Bowers was at Temple.  Indeed, that fact is the very source of the controversy with respect to the sanctions in this case.  In turn, the Defendants "could not have been motivated by knowledge [they] did not have," [McKennon, 513 U.S. at 360], and thus cannot now claim that Bowers was deemed a nonqualifier because of his drug abuse.  See also [Mardell, 65 F.3d 1072] (applying McKennon in unlawful discrimination context and holding after-acquired evidence of misconduct is relevant to damages but does not bar liability).

Bowers, 475 F.3d at 537.  In light of the Court of Appeals' determination that Defendants are proscribed from using after-acquired evidence to prove that Bowers was not an "otherwise qualified individual with a disability," 29 U.S.C. § 794(a), Plaintiff argues that Defendants cannot use evidence of Bowers' expedited mathematics coursework and drug use to contest his qualifications.

The NCAA argues that the after-acquired evidence rule is inapplicable to the otherwise-qualified inquiry, because the question of whether Bowers was otherwise qualified is one of the elements of Plaintiff's own prima facie case, and is thus separate from the question of whether Defendants had a legitimate, nondiscriminatory reason for their conduct.  See Wishkin v. Potter, 476 F.3d 180, 184-85 (3d Cir. 2007)

(discussing the McDonnell Douglas burden-shifting framework in
the context of a Rehabilitation Act claim).  According to
Defendants, McKennon's central premise – that "the employer could
not have been motivated by knowledge it did not have," 513 U.S.
at 360 – is not implicated by the determination of whether Bowers
was otherwise qualified, because if Plaintiff cannot prove that
Bowers was otherwise qualified, she "cannot make out a prima
facie case, and the burden never shifts to the defendant."
Employment Opportunity Commission v. Fargo Assembly Co., 142 F.
Supp. 2d 1160, 1164 (D.N.D. 2000).  In other words, since the
otherwise-qualified inquiry is raised at the outset in
Plaintiff's prima facie case, Defendants can challenge Bowers'
qualifications before having to offer a non-discriminatory
rationale and, hence, without having to suggest that they had
been "motivated by knowledge [they] did not have."  McKennon, 513
U.S. at 360.

Defendants' argument, they note, falls squarely within the
holding of McNemar v. Disney Store, Inc., 91 F.3d 610, 621 (3d
Cir. 1996), abrogated on other grounds by Cleveland v. Policy
Management Systems Corp., 526 U.S. 795 (1999).[13]  In McNemar, the
Court of Appeals addressed the question of whether the after-

---

[13] McNemar's ruling on the issue of judicial estoppel was
abrogated by the Supreme Court's decision in Cleveland.  526 U.S.
at 800.  McNemar's application of the after-acquired evidence
rule was not implicated by Cleveland.

acquired evidence rule is applicable where the defendant seeks to

use such evidence to challenge the plaintiff's status as a

"qualified individual with a disability."[14]  McNemar, 91 F.3d at

621.  The court reasoned that the after-acquired evidence rule

was inapplicable, explaining that

> the relevant question in this case is whether McNemar
> established a prima facie case of discrimination, and
> because he has not, Disney has no obligation even to
> articulate a legitimate business reason for its decision.
> Seen in this light, the EEOC's assertion that "[a]
> plaintiff's claim cannot be defeated by an issue of
> qualifications that has nothing to do with the employer's
> motivation for the adverse action" becomes irrelevant,
> again because that assertion has to do with Disney's
> putative pretext for firing McNemar, which is not a
> proper concern for the court unless McNemar first has
> established a prima facie case that he was qualified for
> the job.

Id. (some internal quotations and citations omitted); see also

Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1281 (10th Cir. 1999).

The NCAA urges the Court to adopt the reasoning of McNemar and

deny Plaintiff's motion to exclude after-acquired evidence.

     In reply, Plaintiff argues that the NCAA's arguments run

contrary to the Court of Appeals' instructions in Bowers.

Specifically, Plaintiff notes that Defendants raised the same

argument on appeal, (Pl.'s Reply Br. Ex. 1), which the Court of

---

[14]  In McNemar, the plaintiff's relevant claim arose under
Title I of the ADA, which makes it unlawful for an employer to
discriminate against a "qualified individual with a disability."
42 U.S.C. § 12112(a).  There is no meaningful distinction between
the ADA's "qualified individual" element and the Rehabilitation
Act's "otherwise qualified" element.  See Yeskey, 118 F.3d at
170.

Appeals' impliedly rejected in holding that "Defendants' argument that Bowers was unqualified at the relevant time frame as a result of his drug abuse rests on the erroneous assumption that Defendants could have used evidence of Bowers' drug abuse as an after-the-fact justification for their allegedly discriminatory conduct."  Bowers, 475 F.3d at 537.

      3.   Analysis

Although there is certainly authority from within and outside this Circuit to support Defendants' arguments concerning the applicability of the after-acquired evidence rule to the issue of whether Bowers was an otherwise qualified individual, the Court must grant Plaintiff's preclusion motion.  Irrespective of what result the law of this Circuit might have required the Court to reach prior to the Court of Appeals' decision in Bowers, see McNemar, 91 F.3d at 621, the import of the Court of Appeals' application of the after-acquired evidence rule to Bowers' drug use is unmistakable.  The Court of Appeals addressed the rule specifically in the context of an analysis of whether Bowers was an "otherwise qualified individual with a disability," 29 U.S.C. § 794(a), and did not adopt Defendants' argument that the after-acquired evidence rule is inapplicable to the otherwise-qualified inquiry.  Instead, the court expressly found Defendants' attack on whether Bowers was otherwise qualified based on his drug use to be based on "the erroneous assumption that Defendants could

45

have used evidence of Bowers' drug abuse as an after-the-fact justification for their allegedly discriminatory conduct." Bowers, 475 F.3d at 537.

It is also telling that Defendants advanced a nearly identical argument on appeal, which the Court of Appeals apparently did not find persuasive.  (Pl.'s Reply Br. Ex. 1.) After having raised this argument unsuccessfully on appeal, Defendants now argue that "the Third Circuit did not thoroughly consider whether the after-acquired evidence doctrine even applies to plaintiff's prima facie case of disability discrimination."  (Temple's Opp'n Br. 3.)  This argument essentially asks the Court to find that the Court of Appeals did not mean what it said.  Of course, the Court is in no position to do so, and must instead find, as the Court of Appeals' decision makes clear, that the after-acquired evidence doctrine is applicable to the question of whether Bowers was otherwise qualified.  Bowers, 475 F.3d at 537.

With the law governing Plaintiff's motion clear, its application to the facts here is straightforward.  It is undisputed that the NCAA was not aware of the circumstances under which Bowers took his Algebra and Geometry courses at the time he was deemed to be a non-qualifier, so any effort by the NCAA to use such circumstances to prove that Bowers was not "otherwise qualified" would run afoul of the after-acquired evidence rule,

46

as set forth by the Court of Appeals in <u>Bowers</u>, 475 F.3d at
537.[15]  Plaintiff's motion to exclude after-acquired evidence
will thus be granted in its entirety.

**D.   Plaintiff's Motion to Preclude the NCAA from Contesting that Bowers was Disabled**

The Court next addresses Plaintiff's motion to preclude the
NCAA from contesting Plaintiff's claim that Bowers was disabled.
In support of this motion, Plaintiff argues that the Court should
hold, as a matter of law, that Bowers had a "disability" under
the ADA, 42 U.S.C. § 12102(2); that he was an "individual with a
disability" under the Rehabilitation Act, 29 U.S.C. § 705(20)(b);
that he was "disabled" under the NJLAD, N.J.S.A. 10:5-4.1; or
that Defendants regarded or perceived Bowers as having such a
disability under each applicable statute.[16]  For the following

---

[15]  The NCAA suggests that Bowers' expedited coursework is
also relevant to the issue of causation.  According to the NCAA,
since Bowers had not taken Algebra and Geometry by his senior
year of high school, football recruiters might have lost interest
in him because he had not taken his required math courses, and
not because of his special education curriculum and designation
as a nonqualifier.  As Plaintiff argues, however, whether Bowers
took those courses under "highly irregular" circumstances,
(NCAA's Opp'n Br. at 3), is irrelevant to the NCAA's causation
argument.  Plaintiff does not dispute that the NCAA is free to
introduce evidence as to whether and when these courses appeared
on Bowers' transcript.

[16]  Although Plaintiff's opening brief in support of her
motion couches these points within the context of a judicial
estoppel argument, her Reply all but forgoes the judicial
estoppel argument and asks the Court to rule as a matter of law
that Bowers was disabled and/or that the NCAA regarded him as
such.
    Plaintiff's argument that the NCAA should be judicially

reasons, Plaintiff's motion will be denied.

First, as to the majority of arguments Plaintiff advances in support of her motion, the Court finds that the motion is procedurally improper, in that it calls upon the Court to weigh the sufficiency of the evidence in support of the parties' claims and defenses and, in effect, to resolve the parties' factual disputes on the eve of trial.  As the Court of Appeals has recognized, "[u]nlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of fact, a motion in limine is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."  Bradley v. Pittsburgh Bd. of Educ., 913 F.2d

---

estopped from denying that Bowers had a disability is unpersuasive.  As the Court of Appeals has emphasized, "judicial estoppel is an extreme remedy, to be used only when [a party's] inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court."  Chao v. Roy's Const., Inc., 517 F.3d 180, 186 n.5 (3d Cir. 2008) (internal quotations and citations omitted).  Plaintiff insists that the NCAA perpetrated such a misrepresentation or fraud, pointing to examples such as the NCAA's concession, during Plaintiff's motion for a preliminary injunction, that "Bowers received 'special education' and related services as a result of his classification as a student with a perceptual impairment . . ."  (Pl.'s Br. Ex. 2 at ¶ 30.)  The NCAA's recognition that Bowers received certain services as a result of being classified as a perceptually impaired student falls far short of a misrepresentation to the Court -- indeed, it would be difficult to imagine how the NCAA could have disputed such a fact.  Plaintiff has not identified any conduct on the NCAA's part amounting to fraud on the Court or threatening the "integrity of [the judicial] system," Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 n.7 (3d Cir. 2003), to justify the application of judicial estoppel.

1064, 1069 (3d Cir. 1990); <u>see also</u> <u>C & E Services, Inc. v.</u>
<u>Ashland Inc.</u>, 539 F. Supp. 2d 316, 323 (D.D.C. 2008).  An <u>in</u>
<u>limine</u> motion is not a proper vehicle for a party to ask the
Court to weigh the sufficiency of the evidence to support a
particular claim or defense, because "[t]hat is the function of a
motion for summary judgment, with its accompanying and crucial
procedural safeguards."  <u>C & E Services</u>, 539 F. Supp. 2d at 323
(citing <u>Bradley</u>, 913 F.2d at 1069-70).

It is well settled that "[m]otions <u>in</u> <u>limine</u> address
evidentiary questions and are inappropriate devices for resolving
substantive issues," such as the sufficiency of the evidence to
support a claim or defense.  <u>Natural Resources Defense Council v.</u>
<u>Rodgers</u>, No. 88-1658, 2005 WL 1388671, *1 n.2 (E.D. Cal. June 9,
2005); <u>see</u>, <u>e.g.</u>, <u>Figgins v. Advance America Cash Advance Centers</u>
<u>of Michigan, Inc.</u>, 482 F. Supp. 2d 861, 870 (E.D. Mich. 2007)
("To the extent that the defendants are arguing that the facts
are insufficient to allow the plaintiff to seek punitive damages
from the jury, that argument must be rejected because it should
have been raised in a motion for summary judgment"); <u>Provident</u>
<u>Life & Acc. Ins. Co. v. Adie</u>, 176 F.R.D. 246, 250 (E.D. Mich.
1997) ("If [plaintiff] wanted to preclude [defendant] from
raising these defenses at trial because there was no genuine
issue of material fact as to them, then he should not have filed
a motion <u>in</u> <u>limine</u> on the eve of trial, but instead should have

filed a summary judgment motion pursuant to Federal Rule of Civil Procedure 56.").[17]

Accordingly, to the extent that Plaintiff's motion asks the Court to find, as a matter of law, that Bowers had a record of having a disability, or that the NCAA regarded Bowers as being disabled, the motion will be denied.  These arguments raise questions of fact to be decided by the jury, and are not properly raised through in limine motions on the eve of trial.[18]

The Court will, however, address the merits of Plaintiff's argument that Bowers was disabled as a matter of law under the

---

[17]   The other in limine motions addressed in this Opinion do not raise the same concerns as the motion presently under consideration.  Those motions do not address the sufficiency of the facts to support particular claims, but are instead directed at evidentiary questions or purely legal determinations regarding the availability of a claim or defense as a matter of law.  Cf. Bradley, 913 F.2d at 1070 (observing that "[o]f course, the district court was not precluded from considering whether the complaint stated a claim, an issue which remains open up to the trial on the merits").

[18]   Even if Plaintiff had raised these arguments in a timely summary judgment motion, there would not appear to be a basis for the Court to rule as a matter of law that Bowers was perceived as being disabled or that he had a record of impairments.  See, e.g., Herman v. Kvaerner of Philadelphia Shipyard, Inc., 461 F. Supp. 2d 332, 335 (E.D. Pa. 2006) (noting that "[t]he case law of the United States Supreme Court and the Third Circuit establishes that the determination of whether someone is disabled is a highly fact-intensive inquiry"); Mues v. General Revenue Corp., No. 1:05-CV-00505, 2007 WL 2248165, *7 (S.D. Ohio Aug. 2, 2007) ("The question of whether a Plaintiff is regarded as having such an impairment . . . [under the ADA] ordinarily is not one to be decided on summary judgment, as it involves a determination of state of mind that is more appropriate for the jury than for the judge.").

antidiscrimination statutes at issue in this case because he was determined to be in need of special education services under the IDEA and related New Jersey statutes.  According to Plaintiff, "[t]he fact that Michael Bowers was diagnosed and classified as having a 'perceptual impairment,' pursuant to New Jersey Law and the IDEA, and that, as a result, he received special education services under an IEP for many years, establishes as a matter of law" that he was disabled within the meaning of the statutes that form the basis of Plaintiff's claims.  (Pl.'s Reply Br. at 8.)

Plaintiff's argument is without merit.  Although both the Rehabilitation Act and the IDEA provide certain forms of relief for children with disabilities, the statutes have distinct purposes: "while the Rehabilitation Act provides relief from discrimination, the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination." L.T. v. Mansfield Tp. School Dist., No. 04-1381, 2007 WL 2332308, *2 (D.N.J. Aug. 10, 2007) (citing Hornstine v. Township of Moorestown, 263 F. Supp. 2d 887, 901 (D.N.J. 2003)).

Concomitant to these distinct purposes are separate statutory definitions of what it means to be disabled or handicapped.  Under the IDEA, a "child with a disability" is defined as a child "(i) with [any of a list of impairments, including] specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services."

20 U.S.C. § 1401(3)(A).  Under the regulations implementing the Rehabilitation Act, a "handicapped person" is one who "(i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 34 C.F.R. § 104.3(j)(1).

As these separate statutory treatments of the terms "disability" and "handicapped" make clear, "[a] special education student is not necessarily a 'qualified individual with a disability'" under the Rehabilitation Act.  Dohmen ex rel. Dohmen v. Twin Rivers Public Schools, 207 F. Supp. 2d 972, 975 n.2 (D. Neb. 2002).  It is likely that there will be substantial overlap between the categories of children who "need[] special education and related services," on the one hand, 20 U.S.C. § 1401(3)(A), and children who have "a physical or mental impairment which substantially limits one or more major life activities," on the other.  34 C.F.R. § 104.3(j)(1).  But the likelihood of overlap does not, as Plaintiff argues, mean that a student receiving special education services under the IDEA is per se handicapped under the Rehabilitation Act, see Dohmen, 207 F. Supp. 2d at 975 n.2, and does not relieve Plaintiff of her burden of proving by a preponderance of the evidence that Bowers had "a physical or mental impairment which substantially limit[ed] one or more major life activities."  34 C.F.R. § 104.3(j)(1)(i); cf. Andrew M. v.

Delaware County Office of Mental Health and Mental Retardation, 490 F.3d 337, 349 (3d Cir. 2007) (legislative history of the Rehabilitation Act "does not indicate that a violation of the IDEA is a per se violation of the [Rehabilitation Act] . . . . a plaintiff must still prove that there was a violation of the [Rehabilitation Act]").[19]

Plaintiff's reliance upon an inapplicable provision of the Rehabilitation Act's implementing regulations does not undermine the Court's conclusion.  Plaintiff argues that under those regulations, a "qualified handicapped person" is defined as "a handicapped person . . . to whom a state is required to provide a free appropriate public education under [the IDEA]."  34 C.F.R. § 104.3(l)(2).  In advancing this argument, Plaintiff overlooks the fact that the above-quoted provision only defines what it means to be a qualified handicapped person "[w]ith respect to public preschool elementary, secondary, or adult educational services."  Id.  When read as a whole, § 104.3(l), set forth in full in the margin,[20] makes clear that different definitions of "qualified

_____

[19]   In light of the fact that "[t]he question of whether an individual is substantially limited in a major life activity is a question of fact," Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 763 (3d Cir. 2004), Plaintiff's suggestion that every special education student in the country is so limited solely by virtue of the fact that both the IDEA and the Rehabilitation Act contain the term "impairment" is especially unconvincing.

[20]   Section 104.3(l) provides in full:

handicapped person" are applicable in different contexts, and what serves to qualify an individual in one context does not necessarily suffice in another context.  In this case, Bowers was applying to participate in the NCAA's intercollegiate athletics program, which clearly falls into section 104.3(l)'s "other services" category.  § 104.3(l)(4).  Because this case has nothing to do with whether Bowers was qualified to participate in "public preschool elementary, secondary, or adult educational services," Plaintiff's reliance upon section 104.3(l)(2) is

----

Qualified handicapped person means:

(1)  With respect to employment, a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question;

(2)  With respect to public preschool elementary, secondary, or adult educational services, a handicapped person (i) of an age during which nonhandicapped persons are provided such services, (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under section 612 of the Education of the Handicapped Act; and

(3)  With respect to postsecondary and vocational education services, a handicapped person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity;

(4)  With respect to other services, a handicapped person who meets the essential eligibility requirements for the receipt of such services.

34 C.F.R. § 104.3(l).

misplaced.

In short, Plaintiff has not demonstrated that she should be relieved from proving that Bowers had a "physical or mental impairment which substantially limit[ed] one or more major life activities," § 104.3(j)(1)(i), an element as to which she bears the burden of proof by a preponderance of the evidence at trial. The Court will accordingly deny Plaintiff's motion to preclude the NCAA from contesting that Bowers was disabled.

### E.   NCAA's Motion to Exclude Evidence of the 1998 Consent Decree and Other Subsequent Bylaw Changes

The NCAA has moved to exclude evidence of a 1998 Consent Decree entered into between itself and the Department of Justice, as well as evidence of changes in its bylaws that took place between the designation of Bowers as a nonqualifier under those bylaws in 1996 and the filing of the Consent Decree in 1998.  For the following reasons, the Court will grant the NCAA's motion with respect to the exclusion of the Consent Decree.  As to the NCAA's motion to exclude evidence of pre-Decree bylaw changes, the Court will grant the NCAA's motion without prejudice to Plaintiff's right to seek to introduce such evidence if the NCAA "controvert[s]" the feasibility of alternative policies in its defense.  Fed. R. Evid. 407.

### 1.   The Bylaws and the 1998 Consent Decree

In 1995-1996 when Bowers submitted his application to the NCAA Clearinghouse, the NCAA's bylaws provided that "[c]ourses

that are taught at a level below the high school's regular
academic instructional level (e.g., remedial, special education
or compensatory) shall not be considered core courses regardless
of course content." (NCAA Bylaw 14.3.1.3.)  Additionally, Bylaw
14.3.1.3.5 provided that the NCAA's Academic Requirements
Committee could approve "high school courses for the learning
disabled and handicapped to fulfill the core-curriculum
requirements if the high school principal submits a written
statement to the NCAA indicating that students in such classes
are expected to acquire the same knowledge, both quantitatively
and qualitatively, as students in other core courses." (NCAA
Bylaw 14.3.1.3.5.)  According to Plaintiff, under the NCAA's
1995-1996 policies, the NCAA also imposed restrictions on
students seeking credit for SAT scores for exams taken on an
extended-time basis, (Pl.'s Opp'n Br. Ex. B), and required
students seeking waivers of initial eligibility determinations to
induce an NCAA member institution to file a waiver on their
behalf rather than permitting them to file waivers themselves.
(Karpinski Dep. 89.)

    According to evidence submitted by Plaintiff (and apparently
not disputed by the NCAA), before it entered into the 1998
Consent Decree, the NCAA made various changes to its eligibility
policies.  These changes included: (1) permitting learning
disabled students to satisfy core course credits with summer

56

school courses following graduation, (Pl.'s Opp'n Br. Ex. F); (2) adopting Bylaw 13.3.1.3.4, which gave core course credit to courses for students with learning disabilities that were "substantially comparable, quantitatively and qualitatively," to mainstream courses; (3) permitting learning disabled students to file waiver requests themselves; (4) loosening the restrictions on students seeking credit for extended-time SAT scores, (Pl.'s Opp'n Br. Ex. J); and (5) reducing the paperwork high schools were required to submit in order to qualify special education courses as core courses.  (Pl.'s Opp'n Br. Ex. K.)

On May 26, 1998, the NCAA and the Department of Justice entered into a Consent Decree under which the NCAA made additional changes to its eligibility requirements.  In the Consent Decree, the NCAA did not admit liability, but instead "dispute[d] the allegations contained in the complaints" referenced in the Decree.  (NCAA Br. Ex. A at 2.)  Pursuant to the Consent Decree, the NCAA: (1) removed the words "special education" from Bylaw 14.3.1.3; (2) revised Bylaw 14.3.1.3.4 to specify that the designation "special education" was itself insufficient to disqualify a course from meeting its core curriculum requirements; (3) permitted learning disabled students who did not meet the initial eligibility criteria to earn an additional year of athletic competition under certain circumstances; and (4) revised its policies regarding self-filed

waiver requests.  (Id.)

  2.   Admissibility of the Consent Decree

The NCAA has moved to exclude the 1998 Consent Decree under Rule 408, Fed. R. Evid.[21]  The Court will grant the NCAA's motion.

Under Rule 408, evidence of a party "furnishing . . . a valuable consideration in compromising or attempting to compromise the claim," as well as "conduct or statements made in compromise negotiations regarding the claim," is "not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction."  F. R. Evid. 408(a) (emphasis added).[22]  "The purpose of Rule 408 is, of course, to encourage settlements and compromises of disputed claims, which would be discouraged if such evidence were admissible."  New Jersey Turnpike Authority v. PPG Industries, Inc., 16 F. Supp. 2d 460, 473 (D.N.J. 1998).

Courts have consistently held that Rule 408's exclusionary

_____

[21]  In its motion, the NCAA treats the Consent Decree and the bylaw changes that preceded the Consent Decree collectively. As the instant discussion makes clear, the Consent Decree and the independent alterations to the bylaws are subject to distinct evidentiary considerations, and will be addressed separately in this Opinion.

[22]  The Rule also provides for three exceptions, none of which are applicable to this case.  F. R. Evid. 408(b).

provision is not limited to settlements between private parties, but also applies to civil consent decrees between private parties and government agencies.  See, e.g., id. (citing cases). Moreover, as the language of the Rule makes clear, Rule 408 prevents a party from introducing settlement- and compromise-related evidence against the compromising party whether or not the party seeking to introduce the evidence was party to the compromise agreement.  See, e.g., Hudspeth v. C.I.R., 914 F.2d 1207, 1213 (9th Cir. 1990) ("Rule 408 does apply to situations where the party seeking to introduce evidence of a compromise was not involved in the original compromise"); Green v. Baca, 226 F.R.D. 624, 640 (C.D. Cal. 2005) (citing cases holding that Rule 408 "extends to evidence of completed settlements in other cases where the evidence is offered against the compromiser"); Young v. Verson Allsteel Press Co., 539 F. Supp. 193, 196 (E.D. Pa. 1982) (same).

As these principles make clear, Rule 408 is plainly applicable to the 1998 Consent Decree, and the policies underlying the Rule would be undermined by permitting Plaintiff to introduce the Consent Decree into evidence.  The Consent Decree is a "compromise" within the meaning of Rule 408, see New Jersey Turnpike Authority, 16 F. Supp. 2d at 473, and Plaintiff seeks to use the Consent Decree as evidence of the liability of the NCAA, a party to the compromise.  See Hudspeth, 914 F.2d at

59

1213.  Rule 408 does not permit Plaintiff to use the Consent
Decree as evidence of the NCAA's liability for the conduct
underlying her claims.

Plaintiff's argument that the NCAA should be judicially
estopped from contesting the admissibility of the Consent Decree
because it cited the agreement in its 1999 motion for summary
judgment is not persuasive.  As the Court explained, supra,
"judicial estoppel is an extreme remedy, to be used only when [a
party's] inconsistent positions are tantamount to a knowing
misrepresentation to or even fraud on the court."  Chao, 517 F.3d
at 186 n.5 (3d Cir. 2008) (internal quotations and citations
omitted).  The doctrine is applicable only where "the party in
question [has] adopted irreconcilably inconsistent positions[,] .
. .the party [has] adopted these positions in 'bad faith[,]'. . .
and . . . no lesser sanction would be sufficient."  Id. (citation
omitted).

The NCAA's reference to the Consent Decree in its motion for
summary judgment is not "irreconcilably inconsistent" with its
Rule 408 argument.  At the time it filed its summary judgment
motion in 1999, Plaintiff had a claim for injunctive relief that
has since been dismissed.  That the NCAA invoked the "importance"
of the Consent Decree in response to Plaintiff's claim for
injunctive relief in order to show that the "NCAA has already
provided modifications to enable learning disabled students to

meet the initial-eligibility standards," (Pl.'s Opp'n Br. Ex. N
at 30), is not irreconcilably inconsistent with its present
position on the admissibility of the Decree, years after Bowers'
claim for injunctive relief was dismissed from the case.
Moreover, there certainly is no indication that the NCAA's
positions were taken in bad faith or in an effort to perpetrate a
fraud upon the Court.  <u>Chao</u>, 517 F.3d at 186 n.5.

In summary, the Court will grant the NCAA's motion to
exclude evidence of the 1998 Consent Decree under Rule 408.

3.   <u>Admissibility of Pre-Decree Bylaw Changes</u>

The NCAA argues that evidence of pre-Decree bylaw
modifications should be excluded under Rule 407.  Rule 407
provides in relevant part:

> When, after an injury or harm allegedly caused by an
> event, measures are taken that, if taken previously,
> would have made the . . . harm less likely to occur,
> evidence of the subsequent measures is not admissible to
> prove . . . culpable conduct . . . . This rule does not
> require the exclusion of evidence of subsequent measures
> when offered for another purpose, such as proving . . .
> feasibility of precautionary measures, if controverted,
> or impeachment.

F. R. Evid. 407.  The parties' arguments focus largely on whether
the pre-Decree bylaw modifications should be admitted for
purposes of proving the feasibility of precautionary measures,
whether the NCAA disputes that such alternative measures were
feasible, and whether the evidence is admissible for impeachment
purposes.

In its argument, the NCAA emphasizes that evidence of the
feasibility of precautionary measures is admissible only where
the feasibility is "controverted."  Id.  The NCAA argues that
under Rule 407, a party does not controvert the feasibility of an
alternative policy unless it argues that such an alternative
would be impossible.  According to the NCAA, since the bylaws
consist of "mere words on a page," it goes without saying that
"the NCAA bylaws feasibly could have been worded differently."[23]
(NCAA Br. 13.)

In response, Plaintiff argues that the NCAA will be forced
to contest the feasibility of alternatives to the 1995-96 bylaws

---

[23]  The NCAA also argues that Plaintiff should not be
permitted to introduce evidence of the bylaw changes under Rule
407's impeachment exception, because unless a witness testifies
that it was impossible to improve upon the challenged policy, the
exception is inapplicable.  As the Court of Appeals explained in
Kelly v. Crown Equipment Co., 970 F.2d 1273 (3d Cir. 1992):

> Dr. Watkins did not make a statement that the forklift's
> design was the best or the only one possible.  He said
> only that it was an excellent and proper design.  Thus,
> evidence of subsequent changes cannot serve to impeach
> his statements . . . . Defining the term "impeachment" in
> a less stringent manner would permit the exception to
> swallow the rule since any evidence of subsequent
> remedial measures might be thought to contradict and so
> in a sense impeach a party's testimony.

970 F.2d at 1278 (internal quotations and citations omitted).
While the NCAA's argument accurately describes the scope of Rule
407's impeachment exception, this matter cannot be determined in
limine before the testimony to be impeached has been presented.
Then Plaintiff may press this point prior to her rebuttal case,
or prior to cross-examination of a particular NCAA witness whose
testimony is sought to be impeached.

as a result of the very nature of the claims and defenses in this
case.  Plaintiff reiterates her argument, addressed in
subsections III.A and III.B, supra, that because the definition
of "core course" in the 1995-96 bylaws was not facially neutral,
the bylaws are not subject to a reasonable modification defense.
See New Directions Treatment Services, 490 F.3d at 305 (holding
that "it is inappropriate to apply the 'reasonable modification'
test to facially discriminatory laws").  Instead of being able to
raise a reasonable modification defense to her disparate
treatment claim, Plaintiff argues, the NCAA may argue in defense
that its policies were "necessary for the provision of the . . .
accommodations being offered."  42 U.S.C. § 12182(b)(2)(A)(i).
According to Plaintiff, because the NCAA will have to argue that
the allegedly discriminatory provisions in its bylaws were
necessary to the provision of its accommodations, its defense
will, by its very nature, contest the feasibility of alternative
policies.

        In light of its ruling, supra, that the NCAA's bylaws were
not facially neutral, the Court is inclined to agree with
Plaintiff that the NCAA will be compelled to controvert the
feasibility of alternative policies in defending its bylaws as
"necessary for the provision of the . . . accommodations being
offered."  Id.  If the NCAA argues in defense of its initial
eligibility policies that no alternative measures were feasible

on account of the necessity of those policies to its program, or
if the NCAA introduces such evidence of infeasibility, then
Plaintiff may at trial renew her attempt to introduce evidence of
pre-Decree bylaw changes in order to demonstrate that such
alternative measures were available.  The Court will grant the
NCAA's motion to preclude pre-Decree Bylaw changes without
prejudice to Plaintiff's right to seek to introduce such evidence
if the NCAA has "controverted" the feasibility of alternative
policies in its defense.  Fed. R. Evid. 407.  If so, this
determination could be revisited before Plaintiff's rebuttal
case, or before the Plaintiff's cross-examination of an NCAA
witness who testifies to such infeasibility of alternative
policies of the type contained in the post-1996 Bylaw changes.

## IV.  CONCLUSION

As the Court explains above, it will grant in part and deny
in part Plaintiff's motion to preclude Defendants' "reasonable
modification" and "waiver proceeding" defenses consistent with
the reasoning set forth in this Opinion, and will grant the
NCAA's motion to exclude evidence of the 1998 Consent Decree and
pre-Decree bylaw changes without prejudice to Plaintiff's renewal
of its request to introduce evidence of pre-Decree bylaw changes
if the NCAA controverts the feasibility of alternative policies
in its defense.  In addition, Plaintiff's motion to exclude
after-acquired evidence will be granted, and Plaintiff's motion

to preclude the NCAA from contesting that Bowers was disabled
will be denied.  The accompanying Order will be entered.




**July 1, 2008**                              **  s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              United States District Judge